```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
   Criminal Action No. 15-CR-00200-REB
 3
   UNITED STATES OF AMERICA,
 4
        Plaintiff,
 5
   vs.
 6
   SHAWN SHIELDS,
 7
        Defendant.
 8
   _____
 9
                     REPORTER'S TRANSCRIPT
10                   (Jury Trial – Day 1)

11 _____

12         Proceedings before the HONORABLE ROBERT E. BLACKBURN,

13 Judge, United States District Court for the District of

14 Colorado, commencing at 8:58 a.m., on the 20th day of February,

15 2018, in Courtroom A1001, United States Courthouse, Denver,

16 Colorado.

17

18

19

20

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
        Produced via Computer by Tracy Weir, 901 19th Street,
25       Room A258, Denver, Colorado 80294, (303) 298-1207
```

1                          **APPEARANCES**

2              VALERIA SPENCER and CLAY COOK, Assistant U.S.

3    Attorneys, 1801 California Street, Suite 1600, Denver, Colorado

4    80202, appearing for the plaintiff.

5              ABRAHAM HUTT and DAVID BELLER, Attorney at Law,

6    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

7    Colorado 80202, appearing for the defendant.

8                          *   *   *   *   *

9                          **PROCEEDINGS**

10             (In open court at 8:58 a.m.)

11             *THE COURT:*  Good morning, and thank you.  Please be

12   seated.

13             Very well.  We open the record in open court operating

14   deliberately intentionally outside the presence and hearing of

15   all prospective jurors to conduct continuing pretrial

16   proceedings in case 15-cr-00200, formally identified as United

17   States of America versus Shawn Shields.

18             Mr. Shields, good morning.

19             *THE DEFENDANT:*  Good morning, Your Honor.

20             *THE COURT:*  Counsel, good morning.

21             Very well.  I believe the Government had a concern,

22   and, thus, the Government may be heard.  Ms. Spencer.

23             *MS. SPENCER:*  Thank you, Your Honor.  May I speak from

24   the microphone or do you prefer I go to the podium?

25             *THE COURT:*  I would prefer the podium, please.  Thank

1    you.

2          *MS. SPENCER:*  Your Honor, the defense filed their

3    proposed voir dire at document 100.  I had two concerns with it

4    that I wanted to raise with the Court before the panel is

5    brought in; specifically, one is the raising of choice of evils

6    or necessity.  I think that the Court's order previous to this

7    sort of obviates the need for that.

8          I was concerned about the Court's discussion with us

9    about not getting into specific facts.  There are some

10   questions that were so directly related to the facts of this

11   case that they're not even an analogy.  I just wanted to raise

12   those to the Court's attention in terms of our objection to the

13   defense being allowed to go into those.

14         *THE COURT:*  Very well.  Thank you.

15         *MS. SPENCER:*  Thank you.

16         *THE COURT:*  Response on behalf of Mr. Shields,

17   Mr. Hutt.

18         *MR. HUTT:*  Actually, no, Your Honor.  I suppose I have

19   the same questions.  I had hoped that the questions I crafted

20   with regard to the issues regarding Mr. -- the facts of the

21   case take place in a prison -- would be appropriate within the

22   Court's rules.  I tried to craft them that way.  So I guess

23   that's the only response I have to the Court.

24         *THE COURT:*  Thank you.

25         Directing your attention to the paper entitled "Shawn

1  Shields Proposed Voir Dire Questions," document 100, filed
2  February 12, 2018, commencing on page 1.  The objection of the
3  Government to the final question on that page is sustained.

4       First of all, the question implies a legal standard
5  that is neither correctly nor completely stated.  To that
6  extent, it creates a misimpression and misapprehension
7  unnecessarily and unreasonably on the part of the prospective
8  jurors.

9       Turning to page 2, all three questions are simply out
10  of bounds; to rehearse, at the time of the Trial Preparation
11  Conference, I advised counsel that I was neither intimidated
12  nor frustrated by attorney-conducted voir dire examination, and
13  then I admonished counsel to eschew the commission of the two
14  great and deadly sins normally associated with
15  attorney-conducted voir dire examination.

16       The first, the reiteration unnecessarily of a question
17  asked and answered is not implicated.  The second is that this
18  is not the opportunity for counsel to become case specific,
19  case theory specific, fact specific, or evidence specific.  All
20  three questions on page 2 of the proposed voir dire examination
21  violates and offends that admonition and, for that reason, the
22  objection of the Government is sustained as to those three
23  questions.

24       Further business now by the Government?
25       *MS. SPENCER:*  None.  Thank you, Your Honor.

1          *THE COURT:*  Or by the defense?

2          *MR. HUTT:*  No, Your Honor.

3          *THE COURT:*  I digress.  I'm going to supplement my

4    ruling with respect to the three questions on page 2 of the

5    proposed voir dire that I just addressed.

6          In addition, these questions are -- these

7    fact-specific questions are being posed to prospective jurors

8    in the abstract without sufficient or any factual context and

9    without concomitant and important instruction by the Court,

10   and, for those reasons, the objection of the Government is

11   likewise sustained.

12         Now, addressing the defense that this matter was not

13   filed under seal or restriction, the Court has issued its writ.

14   It's my understanding that Mr. Heisler will be produced as

15   required by the defense.

16         I'm also advised, however, by the United States

17   Marshals that he's upset, he's frustrated, he has no idea why

18   he has been called.  Mr. Hutt, I presume you'll rectify that,

19   of course, between now and the time of the calling of the

20   witness.  The marshal is concerned by an

21   in-court-in-the-presence-of-the-trier-of-fact demonstration

22   which, of course, might work prejudice to the parties,

23   including Mr. Shields.

24         Since this is a defense witness, Mr. Hutt, I will

25   require that you ameliorate or extenuate those potential issues

 1   insofar as possible.

 2          I'm not coercing or requiring a response, however.

 3   This is your opportunity to make an additional record.

 4          *MR. HUTT:*  I would like to, Your Honor.  May I have a

 5   moment?

 6          *THE COURT:*  You may.  I want you to consider one other

 7   thing.  Do you know whether this witness is likely to invoke

 8   his Fifth Amendment right not to testify?

 9          *MR. HUTT:*  I do not know, Your Honor.

10          *THE COURT:*  All right.  That needs to be ascertained,

11   of course, outside the presence and hearing of the jury because

12   under Tenth Circuit precedent, it is absolutely improper to

13   require a witness to take the stand, be sworn, and then invoke

14   his right against self-incrimination under the Fifth Amendment

15   in the presence of the jury.

16          *MR. HUTT:*  I understand, Your Honor.

17          *THE COURT:*  Very well.

18          *MR. HUTT:*  May I have a moment?

19          *THE COURT:*  You may.  Thank you.

20      (Pause in proceedings.)

21          *MR. HUTT:*  Your Honor, if I may.

22          *THE COURT:*  You may.  Thank you.

23          *MR. HUTT:*  Mr. Heisler, we have put on the witness

24   list as a witness going to the defense that I have endorsed

25   and, obviously, made record of to the Court previously with

1    regard to necessity, a defense that I understand the Court to

2    have ruled quite clearly in a number of ways now is not

3    available to Mr. Shields in this matter.

4         *THE COURT:*  Not entirely.  Based on the record that

5    was available to the Court, I'm dubious that Mr. Shields can

6    make the foundational, evidential showing that would be

7    required to instruct the jury on the affirmative defense of

8    necessity, sometimes known as coercion, duress, or choice of

9    evils, but I am not going to foreclose him altogether in an

10   effort to mount that defense.

11        What you're probably about to tell me is you don't

12   need Mr. Heisler, and what I'm telling you is, I have not

13   completely forever and all times, foreclosed the opportunity,

14   at least, to present some evidence about which the Court may be

15   totally unaware or has not been able to posit in its limited

16   judicial prescience.

17        *MR. HUTT:*  I think I understand what the Court is

18   saying.  So I need to ask the Court if we can return to the

19   question, the voir dire questions, because, again, I believe

20   that I crafted the initial question in a way that is consistent

21   with Tenth Circuit on Mr. Shields' burden of proof with regard

22   to establishing necessity, and that it is that -- it is to find

23   out whether or not there are jurors who simply do not believe

24   that that is ever an appropriate defense.

25        *THE COURT:*  Ask that question, but not by making

1  specific reference to a sharpened object in the rectum of an

2  inmate.

3          *MR. HUTT:*  Okay.  May I have a moment, Your Honor?

4          *THE COURT:*  You may.

5          *MR. HUTT:*  The question I thought to posit, the very

6  first one in that subject matter, at the end of the first page

7  states that "The law states that there are limited times when a

8  person can be found not guilty of a crime if he has shown that

9  he committed the crime trying to avoid imminent harm to himself

10  or others," which I believe to be a correct statement of the

11  Tenth Circuit law on the obligation.

12          I go on to say, "This is sometimes referred to as

13  having to make a choice of evils or as a crime being excused by

14  necessity," and then I asked the question, "Do you believe it

15  should never be a defense to a crime that it was done to avoid

16  another in imminent harm?"

17          I think I have stated the law correctly, but if I'm

18  understanding right, the Court is saying that that's not an

19  appropriate question because it does not state the law

20  properly?

21          *THE COURT:*  Well, I'll treat this as your oral motion

22  to reconsider my ruling with respect to that one question, the

23  final question on page 1 of your proposed voir dire

24  examination.

25          Once you've completed argument, I'll invite response

```
 1   by the Government and then rule on your motion to reconsider.
 2           MR. HUTT:  Thank you, Your Honor.  That is my motion.
 3   I'd ask the Court to allow, based on its present ruling about
 4   the potential availability of that defense, to allow me to ask
 5   it.
 6           THE COURT:  Very well.  Response by the Government.
 7           MS. SPENCER:  I'm concerned when the defense is
 8   beginning to instruct the jury on the law.  That is not our
 9   job.  That is the Court's job.
10           So by starting off saying, "The law states" and going
11   through, that is a concern.
12           We have briefed the issue of necessity and its
13   availability in this case.  We continue to believe the defense
14   will not be able to gather the facts to support any kind of
15   necessity, choice of evils, et cetera.  I believe it is
16   inappropriate.
17           What I heard the Court say is they can ask the basic
18   question about necessity but not stating what they believe the
19   law to be.
20           As the Court has already said, it's an incorrect
21   statement.  I don't have more to say about it.
22           THE COURT:  Thank you.  Erring on the side of caution
23   and on the side of affording Mr. Shields in particular a fair
24   and full opportunity to present, if he can, facts related to
25   the affirmative defense of necessity during trial, I'm going to
```

1    grant the oral motion to reconsider and allow counsel to ask

2    the final question on page 1 once it is scrubbed to make a

3    reference to what the law is.

4         *MR. HUTT:*  May I approach the podium, Your Honor?

5         *THE COURT:*  You may.

6         *MR. HUTT:*  Is it appropriately scrubbed if it simply

7    states, "There are limited times when a person can be found not

8    guilty of a crime," and take out the phrase "The law states

9    that"?

10        *THE COURT:*  That would satiate me.

11        *MR. HUTT:*  It would satisfy me, Your Honor.

12        *THE COURT:*  Implicitly -- well, underpinning that is

13   this must be what the law states.  In fairness to Mr. Shields,

14   I'll permit that question.

15        *MR. HUTT:*  Thank you, Your Honor.

16        *THE COURT:*  Very well.

17        *MR. HUTT:*  Thank you, Your Honor.

18        *THE COURT:*  Very well.  I presume no further business.

19   The prospective jurors are available, ready, willing, and able

20   to proceed.

21        Thus, the Court will be in recess for the time

22   necessary to impanel the first 31 prospective jurors.

23        Very well.  Madam Clerk, please declare the recess of

24   the Court.

25        (Recess taken at 9:15 a.m.  Voir dire commenced from

1    9:29 a.m. until 12:55 p.m, and a jury was seated.  The

2    transcript of voir dire is bound and filed under separate

3    cover.)

4              (In open court at 2:36 p.m.)

5              *THE COURT:*  Thank you.  As you choose, either be

6    seated or remain standing for the jury.

7              Madam Clerk, please retrieve the jury.  Thank you.

8         (Pause in proceedings.)

9              *THE COURT:*  Counsel, if you have not already done so,

10   please surrender your copy of juror questionnaires to

11   Ms. Roberson for destruction.  Of course, the originals will be

12   maintained as an integral part of the trial record.

13        (Pause in proceedings.)

14             *THE COURT:*  All rise for the jury, please.

15        (Jury in at 2:27 p.m.)

16             *THE COURT:*  Thank you.  Please be seated.

17             Ladies and gentlemen of the jury, good afternoon.

18   You've been provided with note-taking materials, which

19   signifies you may, if you choose, take notes during the course

20   of the trial.

21             Please, of course, write your name on your note-taking

22   materials.  The notepads may only be used by you in the

23   courtroom during the trial and then in the jury room during

24   your deliberations.

25             You may take your notes between the jury room and the

1    courtroom and no other place.  They don't leave with you during

2    the noon recess and don't go home with you at the end of the

3    trial day.  If you take notes, again your decision, do not let

4    your note-taking detract from your other trial activities

5    ongoing.

6          Frankly, I encourage you to take notes sparingly.

7    Please don't act as second court reporter.  Notes can be

8    particularly helpful in recording and recalling dates, times,

9    places, measurements, identities, and relationships.  Whether

10   or not you take notes, plan to rely, insofar as possible, on

11   your own memories and not your notes or the notes of your

12   colleagues.

13         At this time, I'm going to reread the Indictment to

14   you.  Again, an Indictment is the title of the formal charging

15   document used in federal court.  Again, I instruct you that

16   neither the Indictment, nor the charges or allegations in it,

17   are evidence in this trial and, therefore, you may not consider

18   the Indictment as evidence.

19         Count 1.  On or about March 18, 2015, in the state and

20   District of Colorado, the defendant, Shawn Shields, being an

21   inmate of a prison as defined in Title 18 United States Code

22   Section 1791(d)(4), did knowingly possess and obtain a

23   prohibited object; namely, a weapon other than a firearm or

24   destructive device, and an object that is designed and intended

25   to be used as a weapon as defined in Title 18 United States

1  Code Section 1791(d)(1)(B).

2          Please note Mr. Shields, the defendant, is not on

3  trial for any acts or conduct not specifically charged in the

4  Indictment which I just read to you.

5          Now, as we proceed, let me take this opportunity to

6  describe the step-by-step process that we shall use and follow

7  during the course and balance of this trial.  First, the

8  Government and the defendant may make an opening statement.

9  However, Mr. Shields, as the defendant, may defer his opening

10  statement until after the Government has presented and

11  completed its evidence in its case in chief.

12          I instruct you that opening statements are not

13  evidence.  Their purpose is to help you understand what the

14  evidence will be from the unique perspective, which is that of

15  the Government and Mr. Shields.  Therefore, what the attorneys

16  say to you or show to you during opening statements, that is

17  not evidence and may not be considered by you as evidence.

18          Following opening statements, the evidence will be

19  presented.  Evidence consists of the sworn testimony of the

20  witnesses, the exhibits received in evidence, and any fact that

21  is admitted, stipulated, or judicially noticed.  Again, the

22  Indictment and the allegations in it are not evidence.

23          The mere number of witnesses appearing for or against

24  a certain fact, issue, or proposition does not in and of itself

25  prove or disprove that fact, issue, or proposition.

1          There are two types of evidence from which you may

2    properly find the truth in this case.  One is direct evidence

3    presented by what we call a percipient witness, such as an

4    eyewitness or an ear witness.  All else is indirect or

5    circumstantial evidence; that is, the proof of certain facts

6    from which other facts may reasonably be inferred.

7          The law makes no distinction between direct and

8    circumstantial evidence.

9          The Government presents its evidence first.

10   Mr. Shields may cross-examine all witnesses and evidence

11   presented against him by the Government.

12         After the Government has presented its evidence and

13   completed its case in chief, the defendant may present evidence

14   in his own behalf, but, as I have told you now for the third

15   time, he's not required to do so.  I remind you that

16   Mr. Shields, as the defendant, is presumed to be innocent.  It

17   is the Government that must prove the guilt of Mr. Shields

18   beyond a reasonable doubt.  He does not have to prove his

19   innocence or call or examine any witnesses or introduce any

20   evidence, although he certainly may do some or all of that.

21         The Government, in turn, may cross-examine any witness

22   called by the defendant.  If Mr. Shields, the defendant,

23   presents evidence, then, under limited circumstances, the

24   Government may present what we call rebuttal evidence.

25         At the conclusion of the evidence, regardless of who

1    presents it, I'll instruct you on the rules of law you are to

2    use in reaching your verdict in this case.  I will read those

3    rules of law to you from written jury instructions.  You'll

4    have the originals and, oh, by the way, you will have your own

5    set of copies for your convenient reference.

6         After you've heard the evidence and I've instructed

7    you on the law, the parties will make their closing arguments,

8    sometimes called final arguments or summations, commencing with

9    the Government, followed by the defense, and then concluding

10   with the Government by rebuttal.

11        It's at that point that I will formally submit or

12   transfer this case to you to commence your solemn

13   deliberations.  In the meantime, you must be those incredibly

14   patient persons that I discussed with you during the jury

15   selection process.

16        Your purpose as jurors is to decide what the facts

17   are.  That decision must be based only on the evidence and the

18   reasonable inferences, deductions, and conclusions that you

19   draw from that evidence.

20        Once again, neither sympathy, bias, prejudice, or

21   public opinion should influence your participation in this

22   trial.

23        I've already predicted that you'll have to decide what

24   testimony to believe.  You should carefully consider all of the

25   testimony given and the circumstances under which each witness

1    testifies.  Consider each witness's knowledge, motive, state of

2    mind, demeanor, and manner while on the witness stand.

3         Consider the witness's means of knowledge, ability to

4    observe, and strength of memory.

5         Consider, also, any relationship each witness may have

6    to either side in the case, the manner in which each witness

7    might be affected by the outcome of this trial, and the extent

8    to which, if at all, each witness is either supported or

9    contradicted by other evidence or testimony presented during

10    the trial.

11         You should consider all facts and circumstances shown

12    by the evidence which affects the credibility of the witness's

13    testimony, and then you and you alone may believe all of the

14    testimony of a witness or only part of that testimony, or

15    absolutely none of that testimony.

16         Now, I repeat, it's my job to decide what rules of law

17    apply in the trial of this case.  Consistent with your solemn

18    oath, you must follow all of those rules as I instruct you, as

19    I explain them to you.

20         You are not at liberty to follow some and ignore

21    others.  Even if you disagree or don't understand the rationale

22    for a given rule of law, nevertheless, you must follow it as

23    you are instructed.

24         You will apply those rules of law to the facts you

25    find from the evidence and, in that way, you will determine if

1    the Government has proven the guilt of Mr. Shields beyond a

2    reasonable doubt.

3           Concerning reasonable doubt, an important term.  It is

4    not required that the Government prove guilt beyond all

5    possible doubt.  The test is one of reasonable doubt.  Proof

6    beyond a reasonable doubt is proof that leaves you firmly

7    convinced of the defendant's guilt.  There are few things in

8    this world that we know with absolute certainty, and in

9    criminal cases the law does not require proof that overcomes

10   every possible doubt.  It is only required that the

11   Government's proof exclude any reasonable doubt concerning the

12   defendant's guilt.

13          A reasonable doubt is a doubt based upon reason and

14   common sense after a careful and impartial consideration of all

15   the evidence or lack of evidence in the case.  It is not a

16   vague, speculative, or imaginary doubt, but a doubt that would

17   cause a reasonable person to hesitate to act in a matter of

18   importance to himself or herself.

19          If, based on your consideration of the evidence, you

20   are firmly convinced that Mr. Shields is guilty of the crime

21   charged in the Indictment, you must find him guilty.

22          If, on the other hand, you think there is a real

23   possibility that he is not guilty, you must give him the

24   benefit of the doubt and find him not guilty.

25          Testimony and exhibits may be admitted in evidence

1    during the trial if they satisfy certain legal requirements.

2    It's the duty of an attorney to object when testimony or other

3    evidence is offered which the attorney believes is

4    inadmissible.  In fact, only by offering an objection may an

5    attorney request and receive a ruling from the Court on the

6    admissibility of such evidence.

7         For your part, you must not be prejudiced against any

8    attorney or party because an attorney makes an objection, and

9    do not attempt to interpret my rulings on objections as somehow

10   indicating how I think you should decide this case.  I am only

11   ruling on limited legal questions.

12        Now, at times I may sustain objections or direct that

13   you disregard certain questions, testimony, exhibits, or other

14   information.  In those circumstances, you may not guess or

15   speculate about what the answer or evidence might have been.

16   You must not consider any evidence to which an objection has

17   been sustained or which I have instructed you to disregard.

18        At times, I may overrule objections to questions or

19   answers.  In those circumstances, you must not give such

20   evidence any more weight simply because I overruled the

21   objection.

22        Overruling an objection is not the equivalent of me

23   endorsing or supporting the evidence at issue.

24        At times, I may limit the introduction of evidence to

25   a specific purpose.  You may not consider that evidence for any

1    other purpose.  Any evidence to which I've sustained an

2    objection or which I have stricken or instructed you to

3    disregard must be disregarded entirely.

4         Legal arguments occasionally are required to be

5    considered outside your hearing, and in some instances outside

6    your presence altogether.

7         Please understand while you are waiting patiently,

8    we'll be working diligently to resolve the issue or issues then

9    under consideration.

10        Of course, we'll do what we can to minimize the number

11   and length of those conferences.  In fact, I may not grant the

12   request of a party to be heard at my bench or outside your

13   presence, and do not be prejudiced for or against any attorney

14   or party if I grant or deny a request for a conference at my

15   bench.

16        Periodically, but hopefully not often, it may be

17   necessary for me to admonish counsel.  You should not be

18   prejudiced against an attorney or the client represented by

19   that attorney because of any such admonishment.

20        All rulings I'm required to make during this trial

21   will be based solely on the law that applies.  You must not

22   infer from any ruling or from anything I say or do during the

23   trial that I hold any views either for or against the

24   Government or Mr. Shields in this case.

25        Now, I do not permit jurors to ask questions of the

1   witnesses or the attorneys.  Therefore, please do not interrupt

2   the attorneys during their examination of witnesses or

3   otherwise.  However, there's one important exception.  If you

4   are unable to hear a lawyer or witness, please bring that to my

5   attention, and I will rectify that situation for you.

6        During recesses, like the noon recess you just

7   experienced, and at the end of the day, you will be free to

8   separate, leave the federal courthouse, go your separate ways

9   for the time of that recess, subject always to the continuing

10  ongoing rules that govern your participation in this trial.

11       Now, I've got a courtroom deputy, Ms. Roberson.

12  You've met her.  You've interacted with her.  She's going to

13  serve as your initial bailiff.  She's here to take care of your

14  needs during the course of this trial.  She is not your

15  attorney and do not discuss this case with her, do not seek

16  legal advice about this case from her.  If you have a personal

17  problem or need, by all means, take that up with Ms. Roberson,

18  who, in turn, will take the matter up with me.

19       Now, among you are 12 regular and one alternate juror.

20  12 regular jurors and one alternate.  Here's the beauty.  That

21  alternate juror will remain anonymous until the commencement of

22  deliberations of the 12 regular jurors.  Therefore, all of you

23  must pay close attention to all that transpires during the

24  trial of this case.  You may not assume from your seating

25  position that you are a regular or the alternate juror.

1    Now, under Federal Rules of Evidence, Rule 615, except

2 for the defendant, advisory witnesses, and witnesses granted

3 exemptions from sequestration, all other witnesses who may

4 testify during the trial must now leave and remain outside the

5 courtroom and shall not discuss their testimony with anyone,

6 except counsel, pending further order of Court.

7    Each party shall advise all prospective witnesses

8 endorsed by them of the Court's now effective sequestration

9 order.

10    Very well.  To opening statements.  If the Government

11 is ready to make opening statements, it may.  Mr. Cook.

12    *MR. COOK:*  Thank you, Your Honor.

13    *THE COURT:*  You're welcome.

14                    **OPENING STATEMENT**

15    *MR. COOK:*  Technology can be a blessing or technology

16 can be a curse.  Technology is a blessing when that technology

17 frankly works or is helpful to you, such as a GPS application

18 on a smartphone to get you from point A to point B without

19 incident.

20    On the other hand, technology can be a curse when it

21 fails to work or with that same GPS application you spend 20

22 minutes driving around downtown Denver trying to be find the

23 courthouse when it was right in front of you the entire time.

24    In rare instances, technology can both be a blessing

25 and a curse when we're talking about the same piece of

1   technology and the same use depending on the perspective.  This

2   is particularly the case in law enforcement when a new piece of

3   technology is employed to detect criminal activity.  It is a

4   blessing for the law enforcement entity, law enforcement

5   officers, and the public at large.

6          On the other hand, the same piece of technology that's

7   being used is a curse for that person who is committing that

8   crime.

9          In this case, when the defendant realized technology

10  was no longer on his side, he lamented that very technology

11  with these words, "Okay.  You got me.  Damn technology today is

12  a bitch.  Just escort me to a cell, and I'll give it to you.

13  That's my word."

14         Now, what exactly were the circumstances that led the

15  defendant to make that statement and why are we here today?  If

16  you allow me to take you back to March 18, 2015, as we go

17  through the chronology of events in this case, the Government's

18  evidence will show that on or about March 18, 2015, the

19  defendant was incarcerated at the United States Penitentiary

20  Administrative Maximum in Florence, Colorado.  As you heard

21  Judge Blackburn describe it this morning, that prison is also

22  known by the acronym ADX and sometimes called Federal Super Max

23  in Florence, Colorado.

24         On March 18, 2015, the defendant was incarcerated in

25  this prison particularly in a step-down unit known as joker

1    unit or J unit.  Step-down unit is where the inmates are

2    allowed to have more interaction with each other with less

3    barriers, they're out and about out of their cell more

4    frequently, and allowed to exercise together, among other

5    things.

6           It was the morning of March 18, 2015.  Officer Joe

7    Hill observed the defendant, along with two other inmates, one

8    Donald Heisler, exercising on the lower level.  The step-down

9    unit of joker is divided into two levels, upper and lower

10   level, separated by a staircase.  The defendant and Mr. Heisler

11   were exercising right near the staircase.

12          During the exercise routine, the defendant and

13   Mr. Heisler had a verbal disagreement which led Mr. Heisler to

14   lunge after the defendant.  The defendant quickly scurried up

15   the stairs to the second level, and the third inmate stepped in

16   and stopped Mr. Heisler from continuing after the defendant.

17          The defendant reached the second tier, walked briskly

18   to his cell, knelt down next to his cell, and appeared to

19   retrieve something from underneath his cell door that was

20   wrapped up in a towel.  He takes that item, tucks it in his

21   waistband, and continues to pace the upper tier while

22   Mr. Heisler stayed on the lower tier.

23          After a few moments, calmer heads prevail, and the

24   defendant and Mr. Heisler have a conversation in front of the

25   camera where they work out their differences.  Soon thereafter,

1    the unit is locked down, inmates are returned into their cell.

2    All the inmates in that housing unit are single celled meaning

3    they have no cellmates.  The unit is locked down, and shortly

4    thereafter the investigative unit arrives in the unit.

5            The investigative staff is led by Lieutenant Charles

6    Alvarez, Lieutenant Amy Kelley, and Officer Jaime Munoz.  Once

7    they enter the housing unit, they let the investigators know it

8    would remain on lock-down status.  As the housing unit is

9    searched, the cells are searched, the inmates involved in the

10   altercation are pulled out and interviewed and searched as

11   well.  That's exactly what happened in this case.

12           Mr. Heisler was pulled out of his cell, taken to an

13   interview room, was interviewed, and escorted from the housing

14   unit to a -- to the Special Housing Unit, which I'll talk about

15   shortly.

16           Soon thereafter, the defendant was also escorted out

17   of his assigned cell and, per normal procedures, the defendant

18   was handcuffed from behind, escorted to an interview room where

19   investigators spoke with him approximately ten minutes.

20           Soon thereafter, Officers Alvarez and Munoz escorted

21   the defendant still handcuffed from J unit to the Special

22   Housing Unit.  The Special Housing Unit is another area of the

23   ADX where inmates who are undergoing investigation are

24   temporarily housed while that investigation ensues.  It was in

25   the Special Housing Unit that once inmates enter, they go

1   through various search procedures that are standard for all

2   inmates.

3            One of those search procedures is for the inmate to go

4   through what is called the SecurPASS machine you heard about

5   this morning.  The SecurPASS machine is similar to the machines

6   at the airport that the TSA use for screening purposes.

7            One distinction between the SecurPASS machine and the

8   machine at the airport is instead of standing inside the

9   machine and the drum goes around you like at the airport, the

10  inmates are instructed to stand on a platform where they put

11  their feet on markers, black footprints on the platform, stare

12  down at another circular marker, and the platform physically

13  moves them through a doorway apparatus.  As the inmate is moved

14  through the doorway apparatus, an image is taking similar to an

15  x-ray.

16           As Lieutenant Alvarez and Officer Munoz escorted the

17  defendant into the Special Housing Unit, Officer Terral

18  Anderson, one of the officers working that day, took control of

19  the defendant who was still handcuffed from behind per normal

20  procedures, escorted him to the SecurPASS room, and placed him

21  on top of the platform.  Officer Anderson was running the

22  SecurPASS machine.  He operated it, ran the defendant through

23  the machine once and looked at the image on the computer

24  screen.  Officer Anderson noticed there was an odd-looking

25  object in the lower abdominal area of the defendant on the

1    screen.  He was unclear as to what the object was, but the way

2    it was glowing and the way it showed up on the screen, he knew

3    it was a foreign object of some sort.

4         Officer Anderson decided to get a second opinion.  He

5    went out and found Lieutenant Alvarez, brought Lieutenant

6    Alvarez in to view the image on the screen.  Lieutenant Alvarez

7    also observed the same object in the lower abdominal region of

8    the defendant.

9         Lieutenant Alvarez questioned the defendant whether he

10   had history of back surgery, if he had a screw placed in his

11   back.  The defendant responded he had; that there was a screw

12   placed in his back.  Lieutenant Alvarez lifted up the

13   defendant's shirt, scanned his body, looked at the lower back

14   region, and did not see scarring or anything that was

15   indicative of a prior back surgery.

16        At this time, Lieutenant Alvarez decided to place the

17   defendant back in the machine and run it through one more time,

18   the difference being this time he ordered the defendant to

19   raise his hands slightly above his back so the hands would not

20   be obstructing the image because the image had a slight

21   obstruction from hand restraints and wanted to make sure the

22   hand restraints were not the reason for the unknown object

23   showing up on the screen.

24        Lieutenant Alvarez instructs Officer Anderson to place

25   the defendant on the machine again and run him through one more

1    time.  They look at the image one more time and look and see

2    while the hand restraints are now up higher on the defendant's

3    back, the unknown object remains in the same spot.  It had not

4    changed.

5              At this point, Lieutenant Alvarez questions the

6    defendant or, in fact, orders the defendant to give up the

7    object that he had concealed, and the defendant said, "If you

8    show it to me on the screen, I will give it to you."

9              Lieutenant Alvarez escorts the defendant to the screen

10   where the defendant's allowed to look on the screen to visually

11   observe his own image, and at that point the defendant says,

12   "Okay.  You got me.  Damn technology nowadays is a bitch.  Just

13   escort me to a cell, and I will give it to you.  That's my

14   word."

15             Lieutenant Alvarez directs correctional officers to

16   escort the defendant to the adjacent interview room where they

17   secure him inside the room, remove his handcuffs, and through

18   the window on the door Officer Munoz and Lieutenant Alvarez

19   view the defendant go into the back of the room, place his

20   hands down the back of his pants, and after about ten seconds

21   remove an object from his rectum.

22             Now, the object is described as about 6 inches in

23   length covered in blood and feces.  The defendant brings the

24   object over to the door.  Officer Munoz was standing by with a

25   bed pan with a plastic bag inside.  The defendant deposits the

1    unknown object inside the plastic bag.

2         Officer Munoz secures the bag and removes it from the

3    Special Housing Unit.  We'll catch up with Officer Munoz in a

4    few moments.

5         At the same time, Officer Alvarez, to ensure the

6    defendant had removed all the items from inside his own body,

7    takes the defendant back into the SecurPASS room, runs him

8    through one more time, and the image shows up as negative for

9    contraband.  The unknown object in there before is now gone.

10        Meanwhile, Officer Munoz had taken the unknown object

11   to be photographed and to unravel the object.  As I mentioned

12   before, the outer layer is covered in blood and feces.  There

13   is an outer plastic wrapping.  They peel back an outer plastic

14   wrapping and reveal a second layer of wrapping made out of

15   toilet paper.  They pull back the toilet paper, unravel that,

16   and underneath the toilet paper is a homemade sheath,

17   cardboard-like sheath, and tucked neatly in the sheath are two

18   weapons commonly referred to as shanks.  One is a 4 1/2 inch

19   piece of metal sharpened to a point at one end, and the other

20   is a 1 1/2 inch piece of metal sharpened to a point that

21   resembles a razor blade.

22        Officer Munoz, after he concludes photographing and

23   documenting the weapon that was discovered, he secures that

24   weapon in an evidence locker.

25        Members of the jury, the Government is tasked with

1   proving the defendant's guilt beyond a reasonable doubt.  The

2   Government welcomes that burden, and the Government will meet

3   that burden.

4           The elements in this case are three-fold.  First, on

5   or about March 18, 2015, the defendant was an inmate of a

6   prison.  Second, that on or about March 18, 2015, the defendant

7   knowingly possessed an object.  Finally, the third, that object

8   was a prohibited object.

9           The term "prison" is defined as a federal correctional

10  facility or institution or any prison in which persons are held

11  in the custody by direction or pursuant to a contract or

12  agreement with the attorney general.  Likewise, prohibited

13  object is defined as a weapon other than a firearm or

14  destructive device that is designed or intended to be used as a

15  weapon.

16          Now, members of the jury, I ask you, what about

17  technology in this case?  Was it a curse?  Was it a blessing,

18  or was it both?  In the defendant's own words, he said, "Damn

19  technology nowadays is a bitch."

20          We ask you members of the jury to find the defendant

21  guilty of Count 1 of the Indictment.  Thank you.

22          *THE COURT:*  Thank you, Counsel.  Gentlemen for the

23  defense, will Mr. Shields be making his opening statement now

24  or later?

25          *MR. HUTT:*  We'd like to make it now, please, Your

1    Honor.

2              *THE COURT:*  And you may, of course, Mr. Hutt.

3              *MR. HUTT:*  Thank you, Your Honor.

4              *THE COURT:*  You're welcome.

5              *MR. HUTT:*  May I have a moment, Your Honor?

6              *THE COURT:*  You may.  Certainly.

7                          **OPENING STATEMENT**

8              *MR. HUTT:*  May I begin, Your Honor?

9              *THE COURT:*  And you may.  Thank you, Counsel.

10             *MR. HUTT:*  May the odds be ever in your favor.  Some

11   of you may recognize that line from a book, and I'm afraid

12   that's what you're going to hear about for the next couple

13   days.

14             Mr. Cook told you there was a verbal altercation and

15   they worked out their differences, and the truth about what

16   happened here, ladies and gentlemen, is that a man roughly

17   twice Shawn Shields' size told him, "I'm going to break your

18   fucking jaw and throw you off the tier," proceeded to go over

19   to a table, grab a weapon, and chase him up the stairs.  If you

20   don't believe me, let me show it to you on video because I have

21   no doubt the Government will introduce to you their Exhibit 3D.

22   For some reason -- it's there.  You'll get a chance, I promise

23   you, to be able to view this.  Let me just point out a couple

24   things to you.

25             You will see here a large man standing at the door of

1   the cell.  That large man is Donald Heisler who in a few

2   moments is going to threaten to kill Mr. Shields and going to

3   chase him up the staircase.  I'm going to fast forward.

4   Otherwise, it will take me all of my opening statement to show

5   you this 22, 23-minute video.

6           Let me just point out to you here that down here in

7   the corner you'll see someone gesturing.  That's Mr. Shields.

8   We'll get a better view of him in a minute.  Okay.  I went too

9   fast.  Don't worry.  I'll play it back for you.  I'll play it

10  back for you a couple times.

11          Take a look, please, very carefully because you see

12  Mr. Heisler right here.  If you have any doubt in your mind

13  what he's doing, you'll get a chance to look at that very

14  carefully.  This argument is on, and he has already told

15  Mr. Shields, "I'm going to break your jaw and throw you off the

16  tier."  What he does immediately after saying that is he walks

17  over to a table and grabs a sharpened pencil.

18          Mr. Shields, you'll see right here.  He's headed up

19  the stairs and away just as fast as he can.

20          Now intercedes a guy named Vincent Basciano who,

21  fortunately for Mr. Shields, happens to be present and is

22  willing to literally tackle Donald Heisler.  There's

23  Mr. Shields.  He's right here.  You keep watching what happens

24  with Mr. Basciano and Mr. Heisler.

25          I'm going to fast forward again.  Bear in mind the

1   guards, you will not see any of them here, because the guards

2   didn't come in.  Guards didn't lock everybody down at that

3   point.  The guards didn't say, everybody go to your cells

4   immediately.  The guards didn't say, Mr. Heisler, you get away

5   from Mr. Shields.  Mr. Shields, you get away from Mr. Heisler.

6   The guards did nothing.

7          You'll see another view of this where you'll see a

8   guard come out, stand behind a locked grate, and watch to see

9   what happens, and does absolutely nothing to intervene.

10         Now, eventually, during the course of the next 20

11  minutes, the cells do get locked, and you'll hear that they

12  lock these cells one by one.  That is, they don't open the

13  doors all at the same time and close all the doors at the same

14  time like on TV.  They close and open doors one at a time.

15         You will see each inmate in succession or apparent

16  succession going into his cell, and the door being locked

17  behind him one by one as the others remain out on what they

18  refer to as the range, this common area.

19         To establish the defense of necessity, Mr. Shields has

20  to show you that he was acting to prevent an imminent harm,

21  such as, "I will break your jaw and throw you off the tier";

22  that the action he took was reasonably related to preventing

23  that harm, and he reasonably believed that the action he took

24  would prevent that harm.  I'm going to show you that as well.

25  And, third, that he had no reasonable legal alternative to what

1   he did, and we will show you with this video and with the other

2   evidence you hear from all the witnesses who testify today and

3   tomorrow and the next day if we need it, that that was the

4   case; that he was doing whatever he could so that the odds

5   could ever be in his favor.

6           At one point, you will see here -- and it's funny --

7   in some ways funny -- Mr. Shields said to me, "I was using my

8   words."  You know how parents say, "Use your words."  You will

9   see that in an effort to employ every reasonable legal

10  alternative available to him because those guards are unwilling

11  to come in and intervene and to protect him, step two was, "I'm

12  going to use my words."  You will see on this video that he

13  spends five minutes at least, eight minutes, ten minutes.

14          So here's Mr. Shields up here where you saw the

15  cursor.  Here's Mr. Heisler down here.  Shields is staying away

16  from the danger.  What you're going to see is Mr. Heisler gets

17  up and charges upstairs.  Now Mr. Shields is going to use his

18  words.

19          Because understand for a minute, folks, please, who

20  Donald Heisler is.  This is a guy who, when interviewed by the

21  guards said, yeah, I went off and, yeah, if that other guy

22  wouldn't have gotten in the way, I would have killed him.

23  That's what he says in his interview.  They were adjusting my

24  meds and my moods were off.

25          You're talking about a dangerous, volatile, armed,

1   mentally ill man screaming at someone, "I will kill you."  The

2   guards do nothing.  So it's up to Mr. Shields now to use his

3   words.  You'll see him on here.  They don't record this so you

4   can't hear words, but you'll see Mr. Shields now spend -- as

5   the guards do nothing but watch.  Mind you, they're going to

6   tell you when we heard all this commotion, we went out and saw

7   this, we went back and looked immediately at the video.  We did

8   that.  We thought that what was going on is Mr. Shields went

9   and got a weapon.  If you look at it carefully -- I've already

10  showed it to you -- you can see Mr. Heisler goes for a weapon

11  on the table.

12         Understand what it is they're saying to you here.  We

13  have two guys in a confined area who we believe to be armed who

14  we did not go in to do anything about, who we did not lock down

15  the unit, who we did not order to stay away from one another,

16  who we did not say immediately, go to your cells.  None of

17  those things.  And may the odds be ever in your favor.

18         Keep watching this.  They talk and they talk and they

19  talk.  I'm going to show you a different angle for a second

20  because I'm confident the Government will show you Exhibit 3C

21  as well.  Here's what you're going to see happens.  After all

22  this is done -- you see the guy go into his cell.  You see the

23  door close.  That's actually the last guy going into his cell.

24  You see them talking.  You see Mr. Shields using his words, his

25  last alternative to keep himself from getting killed and, you

1    know what, thank God for him he's good at.  Mr. Heisler doesn't

2    try to kill him.  They go up here, talking to guards, standing

3    behind the grill, have other guys going to their cells.

4              I want to show you what happens.  There's one guy

5    going into his cell.  There's a second guy going into his cell.

6    There's Mr. Shields bringing the work-out equipment up into his

7    cell.  He's third door from the right.  He puts his stuff

8    inside.  His door closes.  Here's Mr. Basciano still out

9    walking around doing his thing not talking to the guards.  Goes

10   down, gets his stuff.  Comes upstairs, takes a drink of water,

11   and goes directly to his cell, right?  As ordered.  No.  Stops

12   at Mr. Shields' door to say, you know what?  We'll finish this

13   tomorrow at rec.

14             Now goes back a couple doors.  Do you see a guard come

15   out?  Do you see guards anywhere over here?  You will when you

16   look at it.  You'll see when they come out and you watch it

17   from this angle and they come out to watch and not do anything.

18             There's a counter down here.  You can see the time on

19   this.  Let me try it again.  See where it says 9:21?  This is

20   an excerpt.  It is just a counter.  It's not realtime.  It

21   starts down here at 00:01, 02, right, and goes all the way over

22   here to 22:13, 22 minutes 13 seconds.  First time we ever see a

23   guard come on to that range is 16 minutes 54 seconds.

24             So they're charging in to get these guys, right, to

25   make sure there's not a problem, right?  Nope.  They're coming

1    in to deliver laundry or commissary.  You see them come down,

2    kind of talk to people, take the bin around to various,

3    dropping stuff off at the cells because the video has told them

4    that they have two armed men, one of whom has threatened to

5    kill the other, and the other had to take ten minutes to talk

6    the guy off the ledge.

7            So, yes, what we are telling you is that this is that

8    rare circumstance where somebody has done the act, had

9    something prohibited and did it out of necessity, necessity in

10   the way the law describes, doing to prevent an imminent harm to

11   himself in the belief that what he's doing will prevent the

12   harm and having exhausted every other reasonable legal

13   alternative that he has.

14           Those things, ladies and gentlemen, are for you to

15   decide.  I expect the judge will tell you at the end of the

16   case.  We keep talking about reasonable.  That's why we have

17   jurors to decide what's reasonable.

18           You think you don't have to be desperately afraid of

19   your life to have that concealed in your rectum?  Because

20   that's it, ladies and gentlemen.  It's ugly, and I'm sorry.

21   It's their Exhibit 17.  I have no doubt they're going to show

22   it to you.  That's what we're talking about here.  May the odds

23   be ever in your favor.

24           You don't do that unless you have no other reasonable

25   legal alternative.  You don't do that unless a guy has

JOSEPH HILL – Direct

1   threatened to kill you.  You don't do that unless he's come to

2   your door right after this happened and the guards have done

3   nothing for the purpose of repeating the threat for the next

4   time they're together.  He is not guilty.  Thank you, Your

5   Honor.

6              *THE COURT:*  Counsel, thank you.

7              Very well.  To the evidence to be presented commencing

8   with the Government's case in chief.  Thus, if the Government

9   is prepared, it may call its first witness.

10             *MS. SPENCER:*  Thank you, Your Honor.  The Government

11  calls Joe Hill.

12             *THE COURT:*  Very well.

13             Joe Hill, good afternoon.  If you would come forward

14  to please be sworn by the Court.  To accomplish that, if you'll

15  make your way to stand in this open area.  Right there is fine.

16  Please raise your right hand to be sworn.  Thank you.

17             May I have your attention in the courtroom.

18        (**JOSEPH HILL** was sworn.)

19             *THE WITNESS:*  I do.

20             *THE COURT:*  Thank you.  Please be seated in that

21  witness stand.

22             Ms. Spencer.

23             *MS. SPENCER:*  Thank you, Your Honor.

24             *THE COURT:*  You're welcome.

25                         **DIRECT EXAMINATION**

JOSEPH HILL – Direct

1  BY MS. SPENCER:

2  Q    Can you introduce yourself to the jury and spell your last

3  name for the court reporter, please?

4  A    I'm senior officer Joseph Hill, H-I-L-L.

5  Q    Officer Hill, you're a senior officer where?

6  A    At the ADX in Florence, Colorado.

7  Q    Is that part of the Federal Bureau of Prisons?

8  A    Yes.  It is a United States Penitentiary Administrative

9  Maximum security, Federal Correctional Institution.

10 Q    How long have you -- can I call it ADX?

11 A    Yes.

12 Q    How long have you been at the ADX?

13 A    I've been there six years.

14 Q    You said you are a senior officer.  Tell us a little bit

15 about your career with the Bureau of Prisons and where you

16 worked and what your job titles have been.

17 A    I was hired to work at the ADX in 2012 as a correctional

18 officer.  I worked there the entire time, entire six years, and

19 I'm now a senior officer.

20 Q    What sort of duties do you have as a correctional officer?

21 A    I work in the general population step-down unit and inmate

22 escorts around the institution.  I do the daily duties of an

23 officer for recreation, feeding type procedures.

24 Q    We're going to unpack that in a moment.  I think I heard

25 you say ADX is a federal prison or federal institution.  Is

1  that accurate?

2  A    That's correct.

3  Q    Where is ADX located?

4  A    In Florence, Colorado.

5  Q    Is it part of a complex of other federal correctional

6  institutions there?

7  A    It is.  We have four institutions there.

8  Q    And I've heard it called the FCC.  Is that the Federal

9  Correctional Complex itself?

10  A    Yes, it is.

11  Q    All in Florence, Colorado?

12  A    Yes.

13  Q    How many prisons are designated as an ADX within the

14  Federal Bureau of Prisons?

15  A    There's only one ADX within the Federal Bureau of Prisons.

16  Q    What distinguishes ADX from a United States Penitentiary?

17  How are they different?

18  A    United States Penitentiary is maximum security.  United

19  States Penitentiary Administrative Maximum is, inmates are

20  housed separately.  They are not allowed access to one another

21  in the ADX.

22  Q    Housed separately.  They do not have cellmates?

23  A    They do not.

24  Q    In the United States Penitentiary, USP, they have

25  cellmates?

1   *A*   They do.

2   *Q*   How many units are in ADX?

3   *A*   Nine total, five general population.

4   *Q*   When you say "general population," what does that mean?

5   *A*   That means the inmates are housed single cell.  Their

6   recreation is conducted outside in recreation areas.  They are

7   moved to and from their cell by two unit officers.  Their

8   showers are contained inside their cell.  Programming is done

9   on a closed circuit television system inside their cell.

10  *Q*   So they're kept pretty much to themselves; is that

11  accurate?

12  *A*   Yes.

13  *Q*   Do they have the ability to have physical contact with each

14  other?

15  *A*   They do not.

16  *Q*   You indicated there was recreation outside.  How about

17  outside in the yard?  Do the inmates have contact with one

18  another there?

19  *A*   Outside they have separate recreation areas but are secure

20  inside, one per recreation.

21  *Q*   They're not allowed to have physical contact with one

22  another?

23  *A*   No.

24  *Q*   Contrast that with the step-down unit.  You spoke of the

25  step-down unit.  How is that different than general population?

JOSEPH HILL - Direct

1    *A*   A step-down is where we house inmates with less restrictive

2    housing.  They are put in groups of no more than eight and

3    allowed to come back and interact with each other as they would

4    inside a United States Penitentiary.

5    *Q*   What does the step-down refer to, stepping to where?

6    *A*   It is a four-step process they use to move inmates into

7    less restrictive housing so they can eventually transition into

8    a USP.

9    *Q*   A United States Penitentiary?

10   *A*   Yes.

11   *Q*   So the step-down unit, do the inmates have physical contact

12   with one another for parts of the day?

13   *A*   Yes.

14   *Q*   What parts of the day may they have contact with one

15   another?

16   *A*   During indoor recreation and during outdoor recreation.

17   *Q*   We'll talk more about that specifically as well.  I want to

18   direct your attention to March 18, 2015.  Do you recall that

19   date?

20   *A*   Yes, I do.

21   *Q*   Were you working at ADX that day?

22   *A*   Yes.

23   *Q*   What shift were you working?

24   *A*   Day watch, 7:00 to 3:00.

25   *Q*   7:00 a.m. to 3:00 p.m.?

JOSEPH HILL - Direct

1   A    Yes.

2   Q    What unit were you assigned to that day?

3   A    J unit.

4   Q    And is J unit a step-down unit?

5   A    Yes, it is.

6   Q    Were you a senior officer, then, in 2015?

7   A    I do not recall.  I believe so.  I believe I had just

8   gotten my senior officer.

9   Q    You get on shift at 7:00 a.m.  Do you go immediately to J

10  unit and start doing something there?

11  A    When I get to the institution at 7:00 in the morning, I

12  stop by the lieutenant's office, I check to make sure the

13  lieutenant knows I'm there, check to sign my posted picture

14  file, and then I head down to the unit.

15  Q    You used some language I don't know.  "Posted picture

16  file"?

17  A    Yeah.  Profiles of all the inmates in ADX so we are aware

18  of who is housed there.

19  Q    Okay.  Their actual pictures with their names so you can

20  look and identify this is who that person is?

21  A    Yes.

22  Q    Is that something that's a regular part of your duties to

23  do everyday when you come on shift?

24  A    It's done monthly.

25  Q    Monthly.  You did it at that point.  Did you know you were

JOSEPH HILL - Direct

1  going to J unit before you came to work on March 18?

2  A   Yes, I did.

3  Q   Was that your regular unit, or were you assigned there in

4  the interim?

5  A   I was assigned to a relief post.  I went to J unit one day

6  a week.

7  Q   I have heard a phrase "No. 1 officer."  Were you the No. 1

8  officer in J on March 18?

9  A   Yes, I was.

10  Q   What does that mean?

11  A   It means I'm responsible for inventory checks, daily

12  security inspection sheets, filling out the daily log book and

13  overall oversight of the unit activities for that day in the

14  unit.

15  Q   Who are the other officers on shift with you?

16  A   I have a control center officer who runs the doors inside

17  the control center.  Number 2 officer and number 3 officer.

18  Q   What are the No. 2 and 3 officers' duties that are

19  distinguished from yours?

20  A   Number 2 officer has oversight on the JB side.  I work on

21  JA side.  The number 3 assists me in JA movements and duties

22  and also assists No. 2 in JB duties and movements.

23  Q   Something new for us.  You are on the A side.  Is that an A

24  unit or range?  How do we distinguish?

25  A   JA unit.

JOSEPH HILL - Direct

1   *Q*   Just JA.  So you are responsible for JA.  Number 2 is

2   responsible for JB?

3   *A*   Yes.

4   *Q*   Two totally separate units?

5   *A*   Totally separate.

6   *Q*   Okay.  I neglected to ask you when you were talking about

7   the cells, you said in the general population that a cell,

8   those inmates have a shower within their own cell; is that

9   correct?

10  *A*   Yes.

11  *Q*   So when we get to JA, is that different?

12  *A*   Yes.  Their showers are on the range.

13  *Q*   Okay.  We'll look at a diagram momentarily.  What is the

14  layout of the cell in the JA units?

15  *A*   Inside JA, they have a bunk to sleep on.  They have toilet

16  facilities and a sink and a drinking fountain, and they have a

17  shelf with a television.

18  *Q*   What is removable in that cell?  When you hear "bunk," I'm

19  thinking of a metal contraption.  Is that accurate or not?

20  *A*   No.  Their bunks are solid cement attached to the floor,

21  all one-piece.

22  *Q*   Similar to the toilet and sink, are those pieces that can

23  be removed?

24  *A*   The toilet and sink are attached to the wall and floor and

25  welded in place.

JOSEPH HILL - Direct

1  *Q*   The shelf, what is that made of?

2  *A*   One of two things, either cement that has been built in

3  one-piece construction with everything else, or it is metal and

4  it is welded to the wall with bolts.

5  *Q*   I want to show you a diagram.  I'm not sure if the exhibit

6  notebook -- I believe it is up there -- I'm going to ask you to

7  flip to Exhibit 2.  Let me know when you've gotten there.

8  *A*   I'm there.

9  *Q*   Do you recognize what Exhibit 2, pages 1 and 2, is?

10 *A*   Yes.  It is the layout of JA unit, the top tier and bottom

11 tier.

12 *Q*   Is that an accurate depiction of what J unit A range looked

13 like on March 18, 2015?

14 *A*   Yes, it is.

15       *MS. SPENCER:*  Move to admit Exhibit 2.

16       *THE COURT:*  Response?

17       *MR. BELLER:*  No objection.

18       *THE COURT:*  Exhibit 2 for identification admitted in

19 evidence with leave to publish and discuss in the presence of

20 the jury.

21 Q  (By Ms. Spencer)  How many inmates are in the J unit on A

22 range, Officer Hill?

23 *A*   No more than eight inmates per group, 16 inmates per floor,

24 32 in total.

25 *Q*   Tell us what we're looking at right now, what's been pulled

JOSEPH HILL - Direct

1  up and the jury has access to that.  Is that the upper or lower

2  tier?

3  A   This is the top floor of the unit.

4  Q   I see some names on this.  What are those names indicating?

5  A   Those names indicate which inmate is in which cell.

6  Q   I see highlighted it says Shields.  Is that where inmate

7  Shields was living on JA on March 18?

8  A   Yes, it is.

9  Q   Can you tell us what cell number it is?  My eyes aren't

10  good enough.

11  A   Cell A205.

12  Q   Now I can see it better.  Is there a schematic for the

13  control officer who has this who knows where everybody is and

14  the numbers of the cells or some way to refer to that for

15  officers?

16  A   Yes.  Inside the control center there is a computer screen

17  they use to control all doors inside the unit.

18  Q   Also on this page that we're looking at on Government's

19  Exhibit 2 it has camera designations in red.  What is that?

20  A   There are cameras throughout the unit that they can view

21  different areas from the control center and from upstairs.

22  Q   When you say "from upstairs," what do you mean by that?

23  A   The Special Investigative Services Department.

24  Q   The Special Investigative Services Department has camera

25  views as well?

JOSEPH HILL – Direct

1    *A*    Yes.

2    *Q*    So they -- camera reviews.  They must have an electronic

3    device they can use to watch this; is that correct?

4    *A*    Yes.  They have screens they can use.

5    *Q*    Who is it who can see it in JA?  Is that all the officers

6    or somebody in particular who is watching this?

7    *A*    The control center officer watches the cameras.

8    *Q*    I want to move to the second page, which is the lower tier.

9    When we look at that, you've been talking about the control

10   unit and things of that nature.  Can you point out on the

11   diagram where that is?

12   *A*    Control center is there, J134.

13   *Q*    What does that mean?  What is it comprised of?

14   *A*    That is where an officer sits.  He has camera views of all

15   the cameras in the unit, including the indoor recreation area

16   and outdoor recreation area.  He controls all doors and grills

17   inside the unit and the grill to exit the unit.

18   *Q*    Can you show us where the grill to exit the unit is that

19   you're talking about?

20   *A*    It does not show a grill to exit the unit.  It shows a

21   grill to exit the range.

22   *Q*    Thank you for correcting my inappropriate language.  What

23   do you mean by that?

24   *A*    This is the range here.  That is the front bars, front

25   grill to the range where inmates are housed.  Right here in

JOSEPH HILL - Direct

1   this white opening, that is where the range grill that is

2   opened and closed for us to enter the range and exit the range.

3   Q   The control officer in that range A134 controls that door

4   opening and closing?

5   A   Yes, it does.

6   Q   By your testimony, are you indicating the guards are on one

7   side of the grill and the inmates on the other side?

8   A   Yes.

9   Q   Why is that?

10  A   We do not have direct contact with the inmates inside of J

11  unit.  They're always kept separate from us.

12  Q   Is that the same in the general population units as well?

13  A   Yes.  Only contact we will have with an inmate is if they

14  are restrained prior to any doors between us being opened.

15  Q   You said you began your shift on March 18, 7:00 a.m.  What

16  time did you actually get to the JA unit?

17  A   I do not recall the exact time.  Normally, ordinarily, I

18  will show up anywhere between 6:55 and 7:05.

19  Q   In terms of this, I didn't ask, on the main floor where we

20  see another camera, are there tables or anything in the general

21  space of that range on the lower floor?

22  A   In this open area right here, there are tables for the

23  inmates to sit at, play games, read the newspaper, and there's

24  also a law library that is attached to the floor in there.

25  There is also a dip bar that is attached to the floor -- well,

JOSEPH HILL – Direct

1   right by the stairs, the white spot by the stairs.

2   Q   Show us where you're saying where the stairs are.

3   A   Right there.

4   Q   You said dip, D-I-P?

5   A   Yes.  For exercise.

6   Q   All right.  So March 18, 2015, you get to JA unit you said

7   a little after 7:00.  What is the morning schedule when you get

8   to JA that morning?

9   A   The recreation schedule starts promptly at 7:00 a.m.

10   everyday for outdoor recreation.

11   Q   Okay.  Walk us through that.  What does that mean?

12   A   The unit officers will walk up to the range grill, the

13   front grill, and they will call for a door to be opened by the

14   control center officer.  Depending what inmates have outdoor

15   recreation that morning, he will begin calling them on intercom

16   asking if they would like recreation.  They either answer yes

17   or no.  If they answer yes or no, if they say yes, the control

18   center officer will open their door.  That inmate will exit his

19   cell on to the range.  The control center will close his door.

20   That inmate will walk to the front grill, and the officers will

21   restrain him with handcuffs.  They will pat search him, metal

22   detect him, and escort him to the outdoor rec yard, and they do

23   this one inmate at a time.

24   Q   Let me back you up.  You said the intercom.  Is that an

25   overhead intercom where everyone can hear it, or one-on-one in

1   the cell?

2   A   Every cell has an intercom inside where they can have

3   direct contract with the control center and the control center

4   can talk to them any time he deems necessary, and the inmate

5   can press a duress button they have if they need to speak with

6   a control officer.

7   Q   If the inmates in the cell needs to get the officer's

8   attention, there's a button to press?

9   A   Yes, there is.

10  Q   Then what happens?

11  A   Then the control center officer acknowledges the duress on

12  his computer screen in the bubble, and then he opens the

13  intercom screen, turns it on, and then he can press a button

14  and talk to the inmate and ask what is the medical emergency or

15  what do you need.

16  Q   Is that something that happens on a regular basis with

17  inmates in the bubble?

18  A   Yes.  Inmates use it all the time.

19  Q   I've been using the word "bubble."  Is that the same thing

20  as control center?

21  A   Yes.

22  Q   You've described how outdoor recreation time gets moving.

23  Starts promptly at 7:00.  How many inmates are entitled to

24  outdoor rec?  A group of how many?

25  A   No more than eight.

1   *Q*   So that accounts for the outdoor rec.  Is there an inside

2   recreation time that is different?

3   *A*   Yes, there is.

4   *Q*   What is inside recreation?

5   *A*   Inside recreation does not begin until 7:15 and runs for

6   one hour every morning.

7   *Q*   What does inside recreation mean?

8   *A*   The inmates are allowed to come out onto the tier, onto the

9   common area of the tier, and they can interact with one

10  another, they can exercise, they can access the showers and

11  take a shower when they're out there, read a book, play a game,

12  whatever they would like to do as long as it's within the rules

13  of the Bureau of Prisons.

14  *Q*   So it's free time?

15  *A*   Yes.

16  *Q*   How long is the inside recreation period that begins at

17  7:15?

18  *A*   It lasts until 8:15, one hour.

19  *Q*   Outdoor rec, how long is that?

20  *A*   Outdoor recreation is 1 1/2 hours.

21  *Q*   Are the cell doors locked during recreation time for the

22  inside recreation inmates?

23  *A*   Yes.  Also, doors are closed once the inmate exits his cell

24  to go to recreation, whether outdoor or indoor recreation.

25  *Q*   You told us about the process, pressing the button, officer

JOSEPH HILL - Direct

1   asking if it's time for rec.  Does an inmate have to come out

2   of his cell for recreation?

3   *A*   No, he does not.  All recreation is voluntary.

4   *Q*   If an inmate does not come out, what happens?

5   *A*   He stays in his cell and watches TV, naps, showers.  You

6   can shower in J unit.

7   *Q*   Spends his time --

8   *A*   Hanging out in his cell for that hour.

9   *Q*   Is there any kind of pressure by the guards to convince an

10   inmate to come out or make them come out for recreation?

11   *A*   No.  We never force anyone to do recreation.

12   *Q*   Is there a point you might intervene if an inmate hasn't

13   come out a certain number of days for rec?

14   *A*   Yes.  If an inmate doesn't come out for a questionable

15   number of days, if he constantly stays in his cell, we'll go

16   and talk to the inmate and ask why he isn't going to rec.

17   *Q*   Is that talk -- is there a way to have it if it's private

18   that the inmate wants to reveal something private to you that

19   he doesn't want anyone else to know about?

20   *A*   Yes.

21   *Q*   What methods would the inmate let you know, Officer, I

22   don't want to come out and here's why?

23   *A*   Inmates have several ways to inform officers they don't

24   want to come out of their cell.  One is a cop-out, a

25   handwritten note on a piece of paper during feeding times,

1   during any time we walk the range past their cells.  They can

2   send a cop-out or letter out with the mail which is all

3   confidential.  They can press their duress button and let the

4   bubble officer know they would like to speak with an officer.

5   Q    In your experience, is that something you've been involved

6   in doing?

7   A    Yes.

8   Q    Any one of those methods?

9   A    Yes.

10  Q    You said when an inmate comes out of a cell for outdoor

11  recreation, getting secured, patted down, I think you said

12  metal detection as well, are those sorts of searches done for

13  inside recreation?

14  A    No.  There's not a method for us to pat down or metal

15  detect or search an inmate going to indoor recreation on JA.

16  Q    When they tell the guard, yes, I want to come out, the door

17  is opened and they come out?

18  A    Yes.

19  Q    What is the method -- are we picturing an old-fashioned

20  grill in a movie where the door opens and shuts?  How does that

21  mechanism work?

22  A    They are solid doors and have a view window in the front of

23  them.  They also have three slots they can speak through or

24  hear through.

25  Q    All right.  Does the door open inside and out, or does it

JOSEPH HILL – Direct

1  slide back and forth?

2  A   It is on a sliding mechanism.   It slides along the wall.

3  Q   If an inmate elects to come out of his cell for indoor

4  recreation time, what are the parameters about what he can

5  bring with him?

6  A   There is a general guideline list that inmates are provided

7  and officers are provided.   It states they can bring out

8  underwear, socks, shorts, T-shirt, pair of khakis, shirt or

9  pants, long john shirt, long john pants, work-out gloves, one

10  board game or book.   In JA unit, they're allowed to bring out

11  shower supplies due to the fact their showers are done on the

12  range during open rec on the range.

13  Q   Okay.   You said a game, a book.   What about any kind of

14  pencils, writing utensils?   If they want to write letters home,

15  can they are --

16  A   They're allowed that, yes.

17  Q   When the materials are brought out, is there any kind of

18  searching done to make sure it's the appropriate listed item?

19  A   No.   Due to the way rec is run, there is no safe way for an

20  officer to go down range and inspect those items.

21  Q   What do you mean there's no safe way?

22  A   We cannot go on range once the inmates are on the range.

23  Because it's one at a time, he comes out, he's on the range

24  during rec time, and he's not handcuffed or restrained.

25  Q   You use the verb "we cannot."   Is that a federal protocol

JOSEPH HILL - Direct

1    that you cannot?  Are those the rules being followed?

2    A   Those are policies and procedures that we cannot go on

3    range with unrestrained inmates.

4    Q   Let's talk specifically about March 18.  Officer Hill, did

5    something happen that morning that drew your attention?

6    A   Yes.

7    Q   What time did something occur?

8    A   I do not recall the exact time.  I believe it was in my

9    memorandum.

10   Q   I'll ask you to look at Exhibit 100 in your book.

11   A   I have it.

12   Q   Do you recognize what that is?

13   A   I do.

14   Q   What is it?

15   A   My memorandum I wrote on that morning.

16   Q   Reviewing that, does it refresh your recollection what time

17   something occurred that drew your attention?

18   A   Yes.

19   Q   What time was it?

20   A   8:10 a.m.

21   Q   Where were you when you heard something going on?

22   A   I was sitting down on my desk inside the officer's station.

23        MS. SPENCER:  If we can pull up Exhibit 2 again

24   page 2, lower level, show us where that would have been.

25   A   Just to the right of that in that room.

JOSEPH HILL - Direct

1   Q   (By Ms. Spencer)   Okay.   Looks like there's an open door

2   there.   Was that door open at the time?

3   A   Yes.

4   Q   What were you doing in there?

5   A   I was completing my daily log books, security inspection

6   forms, and equipment accountability sheets.

7   Q   It's hard for me to tell from the diagram.   How far away

8   are you in that room from the grills you described?

9   A   Maybe two full steps.

10  Q   Okay.   What happened that drew your attention that day,

11  Officer Hill?

12  A   I heard a commotion on the range, and I heard an inmate

13  yell out.

14  Q   All right.   What did you do in reaction to hearing that?

15  A   I stood up from my desk, and I drew my OC spray, and I

16  walked out to see what the yell was about.

17  Q   What's OC spray?

18  A   OC spray is oleum capsicum.   It is pepper spray we use

19  inside the institution.

20  Q   In what way are you armed with weapons as an officer in the

21  ADX?

22  A   I have a rapid rotation baton I carry on my hip in a

23  holster, and I have OC spray that I carry inside a pouch on my

24  duty belt.

25  Q   You said you actually drew the OC spray.   Why did you draw

JOSEPH HILL - Direct

1  it before you knew what was going on?

2  A   Preparing myself.

3  Q   In terms of the procedures you're allowed to follow, can

4  you deploy that OC spray within your own discretion if you see

5  something happens?

6  A   Yes.  Using our use of force model we use, if I deem it

7  necessary, I feel there's a threat to the safety of staff, an

8  inmate or security of the institution or government property, I

9  am allowed to deploy my OC spray.

10  Q   All right.  You say you pull your spray, you came out of

11  the office and went up to the grill?

12  A   Yes.

13  Q   What was going on when you got up there?

14  A   When I arrived to the front grill, I stepped out of my

15  office.  I noticed two inmates standing at the stairs, one

16  inmate, inmate Basciano had the lower portion of inmate

17  Heisler's leg.  They were on maybe the second, third step

18  headed upstairs to the top tier.  Basciano appears to be

19  holding inmate Heisler from going upstairs.

20  Q   You were able to recognize them how?

21  A   Because I've worked with them in other units, and I work

22  there one day a week with the inmates.

23  Q   When you saw them on the stairs as you described, was that

24  after you already heard the verbal exchange?

25  A   Yes.  I heard the exchange.  I came out.  That's what I

JOSEPH HILL - Direct

1   noticed, first thing I saw.

2   Q   What did you do when you saw that?

3   A   I asked the inmates what was going on.

4   Q   And did anybody respond to you?

5   A   They said, "Nothing's going on.  Everything's okay."

6   Q   In your estimation as an officer of some years at ADX, one

7   inmate holding another one on the stairs, is that nothing going

8   on?

9   A   No.  Inmates do not usually have physical contact with one

10  another.  If there is, it leads me to question why they have

11  physical contact with one another.

12  Q   You said you saw the two on the stairs.  Did you see

13  another inmate disappearing up the stairs?

14  A   Yes.

15  Q   Did you know who that was at the time?

16  A   Yes.

17  Q   How did you recognize him?

18  A   Because I've had multiple interactions with them in other

19  units and J unit.

20  Q   Who was that?

21  A   Inmate Shields.

22  Q   You see him running up the stairs and two other inmates on

23  the stairs as you described?

24  A   Yes.

25  Q   Officer Hill, do you see Mr. Shields in the courtroom

JOSEPH HILL – Direct

1    today?

2    A    Yes, I do.

3    Q    Can you point out where he's seated and describe an article

4    of his clothing today?

5    A    He's seated to my right in the center wearing black glasses

6    and a blue and white button-up shirt.

7          MS. SPENCER:   Your Honor, I ask the in-court

8    identification by this witness of the defendant.

9          THE COURT:   Your request is granted subject, of

10   course, to cross-examination.

11   Q   (By Ms. Spencer)   Officer Hill, taking us back to that

12   moment, what did you do?   After you heard the yelling and

13   restraining that's going on, what's your next step?

14   A    I assessed the situation to make sure there was no danger

15   to staff or other inmates.

16   Q    How did you do that?

17   A    Size up the situation, spoke to the two inmates there, I

18   watched where inmate Shields went on the top tier, I made sure

19   there was nothing else going on on the range.   Once I made the

20   personal judgment call there was no current threat or danger to

21   any other inmates, then I made a phone call.

22   Q    Who did you call?

23   A    Special Investigative Services, SIS.

24   Q    Why did you do that?

25   A    Because the SIS can review camera footage and rewind and

JOSEPH HILL – Direct

1    review past camera footage of things going on in the unit that

2    I cannot see.

3    Q    Now, did you -- who did you talk to when you called SIS; do

4    you remember?

5    A    I spoke to an SIS technician named Thompson.

6    Q    Did you describe what you had seen?

7    A    I told Officer Thompson that there had been an issue in the

8    unit.  I saw a couple inmates holding on to one another on the

9    stairs, a second one moving with purpose upstairs to his cell

10   door and needed to roll camera footage back and see what

11   happened prior to me coming on the range.

12   Q    Did Officer Thompson indicate in the affirmative that would

13   be done?

14   A    Yes.

15   Q    We've already looked at Exhibit 2 and the different cameras

16   that are in there.  We've marked on the diagram where the

17   cameras are.  When you're in the unit, are they obvious?

18   A    Yes.

19   Q    So you can look up and see the camera?  It is not hidden in

20   the light switch or something like that?

21   A    No.  The cameras are housed in a stainless steel housing

22   against the wall with a glass plate in front of the camera.

23   Q    Have you reviewed the tapes from this incident since

24   March 18, 2015?

25   A    I have not.

1  *Q*  They're marked as Exhibits 3, 3A, 3B, 3C, and 3D.  Do they

2  accurately indicate or capture the incident from March 18,

3  2015?

4  *A*  Yes, they do.

5          *MS. SPENCER:*  Move to admit 3, 3A, 3B, and 3C and 3D.

6          *THE COURT:*  Response?

7          *MR. BELLER:*  No objection.  Thank you.

8          *THE COURT:*  3, 3A, 3B, 3C, and 3C admitted in evidence

9  with leave to publish and broadcast in the presence of the

10  jury.

11  Q  (By Ms. Spencer)  Officer Hill, if you can set the scene.

12  We are looking at Exhibit 3A.  Before we roll the tape, orient

13  us what we're looking at and what this is?

14  *A*  This is a camera view from the back of the range facing

15  towards the front grill of the range.

16  *Q*  Where is the front grill?

17  *A*  Right there.  It extends across the entire front of that

18  area.  You can see behind the stairs.

19  *Q*  What I'm looking at is open.  You can see through it?

20  *A*  Yes, you can.  It's just bars.

21  *Q*  All right.  Do you recognize any of the inmates seen on

22  this still shot of Exhibit 3A?

23  *A*  Yes, I do.

24  *Q*  Can you point them out and tell us who's who here?

25  *A*  That is inmate Heisler.

JOSEPH HILL – Direct

1    *Q*    Okay.

2    *A*    That is inmate Basciano.

3    *Q*    Are they part of a group together that's allowed to do

4    inside recreation with each other?

5    *A*    Yes, they are.

6           *MS. SPENCER:*  Let's go ahead and start the tape.

7    Q   (By Ms. Spencer)  I see a third inmate now.  Who is that?

8    *A*    That is inmate Shields.

9    *Q*    Has your attention been drawn at this point to anything

10   going on, verbally or otherwise?

11   *A*    No, it is not.

12   *Q*    Okay.  What is inmate Shields doing there behind the

13   stairs?

14   *A*    He is doing curls.

15   *Q*    With what?

16   *A*    Either a garbage bag with water or a sheet over a garbage

17   bag with water to add weight.

18   *Q*    Anything going on at this point?

19   *A*    Shields appears to turn his attention towards Heisler, and

20   they're having a conversation.

21          *MS. SPENCER:*  Stop the tape there.

22   Q   (By Ms. Spencer)  Is that what you were describing that you

23   saw, the chasing up the stairs, one of them going up the

24   stairs, Heisler trying to going up the stairs, and Basciano

25   stopping him?

JOSEPH HILL – Direct

1    A    Yes.

2            MS. SPENCER:  Let's go forward and stop it there.

3    Q   (By Ms. Spencer)  Is that you on the scene now?

4    A    Yes.  That's me walking into the camera's view.

5    Q    How far away is the grill from the stairs where inmates

6    Heisler and Basciano are when you walk out?

7    A    I don't know the exact distance.  I can estimate 15 to

8    20 feet.

9    Q    Further than you and I are from the podium and witness

10   stand?

11   A    Huh-uh.

12   Q    Not this far?

13   A    I would say it's slightly closer to me.

14   Q    Where the court reporter is seated to you and the witness

15   stand?

16   A    That's closer distance, yes.

17   Q    Okay.  So you come out.

18           MS. SPENCER:  Let's play the tape a little bit.

19   Q   (By Ms. Spencer)  Are you saying anything to them to get

20   them to come downstairs?

21   A    I stopped at the front grill, and I asked inmate Basciano

22   and Heisler what is going on.

23   Q    Okay.  What's Heisler got in his hand there; can you tell?

24   A    I cannot.

25   Q    Any concerns -- it looks like he's drinking water.  Does he

JOSEPH HILL – Direct

1    have a water bottle?

2    A    Yes.   Inmates have water bottles to bring out for

3    recreation.

4    Q    So he has that.   Any concern he has weapons?

5    A    Not at this point, no.

6    Q    Okay.   Are you speaking with him there?

7    A    Yes.   I'm trying to assess the situation and find out what

8    exactly had gone on.

9         MS. SPENCER:   Let's stop the tape there.

10   Q    (By Ms. Spencer)   You just walked away?

11   A    Yes.

12   Q    Did you put your OC back in?

13   A    I reholstered my OC and went back to my office.

14   Q    Is that when you called SIS?

15   A    Yes, it is.

16        THE COURT:   Counsel, excuse the interruption.   Perhaps

17   a propitious time for us to declare and take our somewhat late

18   afternoon recess for this afternoon of trial.

19        During which, sir, of course, you may stand down.

20   After which, you must return to continue and complete your

21   testimony.   Will you do that?

22        THE WITNESS:   Yes, Your Honor.

23        THE COURT:   You're excused and may stand down.

24        Counsel, you may be seated at your convenience.

25        Ladies and gentlemen, in preparation for this

JOSEPH HILL - Direct

1     afternoon recess, two things which will become commonplace.

2     First, during the recess, please store your note-taking

3     materials in your suite and, second, be ever mindful of those

4     critically important rules that continue to govern you as

5     jurors in this trial.

6          Very well.  We are in recess for approximately 15

7     minutes.

8          Madam Clerk.

9        (Recess taken from 3:56 p.m. to 4:15 p.m.)

10         *THE COURT:*  Thank you.  Once again, as you choose,

11    either be seated or remain standing for the jury.

12         Madam Clerk, once again, please retrieve the jury, and

13    thank you.

14       (Pause in proceedings.)

15         *THE COURT:*  All rise for the jury, please.

16       (Jury in at 4:16 p.m.)

17         *THE COURT:*  Thank you, Madam Clerk.

18         Ladies and gentlemen, please be seated.

19         Ms. Spencer.

20         *MS. SPENCER:*  Thank you, Your Honor.

21         *THE COURT:*  You're welcome.

22    Q   (By Ms. Spencer)  Officer Hill, I'm pulling up tape 3B, as

23    in boy, camera view 753.  What angle are we looking at now?

24    *A*   This is the top tier of the range right next to the Front

25    Range grill looking towards the rear left portion of the range.

JOSEPH HILL - Direct

1    Q   When I look at that picture, I can see it looks like some

2    inmates grouped around standing around there.  That's allowable

3    in inside recreation time?

4    A   Yes, it is.

5    Q   I'm going to start the tape.  It's at 8:09:40.  Let us know

6    if you see something happen.  We can stop the tape there.  Who

7    is that coming up the stairs?

8    A   Inmate Shields.

9    Q   Is that what you saw, him going up the stairs?

10   A   No.  I did not see his initial climb up the stairs.  I saw

11   him moving down the left-hand side of the range with a purpose

12   towards his cell door when I approached the range.

13   Q   Let's keep the tape playing.  Is that where you saw him

14   there?

15   A   Yes, it is.

16        MS. SPENCER:  Let's stop the tape there.

17   Q   (By Ms. Spencer)  You used the phrase, "walking with a

18   purpose."  What does that mean?

19   A   It means he is not walking in a manner I usually see

20   inmates walking in when they walk around.  He is moving at a

21   quick pace, and it looks like he has a purpose, somewhere he is

22   headed.

23   Q   Is there any kind of restriction on running within the

24   unit?

25   A   You are not supposed to run inside the unit.

JOSEPH HILL - Direct

1    *Q*   When you say you're not supposed to, is that a rule?

2    *A*   We do not allow them to run because you can't differentiate

3    someone running or someone chasing or running from an inmate in

4    the unit.  They're not allowed to do so.

5    *Q*   Outside rec you can run?

6    *A*   Yes.

7    *Q*   All right.  Where we stopped the tape it looked like inmate

8    Shields had stopped.  Is that his cell door?

9    *A*   Yes.

10   *Q*   What's going on there?

11   *A*   He appears to be crouched down at his door.  What he's

12   doing, I do not know.

13          *MS. SPENCER:*  All right.  Keep the tape going from

14   there.

15   Q  (By Ms. Spencer)  From what I see looking at this, the cell

16   doors are shut because everyone is either inside the cell or

17   outside of the cell doing indoor rec time; is that correct?

18   *A*   That's correct.

19   *Q*   Up on the range.  What are the inmates on the lower tier

20   doing while the upper tier is in inside rec?

21   *A*   They're just sitting in their cells.

22   *Q*   Is anyone doing outdoor rec?

23   *A*   There is.

24   *Q*   Who is doing outdoor rec while these inmates are doing

25   indoor rec?

JOSEPH HILL - Direct

1    *A*   I do not recall who was out.  I would have to look at the

2    JA schedule.

3              *MS. SPENCER:*  Let's look at 3C.  If we can stop for a

4    second right there.

5    Q  (By Ms. Spencer)  What view are we looking at on 3C?

6    *A*   This is the exact opposite of the view you had prior to

7    this.  This is the back of the range looking towards the front

8    of the range.

9              *MS. SPENCER:*  You can play the tape until we see

10   inmate Shields come up the stairs.

11   *Q*   (By Ms. Spencer) Is that him coming around the range there.

12   *A*   Yes, it is.

13   *Q*   Is that his cell door he stopped at?

14   *A*   Yes.

15   *Q*   I just noticed the other inmates up there seem to back

16   away.  Anything going on there?

17             *MR. BELLER:*  Objection.  Calls for speculation; lack

18   of foundation.

19             *THE COURT:*  Well, there's no such thing as lack of

20   foundation in the federal rules.  There's lack of demonstrated

21   personal knowledge under Rule 602.  That's really the thrust of

22   the objection and, for now, it is sustained.

23   Q  (By Ms. Spencer)  Looking at tape 3D, what view are we

24   seeing here?

25   *A*   This is the front left-hand side of the range facing

JOSEPH HILL - Direct

1    towards the back of the range on the upstairs tier.

2    Q   I look over on this side here.  It looks like I'm seeing

3    some sort of grill.  Is that a grill on the upstairs?

4    A   It is.  There is a range grill on the first floor and

5    second floor of the tier.

6    Q   All right.  Who is that coming by?

7    A   That is inmate Shields.

8    Q   I see over here it looks like an inmate standing in a door

9    there.  Are inmates allowed to stand at each other's doors and

10   talk?

11   A   They are.

12   Q   What's the mechanism you can actually hear somebody?

13   A   There are three slots cut in the front and back of each

14   door that goes through the steel door.  You can talk through on

15   one side and hear on the other.

16   Q   Is that inmate Shields who has come over to that door I

17   indicated?

18   A   Yes, it is.

19   Q   So if there's someone inside, there could be conversation

20   going on back and forth on both sides of the door?

21   A   Yes.

22       MS. SPENCER:  If we can pull up Exhibit 3.

23   Q   (By Ms. Spencer) You talked about the officers in the

24   control unit, the bubble, being able to watch the tapes.  Is

25   this how they see the tapes, all together?

JOSEPH HILL - Direct

1    *A*   Yes.  All the cameras in the unit are shown on a screen

2    similar to this.

3              *MS. SPENCER:*  Is it playing?

4    Q  (By Ms. Spencer)  The officers in the unit are watching it

5    in real time?

6    *A*   Yes.

7    *Q*   You indicated Special Investigative Services could actually

8    rewind and watch?

9    *A*   Yes.

10   *Q*   Can they rewind in the bubble to watch anything?

11   *A*   No.  We do not have access to rewind tapes.

12   *Q*   So the control officer you described is responsible for

13   watching what's going on in the unit from the various angles?

14   *A*   He watches the cameras during all recreation periods.

15   *Q*   It looks like in the lower most corner that's you there?

16   *A*   That's correct.

17   *Q*   During this time frame, it looks like -- we could see you

18   going past again.  Are you going to the bubble, or where are

19   you going?

20   *A*   At that point, I just contacted the SIS department, and I

21   was going up to the control center to talk to the control

22   center officer and No. 2 and No. 3 officers.

23             *MS. SPENCER:*  If we could stop the tape.

24   Q  (By Ms. Spencer)  What were you going to speak with them

25   about?

JOSEPH HILL - Direct

1   *A*   About the incident that just occurred, if they had seen

2   anything from the bubble that I had missed.

3   *Q*   So you went up and discussed the incident you had seen with

4   the bubble officer and you called SIS, correct?

5   *A*   Yes.

6   *Q*   All right.  I'm going to show you tape 3D.  This is 8:12.

7   8:12:28 it starts.  Do you see inmate Heisler now on the upper

8   tier?

9   *A*   I do.  Inmate Heisler is right next to inmate Shields.

10  *Q*   Now, in these tapes there isn't any audio.  Do you have

11  audio in the bubble you can hear what's going on?

12  *A*   No.  There's no audio for these cameras.

13  *Q*   Okay.  Were you watching the tapes in the bubble at this

14  point when this is happening?

15  *A*   All the officers in the unit had gone in the bubble and

16  were watching the tapes while we were discussing the incident.

17  *Q*   So you're watching them in realtime.  All right.  Looks

18  like Heisler and Shields are walking away from the camera now;

19  is that correct?

20  *A*   Yes.

21  *Q*   Okay.  I'm going to move over to camera 3C.

22        *MS. SPENCER:*  It just disappeared.

23  Q   (By Ms. Spencer)  Looks like the two inmates have come

24  around and are talking.  This is the opposite view of the

25  staircase?

JOSEPH HILL - Direct

1    A    Yes.  It is the back of the top tier.

2    Q    So based on this altercation that you had heard down at the

3    bottom of the stairs, any concern when you're watching this

4    tape from the control unit that inmates Heisler and Shields are

5    talking to each other?

6    A    No.  They do not appear to be aggressive.  There doesn't

7    appear to be a fight between the two of them.  There was no

8    cause for concern.

9    Q    There's an open door here by where they're talking.  What

10   is that?

11   A    Those are the shower cells.  They have bar grill doors on

12   the front they can pull shut with shower curtains on the front

13   when they shower.

14   Q    So that is open for their use?

15   A    It is available for them to shower, yes.

16   Q    Inmates behind them, who is that?

17   A    Tank top gray shorts is inmate Basciano.  Inmate with no

18   shirt is Shyrock.

19   Q    Just to be clear for the record, they're on the upper tier

20   here?

21   A    Yes.

22        MS. SPENCER:  So this is the same view.

23   Q  (By Ms. Spencer)  What is it you heard inmate Heisler say

24   that grabbed your attention that you came out?

25   A    When I was in my office, I heard an inmate yell, "Come back

JOSEPH HILL - Direct

1    and I'll break your jaw."

2    Q   Watching the inmates talking here on the upper tier, any

3    concerns again as the No. 1 officer on the unit about any

4    particular danger from either one of them?

5    A   No.  Working that officer in the unit as much as I have in

6    the past and once a week, I would look at this as two inmates

7    having a normal conversation and shooting the breeze.

8         MS. SPENCER:  If we could back up on that a little bit

9    to 8:17:05.

10   Q  (By Ms. Spencer)  What was inmate Shields doing there?

11   A   He appeared to be showing something in his waistband.

12   Q   Any concerns there?

13   A   Yes.

14   Q   What are the concerns there?

15   A   That there may be a weapon hidden.

16        MS. SPENCER:  Can we pull that back up?

17   Q  (By Ms. Spencer)  Now they're walking away?

18   A   Correct.

19   Q   So nothing occurred from what you said you were concerned

20   about?  Nothing happened?

21   A   No.

22   Q   You're still watching this realtime from the bubble?

23   A   I do not recall if we're still in the bubble at this point.

24   The control center officer would still be viewing the camera

25   footage in the bubble at this point.

JOSEPH HILL - Direct

1   Q   Okay.

2        MS. SPENCER:   Let's play the rest of this clip here.

3   Q   (By Ms. Spencer)   So they're walking down to the end there.

4   At the end you can see, it looks like, an officer has come up.

5        MS. SPENCER:   If you would stop it there.

6   Q   (By Ms. Spencer)   Do you see where I pointed, Officer Hill?

7   Is that you?

8   A   The second officer upstairs was me.   The officer in front

9   of me was Officer Corcoran.

10  Q   What was the purpose of you going up the stairs behind the

11  grill?

12  A   We went up to talk to the two inmates, Heisler and Shields.

13  Q   Why?

14  A   To ask them what had gone on and what the problem was.

15  Q   Did you actually direct them, come over to us?

16  A   Yes.

17       MS. SPENCER:   So let's watch camera 3D then.

18  Q   (By Ms. Spencer)   So we see two inmates standing close to

19  the grill.   Is that when you're talking to them?

20  A   Yes.

21  Q   Who did you say the other officer was?

22  A   Officer Corcoran.

23  Q   Is that inmate Heisler doing the talking?

24  A   Appears to be, yes.

25  Q   Do you recall the nature of the conversation?

JOSEPH HILL - Direct

1  *A*   I don't recall the exact specific conversation, but we had

2  gone up there to try to ascertain what had gone on between the

3  two of them and what the problem had been.

4  *Q*   Did either one of them tell you what the problem had been?

5  *A*   Both inmates were adamant there was not a problem; they

6  were both cool.  Words they used.

7  *Q*   They used the words, "We're cool"?

8  *A*   Yes.

9  *Q*   Looks like inmate Shields has gone away.  Where is he

10  going?

11  *A*   Recreation period is ending.  He's going downstairs to

12  collect his things.

13  *Q*   I think you testified rec was supposed to end at 8:15.

14  According to our clock it's 8:21.  Is that typical that rec

15  runs a little bit late?

16  *A*   Sometimes it does; sometimes it doesn't.

17  *Q*   Are you still up the stairs here where inmate Heisler is

18  talking?

19  *A*   Yes.  We were talking to inmate Heisler and watching

20  inmates go into their cells where the cell doors close.

21  *Q*   Inmate Shields walked by with the water bags you talked

22  about?

23  *A*   Yes.

24  *Q*   Is he about to go inside from inside rec then?

25  *A*   Yes.  He appears to be the next one.

JOSEPH HILL – Direct

1          *MS. SPENCER:*  Stop the tape there.

2    Q  (By Ms. Spencer)  When you say he was "the next one," is

3    there an order by which they return to their cell when rec is

4    officer?

5    A   Recreation is run by the unit control officer.  He will

6    decide which end of the range he will let out first and will

7    start either the first or back.  They'll come out one at a

8    time.  When we have inmates go back in their cell and he closes

9    them back in, he goes in the same order in which they came out

10   ordinarily.

11   Q   How was an inmate to know, it's my turn to go?

12   A   When the cell door for the inmate who come out before him

13   closes with the inmate inside, then his cell door will open.

14   Immediately after his cell door opens, it's time to go inside.

15   Q   All right.  Are they now locked down?

16   A   It would be considered them being locked down, yes.

17   Q   Okay.  I ask you that because I'm trying to understand the

18   phraseology within the Bureau of Prisons.  After everyone is

19   done with their recreation, they go back in their cells in the

20   step-down unit and locked in their cells.  Is that lockdown?

21   A   We use the term "locked in" or "locked down" when they are

22   back in their cells secure, yes.

23   Q   By "secure," you mean they don't have contact with one

24   another again?

25   A   Yes.

JOSEPH HILL – Direct

1   Q   Is there another way in which the phrase "lockdown" is used

2   at ADX?

3   A   Yes.  If there is an incident or threatened incident,

4   lieutenant or anyone with a higher authority can issue an

5   institution lockdown.  All inmates are locked into their cells,

6   and there's no inmate movement anywhere in the institution

7   during a lockdown or they can specifically state this unit is

8   on lockdown and the inmates will be secure in their cells and

9   no inmate movement in or out of that unit without direction of

10  a lieutenant or higher authority.

11  Q   As senior officer, you are not the higher authority?

12  A   I am not.

13  Q   We've seen the first phase of lockdown going on finishing

14  the indoor rec.  Is that what we just saw?

15  A   Yes.

16  Q   Was there a unit lockdown like you were talking about that

17  the lieutenant ordered for JA?

18  A   Yes.  We received a phone call.  It was put on lockdown

19  status.

20  Q   You received a phone call.  Who did that come from?

21  A   The phone call came from the SIS and operations lieutenant.

22  Q   SIA and operations lieutenant in concert said lock down JA?

23  A   Yes.

24  Q   Do you inform the inmates, we're on lockdown?

25  A   No.  Not normally, we do not.

JOSEPH HILL - Direct

1  *Q*   So not to be obtuse, but just so I understand, after SIS

2  and operations say, this unit should be locked down, what does

3  that mean for those scheduled the rest of the morning in JA?

4  *A*   The schedule is no longer in effect.  The schedule is the

5  inmates stay in their cell until directed otherwise.

6  *Q*   Now, you described for the jury this verbal alteration that

7  you heard.  Is there a protocol with the Bureau of Prisons at

8  ADX to follow when there's been something like that incident

9  that happens in the unit?

10  *A*   The protocol is used if there is an altercation of that

11  nature.  It is generally left up to the officer's discretion to

12  first initially assess what had gone on.  If I do not see a

13  direct threat or something that looks like it could threaten

14  the security of the institution or staff or inmates, there is

15  no protocol that needs to be taken.  It is up to my judgment at

16  that point until there is actually a physical altercation.

17  *Q*   Okay.  So in this instance when you saw Basciano and

18  Heisler having contact with each other, did that qualify to

19  move you into that protocol?

20  *A*   I didn't feel anyone was threatened at that point.  That's

21  why I came out and asked the inmates, "What is going on?"  At

22  that point the inmates said, "There was a disagreement.

23  Everything's cool.  We're good."

24  *Q*   Based on the point you were watching through the bubble the

25  tapes we've seen, did you feel there was further action you

JOSEPH HILL – Direct

1   needed to take in your officer discretion?

2   *A*   I felt it was time to lock the inmates in from indoor

3   recreation and let the higher authorities make the call once

4   they reviewed the tapes.

5          *MS. SPENCER:*   I do want to pull up Exhibit 3, the 8:27

6   clip.

7   Q   (By Ms. Spencer)   Was that an inmate from outdoor rec coming

8   in?

9   *A*   Yes, it was.

10  *Q*   Looks like it's pretty quiet now.   Is that what lockdown

11  looks like?

12  *A*   Currently, the officers are going back to the rec yard to

13  get more inmates off the outdoor rec yard.   That's what the

14  unit would look like if they were on a lockdown, is no one on

15  the range.

16  *Q*   On March 18, 2015, after the operations lieutenant and SIS

17  technician informed you JA would be on lockdown, what happens

18  next?

19  *A*   The unit officers make sure the inmates are secured in

20  their cells, and we awaited the arrival of the SIS department.

21  *Q*   Did the SIS department, Special Investigative Services

22  unit, come down to your unit?

23  *A*   Yes, they did.

24  *Q*   Once that happens, what's your role as the officer, the

25  No. 1, in the J unit?

JOSEPH HILL - Direct

1   *A*   My role would be to assist them in any way that they needed

2   my help with.

3   *Q*   Okay.  How many SIS staff came down to J unit that morning?

4   *A*   I do not recall the exact number.  I know the entire

5   department came down.

6   *Q*   Give us an idea, what does an entire department look like?

7   Five people?  Ten?

8   *A*   You have two lieutenants and ordinarily four to five SIS

9   technicians.

10  *Q*   If we say four plus two lieutenants, at least six people

11  came down?

12  *A*   Yes.

13  *Q*   Were you part of removing inmates Heisler, Shields, or

14  Basciano from their cells to be interviewed?

15  *A*   No, I was not.  Once the SIS department arrived, they told

16  me I was to be hands off.

17  *Q*   They took over that role?

18  *A*   Yes.

19  *Q*   Were you part of transferring inmates Shields and Heisler

20  to another unit after they were interviewed?

21  *A*   No, I was not.

22  *Q*   Were you aware they were being moved out of the unit?

23  *A*   Not until a decision was made and they left.

24  *Q*   What does that do in terms of you and your log book and

25  keeping track that two inmates were removed from your unit?

JOSEPH HILL - Direct

1   A   I put in my log book an incident occurred.  I put in times

2   it occurred.  I put in times of the SIS department showing up.

3   Then I put in the times that the inmates departed the unit, and

4   I removed them from my base count.

5   Q   Were those inmates removed from the unit together?

6   A   No.

7   Q   Is that something that's done, that inmates are moved in

8   ADX together?

9   A   Inmates are never moved together inside the ADX.

10  Q   Okay.  Was that standard protocol to move an inmate out of

11  a unit after an altercation you described happened?

12  A   They review what happened, what the situation is.  Then

13  they make the call based on that.  If there's an immediate

14  removal from the unit inside the institution, it is because a

15  Bureau of Prisons rule has not been followed or a prohibited

16  act has occurred.

17  Q   Okay.  So if one or two of those things have happened, then

18  they would have moved the inmate out of the unit they're in?

19  A   Yes.

20  Q   Okay.  Later in the tape, after we'd seen the quiet time,

21  we see an officer looks like delivering commissary.  Have you

22  seen that clip?

23  A   I have.

24  Q   What is commissary?

25  A   Commissary is the institution's version of a store that we

JOSEPH HILL – Direct

1   provide for the inmates to purchase personal items.

2   Q   All right.  And what privileges do inmates have to order

3   those food items to keep in their cells?

4   A   Anything that is placed on a commissary list, if the inmate

5   has the money in his account, he may purchase it up to a set

6   dollar amount and is delivered once a week.

7   Q   In your six years of experience at ADX, have you known

8   inmates to secrete items in their rectum, their body cavity?

9   A   I have.

10  Q   Is that something that happens as a regular practice by

11  inmates at ADX?

12  A   It happens quite often, yes.

13  Q   What types of items have you known that have been recovered

14  from inmates in their rectum?

15          MR. BELLER:  Objection; relevance.

16          THE COURT:  Relevance is the objection.  Your

17  response.

18          MS. SPENCER:  I heard the opening statement talking

19  about how an inmate would never do that.  I believe it's become

20  relevant now.

21          THE COURT:  I agree.  I discern sufficient relevance

22  under Rule 401 for this to be admissible under Rule 402.  All

23  else is for cross-examination.

24          The objection is overruled.  This examination may

25  continue.

1   *A*   I have had inmates pull the razor blade portion of a

2   shaving razor they removed from a razor, and they will put that

3   there.  I have found metal pieces that have been taken out of

4   our fire suppression systems when they pop their sprinkler

5   heads.  They've had fingernail clippers, toenail clippers,

6   pencil sharpeners, pieces of metal they've shaved off their

7   doors or lights inside their cells, and pieces of metal they

8   have taken off their showers.

9           *MS. SPENCER:*  Your Honor, may I have a moment, please?

10          *THE COURT:*  You may.  Thank you.

11          *MS. SPENCER:*  I pass the witness.

12          *THE COURT:*  Very well.

13          Rather than commence cross-examination only to

14   immediately interrupt it, at the end of a long day, I'm going

15   to postpone cross-examination until tomorrow morning.

16          Now, Mr. Hill, I propose that you return to continue

17   and complete your testimony in this trial tomorrow morning at

18   8:30 a.m.  Can you and will you do that?

19          *THE WITNESS:*  Yes, I can, Your Honor.

20          *THE COURT:*  Very well.  You are excused until then and

21   may stand down.

22          *THE WITNESS:*  Thank you, Your Honor.

23          *THE COURT:*  You're welcome.

24          Ladies and gentlemen, in preparation for this

25   overnight recess, two things.  First, please leave in your

1    suite your note-taking materials.  Second, please take the time

2    reasonably necessary to read and heed those important written

3    rules that especially now govern your conduct as jurors in this

4    trial.

5           I respectfully request that you report for service

6    tomorrow morning at 8:30 a.m., but I inquire.  Is that

7    unreasonable or terribly inconvenient for any one or more of

8    you?

9           Presumably not.  We shall proceed on that basis.

10          Now, to make an 8:30 a.m. start doable, you've got to

11   factor in the weather, driving in downtown Denver during rush

12   hour, and parking.  So please leave yourself plenty of time.

13          Very well.  As concerns this case and trial, we are in

14   recess until tomorrow at 8:30 a.m.

15          Good afternoon.

16          (Court stood in recess at 4:49 p.m.)

17                               **INDEX**

18   **Item**                                                   **Page**

19   OPENING STATEMENTS

20      By Mr. Cook                                               21

21      By Mr. Hutt                                               30

22   WITNESSES

23      JOSEPH HILL

24          Direct Examination By Ms. Spencer                     38

25

```
 1                        PLAINTIFF'S EXHIBITS

 2    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

 3    2                45        45

 4    3                61        61

 5    3A-3B            61        61

 6    3C-3D            61        61

 7                        *  *  *  *  *
```

 8                    **REPORTER'S CERTIFICATE**

 9         I certify that the foregoing is a correct transcript from

10    the record of proceedings in the above-entitled matter.  Dated

11    at Denver, Colorado, this 23rd day of October, 2018.

12

13                                        *S/Tracy Weir*
                                          _____
14                                          Tracy Weir

15

16

17

18

19

20

21

22

23

24

25