1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 15-CR-00200-REB
3
UNITED STATES OF AMERICA,
4
        Plaintiff,
5
vs.
6
SHAWN SHIELDS,
7
        Defendant.
8
_____
9
                    **REPORTER'S TRANSCRIPT**
10                   (Jury Trial – Day 2)

11 _____

12          Proceedings before the HONORABLE ROBERT E. BLACKBURN,

13 Judge, United States District Court for the District of

14 Colorado, commencing at 8:40 a.m., on the 21st day of February,

15 2018, in Courtroom A1001, United States Courthouse, Denver,

16 Colorado.

17

18

19

20

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Tracy Weir, 901 19th Street,
25       Room A258, Denver, Colorado 80294, (303) 298-1207

1                                    **APPEARANCES**

2              VALERIA SPENCER and CLAY COOK, Assistant U.S.

3     Attorneys, 1801 California Street, Suite 1600, Denver, Colorado

4     80202, appearing for the plaintiff.

5              ABRAHAM HUTT and DAVID BELLER, Attorney at Law, Recht

6     & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

7     Colorado 80202, appearing for the defendant.

8                          *   *   *   *   *

9                                   **PROCEEDINGS**

10             (In open court at 8:40 a.m.)

11             *THE COURT:*  Good morning.  Again, as you choose,

12    either remain standing or be seated for the jury.

13             Madam Clerk, please retrieve the jury, and thank you.

14         (Pause in proceedings.)

15             *THE COURT:*  All rise for the jury, please.

16         (Jury in at 8:41 a.m.)

17             *THE COURT:*  Thank you, Madam Clerk.

18             Ladies and gentlemen, please be seated.

19             Mr. Shields, good morning.

20             *THE DEFENDANT:*  Good morning, Your Honor.

21             *THE COURT:*  Counsel, good morning.

22             Ladies and gentlemen otherwise, good morning.

23             Ladies and gentlemen of the jury, good morning.  Thank

24    you for being prompt and on time.  We're prepared to resume

25    this trial together.  Let us do precisely that.

1     Cross-examination of Mr. Hill on behalf of

2 Mr. Shields, Mr. Beller.

3    *MR. BELLER:*  Good morning.  Thank you, Your Honor.

4    *THE COURT:*  Good morning.  You're welcome.

5   (**JOSEPH HILL** was previously sworn.)

6         **CROSS-EXAMINATION**

7 *BY MR. BELLER:*

8 *Q* Good morning, Officer Hill.

9 *A* Good morning, sir.

10 *Q* Officer Hill, I want to start with your first realization

11 that there was some commotion on that morning, okay?

12 *A* Okay.

13 *Q* You specifically heard the words, "Come back here and I

14 will break your jaw"; is that right?

15 *A* That's right.

16 *Q* Those were the words shouted by Mr. Heisler?

17 *A* Yes.

18 *Q* You recognized that voice as Mr. Heisler; is that right?

19 *A* I did not recognize the voice at the time.  It was after I

20 came out and saw who was involved that I knew who it was.

21 *Q* Understood.  So you heard him say those words, which was a

22 threat?

23 *A* Correct.

24 *Q* A threat of causing physical harm?

25 *A* That's correct.

JOSEPH HILL – Cross

1  Q   And it is that threat that caused you to come out of your
2  office?
3  A   Yes.
4  Q   When you came out of the office, the first thing you see is
5  Mr. Basciano holding back Mr. Heisler?
6  A   Yes, that's correct.
7  Q   He was restraining him?
8  A   Yes.
9  Q   Fair to call Mr. Heisler a pretty big guy?
10  A   He's large, yes.
11  Q   Large -- quite a bit larger than Shawn Shields?
12  A   Yes.
13  Q   And you also observed Mr. Shields running; is that right?
14  A   I did not see him running.  I saw him walking at a brisk
15  pace.
16  Q   Do you still have the evidence notebooks in front of you,
17  the exhibit notebook?
18  A   I do.
19  Q   If you could please turn to Exhibit 100.
20  A   I'm there.
21  Q   So, Officer Hill, you wrote a report in this matter; is
22  that right?
23  A   Yes, I did.
24  Q   A memo, to be more correct; is that correct?
25  A   That's correct.

1  Q   And you wrote that memo roughly two years ago?

2  A   That's correct.

3  Q   You wrote the memo close in time to when you actually

4  observed this incident?

5  A   Yes.

6  Q   And when you wrote that memo, you described seeing Mr. Hill

7  running -- excuse me.  Let me rephrase that.  You write and

8  describe that you observed Mr. Shields running; is that

9  correct?

10 A   That's correct.  That's what the memo states.

11 Q   It's what you wrote?

12 A   That's correct.

13 Q   "Running on the top tier towards his cell"?

14 A   Correct.

15 Q   So I want to talk a little bit more about the location that

16 you were in at the time.  The office is outside of the range;

17 is that fair?

18 A   Yes.

19 Q   The far end of the unit, correct?

20 A   It is at the front of the unit, correct.

21 Q   And in this office, there's an obstructed view of the

22 range?

23 A   Yes.  From the office, you cannot see the range.

24 Q   And at the time, you were actually working at a computer,

25 right?

JOSEPH HILL – Cross

1   A   That's correct.

2   Q   You didn't specifically have eyes on what was happening in

3   the range?

4   A   No, I did not.

5   Q   And the eyes on is coming from the officer who's in the

6   control center?

7   A   Yes.

8   Q   Now, when you heard the threat, you went out of your office

9   in order to investigate?

10  A   Correct.

11  Q   Your investigation at that time was standing on the other

12  side of the grill and watching?

13  A   Yes.

14  Q   Watching what was occurring within the range?

15  A   Yes.

16  Q   And this investigation lasted, at that time, for 30

17  seconds?

18  A   Yes.

19  Q   I believe you testified on direct examination that it was

20  that investigation in which you determined that there was no

21  current threat to any inmates?

22  A   That's correct.

23  Q   So after this 30-second investigation where you observed

24  and decided that there was no threat to any current inmates,

25  you left?

JOSEPH HILL - Cross

1   A   That's correct.

2   Q   You had a radio at the time?

3   A   Yes, I did.

4   Q   The radio on your body, on your person?

5   A   Yes, I did.

6   Q   In that 30-second time period, you made no calls on that

7   radio for assistance?

8   A   No, I did not.

9   Q   You did not give any direction to any of the inmates that

10  were in the range?

11  A   No, I did not give any directions.

12  Q   In that 30-second time period, you didn't radio and request

13  any type of help?

14  A   No, I did not.

15  Q   Or ask any of the other guards or officers to keep an eye

16  on the range as to what was happening?

17  A   Requesting that was not necessary.

18  Q   My question, sir, is whether or not you made the request

19  for assistance --

20  A   No, I did not.

21  Q   Let me try it one more time.  I need you to answer my

22  question.  You did not call for assistance?

23  A   No, I did not.

24  Q   There was no order at that point for Mr. Heisler to stay

25  downstairs, for example?

JOSEPH HILL - Cross

1   *A*   No.

2   *Q*   Or an order, on your part, for Mr. Shields to remain

3   upstairs?

4   *A*   No.

5   *Q*   You didn't order the inmate, Mr. Heisler, who just made

6   this threat, to get on the ground?

7   *A*   No.

8   *Q*   Or even to have a seat at one of the tables that was there

9   in the range?

10  *A*   No.

11  *Q*   You mentioned to the jury on direct examination there was

12  also an intercom system in the range?

13  *A*   It's not on the range.  It is in the inmate cells.

14  *Q*   In the inmate cells.  Let me ask you this.  If there were

15  to be an announcement through the intercom system in the

16  inmates' cells, is that something that could be heard in the

17  range?

18  *A*   It can be heard, yes.

19  *Q*   It can be heard in the range, in part, because the range is

20  made out of concrete?

21  *A*   Correct.

22  *Q*   Poured concrete?

23  *A*   Correct.

24  *Q*   Quite a bit of echo?

25  *A*   Correct.

JOSEPH HILL - Cross

1    *Q*   Sound travels pretty easily in the range?

2    *A*   Yes.

3    *Q*   Even sound that comes from inside the cells; is that fair?

4    *A*   Yes.

5    *Q*   And so at this point in this 30-second investigation or

6    immediately following, there was no announcement or direction

7    given over the intercom to the inmates?

8    *A*   No.

9    *Q*   Now, I've been asking about whether you gave any direction

10   at that time.  Is it also fair to say that no one else gave

11   direction to the inmates during that time?

12   *A*   No, they did not.

13          *MR. BELLER:*  Mr. Hutt, I'm going to be asking for some

14   videos.

15          *MR. HUTT:*  Okay.

16          *MR. BELLER:*  3C, approximately the 3-minute mark.

17   Q  (By Mr. Beller)  Officer Hill, yesterday on direct

18   examination you were asked to view the videos of this

19   particular incident.  You recall that, I trust?

20   *A*   Yes, I do.

21   *Q*   You were asked a series of questions by Ms. Spencer

22   regarding whether you had any concern over what it is you were

23   viewing; do you recall that?

24   *A*   Yes.

25   *Q*   I want to ask you specifically about some of these videos

JOSEPH HILL - Cross

1   that you testified to yesterday.  If you can take a look at

2   your monitor.  I'm showing you 3C at roughly the 3-minute mark.

3           MR. BELLER:  If we can play that.

4   Q  (By Mr. Beller)  This is Mr. Hill and Mr. Heisler walking

5   and talking; is that right?

6   A   That's incorrect.  That's Mr. Shields and Mr. Heisler.

7   Q   Excuse me.  Thank you.  I mean no disrespect by mixing up

8   the names.  Mr. Shields and Mr. Heisler walking and speaking,

9   correct?

10  A   Yes.  Correct.

11  Q   Now, I believe your testimony yesterday was that as they

12  were speaking, it appeared, to you, that they were simply

13  shooting the breeze; is that right?

14  A   That's correct.

15          MR. BELLER:  If we could have -- we're stopping at

16  3:38 on the counter.  If we could have 3A at approximately the

17  2:15 mark, please.

18  Q  (By Mr. Beller)  Now, this portion is downstairs in the

19  range; is that correct?

20  A   Yes, it is.

21  Q   Downstairs in the range, and it depicts, at least in part,

22  Mr. Heisler?

23  A   Yes.

24  Q   Mr. Heisler is seated at the table?

25  A   Yes, he is.

1   *Q*   Now, approximately two minutes into the video -- this is

2   after your 30-second investigation?

3   *A*   Correct.

4   *Q*   Where you investigated and made a determination that no

5   inmates were in immediate danger or harm, and left?

6   *A*   Correct.

7   *Q*   And this is immediately prior to Mr. Heisler going upstairs

8   in order to shoot the breeze with Mr. Shields?

9   *A*   Correct.

10          *MR. BELLER:*   If we can play this portion.  We can

11   pause.

12   Q   (By Mr. Beller)   The video at that point in your

13   investigation indicates Mr. Heisler pushing away from the table

14   and running upstairs?

15   *A*   Yes, it did.

16   *Q*   In order to, as you say, shoot the breeze?

17   *A*   Correct.

18   *Q*   Now, as the two men are shooting the breeze, you did not

19   hear the conversation?

20   *A*   No, I did not.

21   *Q*   You don't know what was being discussed between the two?

22   *A*   No.

23   *Q*   Leading up to that, you knew there had been a threat from

24   Mr. Heisler, you knew Mr. Heisler pushed away from the table,

25   ran up the stairs, and is now shooting the breeze with

JOSEPH HILL - Cross

1   Mr. Shields?

2   *A*   Yes.

3   *Q*   Fair to say that during your investigation, you did not ask

4   either Mr. Shields or Mr. Heisler what their dispute had been

5   over?

6   *A*   I did not ask what their dispute was about.

7   *Q*   You did not ask Mr. Heisler why he was threatening

8   Mr. Shields?

9   *A*   That's not exactly correct, sir.

10  *Q*   Well, I want to go back to Exhibit 100.

11  *A*   I'm there.

12  *Q*   Two years ago when you wrote a report and you included

13  information that you knew about this incident, at no point do

14  you write, "I asked Mr. Heisler why he was threatening

15  Mr. Shields"?

16  *A*   I did not ask those exact words, no.

17  *Q*   In this memorandum, you say nothing about having done an

18  investigation and inquired what the conflict was about?

19  *A*   No.  In my memo, it states I asked Mr. Heisler what was

20  going on.

21  *Q*   We're going to get to that.  Because what I'm focusing on

22  at this point is that 30-second dispute -- excuse me -- the

23  30-second investigation.  Later you go to the grate or cage or

24  the area where you're on one side and the inmates are on the

25  other, right?

1   *A*   That's correct.

2   *Q*   And your testimony to the jury at that point, to be fair,

3   is that you asked Mr. Heisler what's going on?

4   *A*   When we went upstairs, we talked to both inmates, not just

5   Mr. Heisler.

6   *Q*   You talked to both inmates.  Now, your testimony yesterday,

7   as I understand it, is that both inmates, both Mr. Shields and

8   Mr. Heisler, informed you, "we're cool"?

9   *A*   That is correct.

10  *Q*   Very good.  Let's go back to 100, Exhibit 100.  Again, the

11  memo that you wrote two years ago.

12  *A*   I'm there.

13  *Q*   At that time two years ago when this incident was fresh in

14  your mind, you documented it by saying, "I asked Mr. Heisler

15  what was going on, and Mr. Heisler's answer, what he stated

16  was, we're cool.  We're cool.  It's all good"?

17  *A*   That's correct.

18  *Q*   Absolutely no mention, Officer Hill, that Mr. Shields said

19  anything to you about being good?

20  *A*   That's correct.

21  *Q*   That he never said a word to you about what occurred at

22  that time, right?

23  *A*   Correct.

24  *Q*   And that the first time you're speaking about Mr. Shields

25  telling you that he was okay was yesterday?

JOSEPH HILL - Cross

1   *A*   Correct.

2   *Q*   Now, that conversation with Mr. Heisler and Mr. Shields

3   occurred, for purposes of timeline, after the threat, after

4   Mr. Shields runs up the stairs, after Mr. Heisler is restrained

5   from going after Mr. Shields, and after they shot the breeze.

6   You then have the discussion?

7   *A*   That's correct.

8   *Q*   After the discussion, Mr. Shields, after a period of time,

9   is put in his cell?

10  *A*   Yes.

11  *Q*   Mr. Heisler is still out in the open?

12  *A*   Yes.

13  *Q*   He's still on the range?

14  *A*   Correct.

15  *Q*   So your conversation with the two inmates is now over he's

16  on the range?

17  *A*   Correct.

18  *Q*   It was a poor question.  Let me be more clear.  Mr. Heisler

19  was on the range?

20  *A*   Correct.

21  *Q*   Now, prior to the dispute between the parties, you saw, on

22  the video, Mr. Heisler pick something up off the table?

23  *A*   Yes.

24  *Q*   And you, of course, asked Mr. Heisler for that item, and he

25  gave it to you, correct?

1   *A*   I didn't ask Mr. Heisler for any item.

2   *Q*   So after the investigation and Mr. Heisler runs with this

3   item, you have the conversation with them, Mr. Shields is put

4   in his cell, Mr. Heisler goes and says something else to

5   Mr. Shields?

6   *A*   I'm unaware of that.

7           *MR. BELLER:*   Can we have video 3B?   The 8-minute mark.

8   Q   (By Mr. Beller)   Officer Hill, would you please watch 3B at

9   approximately the 8-minute mark.   This depicts Mr. Heisler

10  going up the stairs, correct?

11  *A*   Yes, it does.

12  *Q*   He then approaches a cell.   That's Mr. Shields' cell, isn't

13  it?

14  *A*   Correct.

15  *Q*   And then Mr. Heisler goes into his own cell?

16  *A*   Yes.

17  *Q*   This is after your investigation?

18  *A*   Yes, it was.

19  *Q*   You never asked Mr. Heisler what he said to Mr. Shields

20  after, as you say, you were told, "We're cool.   We're cool"?

21  *A*   No, I did not.

22  *Q*   You also never asked Mr. Shields that question, did you?

23  *A*   No, I did not.

24  *Q*   Now, you testified to the jury just a few minutes ago that

25  sound carries in the range because it's poured concrete?

JOSEPH HILL – Cross

1   A   Yes.

2   Q   Sound travels?

3   A   Yes, it does.

4   Q   You were asked on direct examination about a distress

5   button?

6   A   Yes.

7   Q   The distress button is located inside the inmates' cells?

8   A   That's correct.

9   Q   And it is a metal speaker.  It's a speaker that's on the

10  wall?

11  A   Yes.

12  Q   And when an inmate speaks into it, they're speaking into it

13  inside this poured concrete cell?

14  A   Yes.

15  Q   And when the individual on the other side in the control

16  center speaks back, it is in the same poured concrete cell?

17  A   Yes, he does.

18  Q   You would agree with me these conversations are not exactly

19  private?

20  A   I would say no.

21  Q   No, they're not private or, no, you don't agree with me?

22  That was a terrible question.

23  A   I wouldn't agree that they're completely private.

24  Q   These distress buttons located inside the cell, I want to

25  talk about what happens when an inmate is in the range.  When

JOSEPH HILL - Cross

1   an inmate is in the range in the open area, their cell doors

2   are closed?

3   *A*   That's correct.

4   *Q*   This isn't the day of Barney Fife where Barney or Andy

5   Griffith goes up to the door with a key and an inmate can come

6   and go as they please, right?

7   *A*   Not inside this institution, no.

8   *Q*   The individual has to go into their cell only when the

9   control center opens the cell door remotely or electronically?

10  *A*   Correct.

11  *Q*   And then once they're in the cell, the door is only closed

12  again when somebody in the control center closes it for them?

13  *A*   Correct.

14  *Q*   And if they're in the range, their door is closed?

15  *A*   That's correct.

16  *Q*   So an inmate would not be able to, for example, run into

17  their cell for safety if the control center is not opening the

18  door for them?

19  *A*   No, they would not.

20  *Q*   And so if an inmate wants to use the distress button, they

21  have to run to their cell door, wait for control center to then

22  open the door, run in, and then again wait for the control

23  center to close the door behind them?

24  *A*   If the method they want to use was the distress button,

25  then yes.

1    *Q*   Well, let's talk about the other methods because another

2    method would be yelling out for a guard's assistance?

3    *A*   That's correct.

4    *Q*   Saying, "help me, help me," correct?

5    *A*   Correct.

6    *Q*   And then you would come out of the office, or somebody else

7    would come out, and watch through the grate what was happening?

8    *A*   We would assess the situation, correct.

9    *Q*   Assess the situation.  For example, hearing a threat of,

10   "I'm going to break your jaw"?

11   *A*   Correct.

12   *Q*   And then assess the situation?

13   *A*   Correct.

14   *Q*   So if an inmate, for example, says, "Oh, my gosh,"

15   hypothetically, "I need your help, I need your help, help me,"

16   you would do the same.  You would come out, and you would

17   assess the situation?

18   *A*   That's partially correct.

19   *Q*   Well, partially, because there's other things, like, I

20   don't know, coming over the intercom and telling everybody to

21   lay on their stomach?

22   *A*   I would not do that over an intercom.

23   *Q*   You could do it without using an intercom from the other

24   side of the grate?

25   *A*   That's correct.

1  *Q*   You could, for example, order one party to stay downstairs

2  and the other party to stay upstairs?

3  *A*   I could.

4  *Q*   Well, you indicated that the distress button is not the

5  only way, and that calling for help would not be the only way.

6  Another option is that they could send a kite, or I think you

7  called it a cop-out; is that right?

8  *A*   That's correct.

9  *Q*   That is, slipping a note to a guard?

10  *A*   Yes.

11  *Q*   You'd agree with me, Officer Hill, that having a snitch

12  jacket or snitch label is an extraordinarily dangerous thing in

13  prison?

14  *A*   Yes, it is.

15  *Q*   To tattle on another inmate is something that could result

16  in injury to the inmate?

17  *A*   I do not believe that could happen at the ADX, sir.

18  *Q*   I'm sorry?

19  *A*   I do not believe that could happen at the ADX.

20  *Q*   Because of security protocol put in place in order to

21  protect an inmate?

22  *A*   That's correct.

23  *Q*   That without these protocols, for example, not just injury

24  could occur, but death could occur at the hands of another

25  inmate?

1    *A*    It's possible.

2    *Q*    Well, it's possible, but you testified on direct

3    examination with Ms. Spencer that inmates have stored all sorts

4    of extraordinarily dangerous weapons in their rectum?

5    *A*    Yes, I have.

6    *Q*    I believe you testified razor blades are stored in their

7    rectums?

8    *A*    Yes.

9    *Q*    Fair to say that the razor blades stored in their rectums

10   is not for shaving?

11   *A*    No, it's not.

12   *Q*    These are weapons?

13   *A*    Not all the time, no.

14   *Q*    Razor blades stored in their rectums, I just want to

15   understand, is not always a weapon?

16   *A*    Let me restate that, sir.  Inmates do not always store

17   razor blades as a weapon.  They use them for other things as

18   well.

19   *Q*    Understood.  I can appreciate that.  Thank you.  The way

20   that the unit is set up is that the door of one cell is

21   immediately opposite the door of another cell?

22   *A*    That's correct.

23   *Q*    In other words, sort of a mirror image, looking at the

24   window of one cell, you look into the window of another?

25   *A*    In J unit, yes.

JOSEPH HILL - Cross

1  Q   In J unit?

2  A   Yes.

3  Q   So an individual slipping a note through their cell door to

4  an officer is something that may be seen by the windows on the

5  other side looking straight at that same window?

6  A   Yes.   Inmates also pass other items through their slot to

7  officers as well, including mail and items for unit team.

8  Q   Yeah.   And that can be seen by other inmates?

9  A   Yes.

10  Q   Now, in this case, Mr. Shields and Mr. Heisler were

11  transferred to different housing units?

12  A   Yes.

13  Q   They were transferred to different housing units to prevent

14  Mr. Heisler from retaliating against Mr. Shields?

15  A   I do not know the specifics of why they were transferred to

16  different units.

17  Q   You would agree with me, wouldn't you, that there are no

18  cameras inside the individual cells?

19  A   That would be unit dependent.   Some cells in the ADX do

20  have cameras inside of them.

21  Q   So for purposes of my questioning, I want to focus on the

22  unit we're talking about here.

23  A   J unit does not have cameras inside the cells.

24  Q   Thank you.   And so there was not a camera inside the cell

25  of Mr. Heisler?

JOSEPH HILL – Cross

1   *A*   No, there was not.

2   *Q*   There was not a camera inside the cell of Mr. Shields?

3   *A*   No.

4   *Q*   At the end of this, after the inmates or when the inmates

5   were put into their individual cells, Mr. Heisler, I believe,

6   being the last, that was because rec time was over?

7   *A*   That's correct.

8   *Q*   They were not put back to their cells because of any type

9   of protocol to separate the inmates for fear of or in response

10   to the threat that Mr. Heisler made?

11   *A*   No, not at that time they were not.

12   *Q*   It's about 20 minutes later; is that right?

13   *A*   I don't know the exact number.

14   *Q*   It was a while; fair?

15   *A*   Fair.

16   *Q*   Now, you indicated that Mr. Heisler and Mr. Shields were

17   transferred to different housing units, although you don't know

18   exactly the reason why?

19   *A*   That is correct.

20   *Q*   You would agree with me that when they were transferred,

21   they were ultimately transferred to the same Special Housing

22   Unit?

23   *A*   Yes.

24           *MR. BELLER:*  Your Honor, may I have a moment, please?

25           *THE COURT:*  Counsel, you may.  Thank you.

1        (Pause in proceedings.)

2            *MR. BELLER:*  Thank you, Your Honor.  I pass the

3    witness.

4            *THE COURT:*  Ms. Spencer, redirect examination for the

5    Government.

6            *MS. SPENCER:*  Thank you, Your Honor.

7            *THE COURT:*  You're welcome.

8                        **REDIRECT EXAMINATION**

9    *BY MS. SPENCER:*

10   *Q*   Officer Hill, I just want to clarify, Mr. Beller kept

11   talking about that memo you wrote and saying it was two years

12   ago.  It was written on March 18, 2015, correct?

13   *A*   That's correct.

14   *Q*   By my poor math, we're heading into three years next month?

15   *A*   Correct.

16   *Q*   All right.  What's the purpose of writing a memo on the day

17   the event happens?

18   *A*   A memorandum written on the day an event happens is to

19   write a narrative for the operations lieutenants and higher and

20   for the SIS to give them the who, what, when, where, why, how

21   of what happened immediately following something that I feel is

22   an incident or needs to be reported to a higher authority.

23   *Q*   Is there a requirement or protocol that you write down

24   every single thing that happened?

25   *A*   No.  What I write down in my memorandum is exactly what I

JOSEPH HILL - Redirect

1    saw at the time of what I consider to be the incident.

2    Q   Okay.  What did you consider to be the incident that you

3    were reporting on on March 18, 2015?

4    A   The verbal threat and the two inmates at the bottom of the

5    stairs and the inmate that was running along the top tier.

6    Q   Okay.  So you testified just now that you heard Mr. Heisler

7    give that threat of physical harm, "Come back here and I'll

8    break your jaw"?

9    A   Correct.

10   Q   Did you hear him make any other threat at all?

11   A   No, I did not.

12   Q   So when you came out, you testified that you weren't sure

13   who it was.  You didn't recognize the voice until you actually

14   saw the people?

15   A   Correct.

16   Q   Okay.  Did you believe that there was an ongoing threat

17   that required you to issue any direction to staff or inmates?

18   A   No, I did not.

19   Q   And is that within your discretion to choose to direct

20   staff or inmates based on something you have observed or heard?

21   A   Yes.

22   Q   Okay.  And so what did you do based on hearing, "Come back

23   here and I'll break your jaw"?

24   A   I went out of my office, I spoke with the inmates that I

25   observed on the bottom tier.  I asked them what was going on,

1   and because I felt something else had gone on prior to me

2   leaving my office, I made a phone call to SIS to review the

3   tapes so that they could make a decision and view what had gone

4   on.

5   Q   So you called SIS.  That was one step?

6   A   Yes.

7   Q   To have them review the tape specifically?

8   A   Yes.

9   Q   Did you tell any of the officers within JA to take any

10  steps?

11  A   They were just to observe on the cameras from the bubble.

12  I did not radio anybody.  I just and went and made the call.

13  After the call was made, I stepped up to the bubble to speak to

14  the officers.

15  Q   So you told the officers to keep an eye what's going on?

16  A   Yes.  I informed them of what I saw when I came out of my

17  office.

18  Q   One thing that you mentioned when you came out of your

19  office and assessing the situation, you said you had a radio on

20  you.  You also testified yesterday a baton and the pepper

21  spray.  Is that pepper spray that you could buy from a store,

22  or is that something higher grade?

23  A   That is Government issued.

24  Q   Is that a stronger --

25  A   Yes.

JOSEPH HILL - Redirect

1    *Q*   I don't know what the right term is for that.

2    *A*   It's oleum capsicum.  I don't know the name of it.

3    *Q*   That's why you call it OC?

4    *A*   Yes.

5    *Q*   Why didn't you use your OC?

6    *A*   I did not feel there was an imminent danger to security,

7    staff, or inmates at the time.

8    *Q*   Okay.  You said that you spoke with inmate Heisler.  Did

9    you speak with inmate Basciano down there as well?

10   *A*   He also responded as well, yes.

11   *Q*   Did they both assure you that everything was fine?

12   *A*   Yes.  They stated there was a disagreement and everything

13   was cool.

14   *Q*   Did you ask further what was the disagreement about?

15   *A*   I did not until we spoke to the inmates at the top grill.

16   *Q*   One thing that you mentioned in your testimony with

17   Mr. Beller is contrasting ADX from J unit.  Is J unit different

18   than the other units in ADX?

19   *A*   Yes, it is.

20   *Q*   In what ways is it different?

21   *A*   J unit is a transitional step-down unit where we try to

22   move inmates to less restrictive housing.  We socialize them

23   with one another in there so they can, for lack of a better

24   term, prove that they can function without separation between

25   them and other inmates and staff without posing a risk to

JOSEPH HILL - Redirect

1    security or danger to inmates or staff.

2    Q    So when you hear inmate Heisler yelling a threat to another

3    inmate, what reaction does that generate in you as an officer

4    on what interception you need to take?

5    A    It makes me worry that there may be an incident about to

6    occur, there may be an assault.  So I come out, I speak to the

7    inmates, make sure there isn't any immediate danger, and

8    inmates are encouraged to work differences out amongst

9    themselves civilly.

10   Q    How is it that inmates are encouraged to do that?

11   A    Through speaking to one another and not physical violence.

12   Q    Using their words?

13   A    Correct.

14   Q    One of the things that Mr. Beller was asking you about was

15   the use of the intercom that's inside an inmate's cell.  Is

16   that intercom system used to direct the entire unit or used for

17   one purpose?

18   A    It is not used for the entire unit.  It is between the

19   control center officer and the individual housed in that cell.

20   Q    You agreed with Mr. Beller, that's really a difficult way

21   to have a private conversation?

22   A    Yes.

23   Q    That is that the inmate next door could hear, oh, the

24   inmate next to me is on the intercom with the control officer?

25   A    Yes.  We can't control the volume of the control center.

1    *Q*    But you also told Mr. Beller there were other ways for

2    inmates to reach out to staff members.  I wanted to ask you

3    more about that.  I think you talked about -- I think

4    Mr. Beller said passing a note under the door; is that correct?

5    *A*    They could pass it under the door.  Most inmates will pass

6    something through the food tray slot when we feed.

7    *Q*    Okay.  So food is passed through a slot that is opened up

8    and it goes back and forth between you and the inmate?

9    *A*    Correct.

10   *Q*    And they can pass notes back out to you?

11   *A*    Correct.

12   *Q*    If an inmate wants to get ahold of his case manager, can he

13   do that with a note?

14   *A*    Yes.

15   *Q*    If he wants to get ahold of a counselor, can he do that

16   with a note?

17   *A*    Yes.

18   *Q*    If he wants to see medical staff, does he do that through

19   means of a note?

20   *A*    Yes.

21   *Q*    So when you talk about a kite or cop-out being sent, it can

22   be for the innocuous purpose of, I need to see somebody on my

23   behalf; is that correct?

24   *A*    Correct.

25   *Q*    So it's not -- I think Mr. Beller called it a snitch

JOSEPH HILL - Redirect

1  jacket.  What does that mean?

2  *A*   If you inform on another inmate, the inmates who are aware

3  of it will label you a snitch.

4  *Q*   Okay.  And so a kite or a cop-out, does that mean that's

5  what you're doing by handing a piece of paper to staff?

6  *A*   No, it does not.

7  *Q*   You said something about that inmates give their mail over

8  as well.  So is that done through the food slot if they have

9  mail to go out?

10  *A*   In J unit sometimes, yes.

11  *Q*   What do you mean by that?

12  *A*   When they're on the range for range recreation, some of

13  them will carry up to the front bars and hand it to us then.

14  *Q*   Can they put something else inside their mail that's

15  directed to prison staff instead of just the personal letter

16  itself?

17  *A*   Yes.

18  *Q*   And how would that actually get to staff if it's inside of

19  a letter?

20  *A*   It is put into a mail bag, and it is sent up to whatever

21  department it's being routed to.  If it has a specific person's

22  name on it, it goes to that person.  Otherwise, it will go up

23  to SIS, and they review all the mail.

24  *Q*   So SIS opens and reads all inmate mail?

25  *A*   Yes.

JOSEPH HILL - Redirect

1   *Q*   Is that something the inmates know?

2   *A*   Yes.

3   *Q*   One of the things Mr. Beller was asking you about was that

4   both inmate Shields and inmate Heisler were removed from J unit

5   and taken to the same SHU.  Is there more than one Special

6   Housing Unit in ADX in March 2015?

7   *A*   No.

8   *Q*   So they necessarily would go to the same unit?

9   *A*   Yes.

10  *Q*   But how is the Special Housing Unit different than the J

11  unit?

12  *A*   Special housing is separated with six ranges, and they also

13  have a specialized fourth range with cameras in the cells.

14  Each range has a top and a lower tier.  They have 12 cells per

15  range -- 24 per range, 12 per tier upstairs and downstairs.

16  *Q*   Are those inmates given the same degree of freedom they are

17  in J, inside recreation and outside recreation, where they can

18  actually have physical contact with one another?

19  *A*   No, they are not.

20  *Q*   What do they have in Special Housing instead of that?

21  *A*   They have what we refer to as bubble rec.  It is a

22  recreation cell that -- it isn't outside necessarily, but the

23  top is open so they have fresh air and sunlight, and it is

24  single celled, solid cement, and the officers escort them, two

25  officers per inmate, one inmate at a time.

JOSEPH HILL - Redirect

1    *Q*   So one inmate goes to recreation at a time?

2    *A*   That's correct.

3    *Q*   Is there an opportunity for inmates, you know, to pass by

4    each other during these transitions in Special Housing Unit?

5    *A*   Not without being separated by a door.

6    *Q*   I don't really understand what you mean being "separated by

7    a door."

8    *A*   Other than J unit, all units with inmates will be -- the

9    inmates will be separated by no less than one door or grill

10   between them.

11   *Q*   Okay.  So there's always an actual physical barrier between

12   inmates?

13   *A*   That is correct.

14   *Q*   In the Special Housing Unit?

15   *A*   Yes.

16   *Q*   You then spoke about in J unit they have showers outside of

17   the cells.  In Special Housing Unit, are the showers inside the

18   cell?

19   *A*   Showers are all inside cells in Special Housing.

20   *Q*   It is their own little apartment.  That's where they're

21   doing their day-to-day business is inside the cell of the

22   Special Housing Unit?

23   *A*   Yes.

24   *Q*   How many hours a day are they inside their cell at Special

25   Housing Unit?

1    *A*    Depending if they go to rec, could be up to 22 hours a day

2    inside their cell.

3    *Q*    Okay.  Is that considered solitary confinement?

4    *A*    No.

5    *Q*    Okay.  One of the things Mr. Beller was asking you about

6    was when inmate Shields was put into his cell, his language.

7    On the tape, we see inmate Shields walk into his cell.  Was

8    that the end of rec, the recreation time?

9    *A*    Yes.

10   *Q*    When he went into his cell, was that part of the protocol

11   you described yesterday, each inmate at a time in a row going

12   into their cells?

13   *A*    That's correct, in order.

14   *Q*    And then, in order, Mr. Heisler went into his cell?

15   *A*    Yes.

16   *Q*    We just saw that on the tape.  Is that accurate what we

17   were seeing?

18   *A*    That's correct.

19   *Q*    Mr. Beller was asking you about when you had spoken with

20   both inmates together.  We saw that on the camera at the end of

21   the range.  I guess I need to ask you, when I say the end of

22   the range, is that actually the front of the range where the

23   grill doors are, or is that the end?  Which is the end of the

24   range?

25   *A*    The front of the range is where the grill door is, where

JOSEPH HILL - Redirect

1   the staff come up to speak with inmates and where we remove

2   them for rec.  The back of the range is where the showers are

3   at.

4   Q   Thank you.  So let me correct my language.  When you -- we

5   saw on the tape you and Officer Corcoran were speaking with

6   inmates Heisler and Shields at the front of the range?

7   A   Correct.

8   Q   Were you concerned then that extra steps needed to be taken

9   by you as the No. 1 officer because of this threat of physical

10  harm that had been made previous?

11  A   No.  After speaking with the inmates, I didn't feel there

12  was an immediate threat.  The conversation between the two

13  inmates, myself and Corcoran, they assured us it was nothing

14  more than a disagreement and everything was fine.

15  Q   Now, you've been with the Bureau of Prisons, you said, for

16  six years; is that correct?

17  A   That's correct.

18  Q   So you're about three years in when this incident happened?

19  A   Correct.

20  Q   Okay.  Had you had enough contact with inmates that you

21  feel you can say to this jury that, in speaking with these two

22  inmates together, that you were comfortable they were open with

23  you?

24          MR. BELLER:  Objection; lack of personal knowledge.

25          THE COURT:  Response.

1          *MS. SPENCER:*  Well, I can ask more foundational

2     questions, if you wish.  He said in his three years of

3     experience he can answer yes or no if he has enough.

4          *THE COURT:*  This isn't so much about personal

5     knowledge directly as it is about opinion, lay versus expert.

6     If it's offered as lay opinion, then that animates the A, B,

7     Cs of Rule 701.  Is it based on his rational perceptions?

8     Check.  Is it likely to be helpful to the trier of fact or in

9     elucidating his own testimony?  Check.  But does it trespass

10    upon the sacred ground of Rule 702 implicating scientific,

11    technical, or other specialized knowledge?  Let's confine our

12    debate there because that's really the thrust of the objection.

13         *MS. SPENCER:*  Your Honor, I would respond that I don't

14    believe it is any technical knowledge.  It is this officer,

15    based on his work at ADX, he's talking to these two inmates in

16    front of him, what does he perceive.

17         *THE COURT:*  Reply.

18         *MR. BELLER:*  Thank you, Your Honor.  But the question

19    specifically was whether or not he believed in the sincerity of

20    the statements of the witnesses, and we have not established

21    that he has the necessary qualifications or expertise to be

22    able to comment to the jury on the sincerity, even his opinion,

23    the sincerity of the witness.

24         *THE COURT:*  Well, the question is not that.  The

25    question is, had you had enough contact with inmates that you

1    feel you can say to this jury that in speaking with these two

2    inmates together, that you were comfortable they were open with

3    you.  Your objection went to personal knowledge.  I steered us

4    into 702, and you've cleverly adopted the Court's argument with

5    respect to that.  You're the proponent of this evidence.  Any

6    last word, Ms. Spencer?

7            MS. SPENCER:  No, Your Honor.

8            THE COURT:  Well, I don't believe that it requires

9    technical, scientific, or specialized knowledge in these

10   circumstances.  So I overrule both Mr. Beller's objection on

11   the grounds of lack of personal knowledge, and I overrule my

12   own concerns about whether this implicates Rule 702 reserved

13   for expert witnesses, and the witness may answer your last

14   question, if you recall Ms. Spencer's last question.  Do you?

15           THE WITNESS:  Could she repeat the question, Your

16   Honor?

17           THE COURT:  Ms. Spencer.

18           MS. SPENCER:  I don't know if I can repeat the

19   question.  The judge did a great job reading it back.

20   Q   (By Ms. Spencer)  My question was directed to whether you

21   were comfortable whether these two inmates in front of you were

22   being open with you?

23   A   I believe that if the inmates had an issue with one

24   another, one or the other would have stated such.  I believe

25   they were being open and honest that they had taken care of the

JOSEPH HILL – Redirect

1    issue and it was just an argument, in my experience dealing

2    with the two inmates.

3    *Q*   And is that the protocol for J unit to try to let inmates

4    resolve among themselves the problems?

5    *A*   Yes.  That is protocol for less restrictive housing.

6          *MS. SPENCER:*  If I may have a moment, Your Honor.

7          *THE COURT:*  You may.  Thank you.

8       (Pause in proceedings.)

9          *MS. SPENCER:*  Nothing further.

10         *THE COURT:*  Very well.  May Officer Hill be excused

11   and released from subpoena, if any?  Any objection by the

12   Government?

13         *MS. SPENCER:*  No, Your Honor.

14         *THE COURT:*  Or by Mr. Shields?

15         *MR. BELLER:*  No, Your Honor.  Thank you.

16         *THE COURT:*  Officer Hill, you are both excused and

17   released from subpoena with our thanks.

18         *THE WITNESS:*  Thank you, Your Honor.

19         *THE COURT:*  You're welcome.

20         Very well.  When prepared, the Government may call its

21   next witness, Ms. Spencer.

22         *MS. SPENCER:*  Lieutenant Amy Kelley.

23         *THE COURT:*  Very well.

24         Lieutenant Amy Kelley.

25         *THE WITNESS:*  Yes, sir.

JOSEPH HILL - Redirect

1          *THE COURT:*  Good morning.  Please come forward to be

2     sworn by the Court.  To accomplish that, if you'll stand in

3     this open area in front of my bench.  Please face me and raise

4     your right hand to be sworn.  Thank you.

5          May I have your attention in the courtroom.

6     (**AMY KELLEY** was sworn.)

7          *THE WITNESS:*  Yes.

8          *THE COURT:*  Thank you.  Please be seated in that

9     witness stand.

10         Ms. Spencer.

11         *MS. SPENCER:*  Thank you, Your Honor.

12         *THE COURT:*  You're welcome.

13                        **DIRECT EXAMINATION**

14    *BY MS. SPENCER:*

15    *Q*   Good morning.

16    *A*   Good morning.

17    *Q*   Would you introduce yourself to the jury and spell your

18    name for the court reporter.

19    *A*   My name is Amy Kelley, A-M-Y, K-E-L-L-E-Y.

20    *Q*   What do you do for a living?

21    *A*   I work for the Bureau of Prisons.  Currently right now I'm

22    a lieutenant.

23    *Q*   In what area in the federal Bureau of Prisons do you work

24    as a lieutenant?

25    *A*   I work in the Special Investigative Services unit, or SIS.

AMY KELLEY – Direct

1   Q   I want to talk about that in a moment.  Tell me, how many

2   years have you worked for the federal Bureau of Prisons?

3   A   Almost six years.

4   Q   What's your career path with the Bureau of Prisons?

5   A   Prior to being a lieutenant with the Bureau of Prisons, I

6   was an SIS technician.  Prior to that, I was a correctional

7   officer.

8   Q   Do you have other correctional officer work prior to going

9   to the federal side?

10  A   Yes.  I worked two years for the Colorado State Department

11  of Corrections.

12  Q   You've used the phrase SIS.  We've heard that.  Can you

13  describe for us, what is SIS?

14  A   It is a Special Investigative Services department.  We are

15  the investigative component within the Bureau of Prisons.

16  Q   And you say "we."  How big is the SIS department within

17  ADX?

18  A   At the ADX, we have three SIS lieutenants and ten SIS

19  technicians.

20  Q   Is someone over you within the SIS department?

21  A   We do have an SIA, a special investigative agent.

22  Q   I'm going to ask you to slow down just a little.

23  A   Okay.

24  Q   So the person above you is the SIA?

25  A   Yes, ma'am.

AMY KELLEY – Direct

1  Q   All right.  In March 2015, were you a lieutenant then?

2  A   No, I was not.

3  Q   You were a technician?

4  A   SIS technician.

5  Q   What are your duties as an SIS lieutenant?

6  A   My duties are to oversee the overall mission of the SIS

7  department as well as supervise the SIS technicians.

8  Q   Slowing down.  So that leads us to the SIS technician that

9  you were in March 2015.  What are your duties as a technician?

10  A   So my duties as a technician were, that day, to conduct an

11  area search of joker alpha unit.

12  Q   You used the phrase in-house investigative unit for the

13  Bureau of Prisons.  What does that involve?

14  A   As far as SIS technician's duties, we collect intelligence,

15  we gather intelligence.  We disseminate that information to

16  other outside agencies and monitor inmate communication,

17  whether mail or phones.

18  Q   One of the things we've heard from a witness is that the

19  SIS department reads the mail of inmates; is that correct?

20  A   Yes, ma'am.

21  Q   Is that something the inmates are aware of?

22  A   Yes.

23  Q   Are there ways for an inmate to get word to an SIS

24  technician if they feel they're at risk from another inmate?

25  A   Yes.

AMY KELLEY - Direct

1  Q   How are those ways?

2  A   Inmates have the ability to write cop-out, or the ability

3  to write directly to the SIS office.

4  Q   We've heard that phrase.  I don't know what it means.

5  A   A cop-out is a written letter or note that comes directly

6  to the SIS office.

7  Q   How do they get that from their cell all the way to SIS?

8  A   So they'll place that in the mail, usually on evening

9  watch, which is in the evening hours.  That mail will come up

10  to the SIS office the next morning through the intra

11  institution mail.

12  Q   Are there other methods to get information up to SIS that

13  they are at risk or want to talk to you?

14  A   Yes.  They can stop any staff member during rounds to call

15  our attention to come down to the unit.

16  Q   Do they have to say what the problem is, or can they just

17  flag, I want to speak with someone from SIS?

18  A   They don't have to flag the situation.

19  Q   So how -- let me ask it this way.  Where is SIS within the

20  institution?

21  A   SIS is in what we call the administrative building.  So

22  it's before you pass main control.  It's in kind of an adjacent

23  building that's connected through a tunnel.

24  Q   Is that all part of ADX, though?

25  A   Yes.

1  Q   Does each one of the institutions in the Federal

2  Correctional Complex at Florence have its own SIS department?

3  A   Yes, they do.

4  Q   You're not spread out through other institutions.  You are

5  specific to ADX?

6  A   We are specific to ADX.

7  Q   Your office in the administrative building, how are you

8  alerted if SIS is needed somewhere in the institution?

9  A   Either via radio, which all of us carry a radio, or via the

10  telephone.

11  Q   Officer Hill spoke about video screens capturing what the

12  cameras are recording in the units.  How is that transmitted to

13  the SIS offices?

14  A   So every SIS personnel has access to all the video cameras

15  within the institution.  So we're able to log into the system

16  and review or view any of the cameras.

17  Q   Is that something you review on your own computer, or are

18  there actual screens up in the office you can watch?

19  A   Both.

20  Q   So you can actually type in which unit and camera you want

21  to see?

22  A   Yes.

23  Q   Do you have an ability to not just watch live but rewind

24  the tape to view something that's already occurred?

25  A   Yes.  We have that capability.

1    Q    What shift were you working on March 18, 2015?

2    A    I was working day watch, which is 7:00 a.m. to 3:00 p.m.

3    Q    Was the SIS unit notified that their assistance might be

4    needed in the J unit?

5    A    I believe we were notified, yes.

6    Q    How were you then told as a technician that your help was

7    going to be needed?

8    A    I don't recall who told me.  I believe the supervisor did

9    come into the SIS tech office and alerted us there may be a

10   possible incident.

11   Q    I'm sorry.  I didn't catch the last part.

12   A    That there may be a possible incident in J unit.

13   Q    Were you told the specifics of what that possible incident

14   was?

15   A    No.  We did review the video footage for it.

16   Q    What do you mean by "we"?  Who is "we?"  What are you

17   reviewing specifically?

18   A    The SIS technicians in my immediate office, we reviewed the

19   video footage from prior that morning in joker unit.

20   Q    Do you make the decision, we're going down to the J unit,

21   or who decides to do that?

22   A    I believe one of our supervisors do.

23   Q    Okay.  How many people responded, then, down to joker unit?

24   A    I can't be sure the number.  I know everybody that was

25   assigned to SIS that day did respond to joker unit.

AMY KELLEY - Direct

1   Q    What are we talking in sort of raw numbers?

2   A    Seven to nine individuals.

3   Q    You all go down there at once?

4   A    Yes.

5   Q    What do you take on your way to respond to a possible

6   incident?

7   A    We took personal protection equipment, so gloves.  We also

8   took, I believe, a couple evidence bags in case there was

9   evidence to collect from the incident.  We also took a still

10  camera with us.

11  Q    What sort of special training, if any, do you have to use

12  that equipment and to be looking for possible evidence?

13  A    So we're provided training.  We go to Glynco.  We have

14  training at the beginning of our BOP career.  Every year we

15  have ART, which is Annual Refresher Training.  So we are taught

16  search methods as well as SIS school where we're taught more

17  in-depth evidence recovery and search methods.

18  Q    Does the FBI assist in any training for the SIS technicians

19  as well?

20  A    We have liaison with the FBI, yes.

21  Q    Do you recall what you reviewed on the tape before you went

22  down to the J unit yourself?

23  A    I do recall reviewing on the tape what appeared to be a

24  verbal altercation between inmate Shields and inmate Heisler on

25  the lower tier of the joker alpha unit.  Following the verbal

1    altercation, inmate Shields ran to the flats area, is what we

2    call, the lower range.  When he made his way up the stairwell,

3    inmate Heisler attempted to run behind him up the stairwell and

4    inmate Basciano was able to grab ahold of inmate Heisler to

5    keep him from going up the stairwell.

6    Q    Did you see any more of the tapes besides what you

7    described to the jury before you made your way down to the

8    unit?

9    A    No, ma'am.

10   Q    You have described with particularity those inmates by

11   name.  In watching the tape, were you aware then who those

12   inmates were?

13   A    Yes, I was.

14   Q    Okay.  Describe for the jury, then, you get to J unit.

15   What are you observing?  What's going on there?

16   A    When we responded down to J unit, the entire unit was

17   locked down.

18   Q    What does that mean?

19   A    So a lockdown in a unit is where every inmate is secured in

20   their assigned cells.

21   Q    So there are no inmates on their way to go to medical

22   treatment or go see a counselor or anything like that?

23   A    No.  Everybody is secured in their cell.

24   Q    So you get there.  Everyone is secured.  What do you do?

25   A    So at that point in time we enter the unit and go down

AMY KELLEY – Direct

1   range, which is beyond the first grill.  Realize everybody is,

2   obviously, secure.  So we're able to go down range.  Anytime we

3   have an incident, our first task is to isolate and contain,

4   which our officers did a great job of doing.

5   Q   Slow down for me again.  I think you used the words

6   "isolate and contain."  What does that mean?

7   A   In any situation, isolate the possible issue or incident,

8   and you want to contain that so it doesn't overflow into other

9   areas of the prison or day hall or other inmates.

10  Q   Okay.  How could you tell that the officers had isolated

11  and contained the situation when you arrived?

12  A   Because all the inmates were secure in their assigned

13  cells.

14  Q   This may sound obvious to you since you work there, but

15  that means the inmates can't actually have physical contact

16  with each other when they're in their own cells?

17  A   Correct.

18  Q   Okay.  So the scene is secure.  There's isolation and

19  containment.  What is the next step in the protocol for SIS?

20  What do you do then?

21  A   So from there our protocol is now going to be to remove all

22  the individuals that were possibly involved in the incident.

23  So we restrained the inmates involved in the incident and

24  removed them from the immediate area in order to search their

25  person and search their cell and search all their belongings.

AMY KELLEY - Direct

1   *Q*   Why is it you want to pull the inmates involved out of

2   their cells?

3   *A*   First and foremost, if there's any evidence that needs to

4   be recovered, if interviews need to be conducted, we want to do

5   that away from other inmates in order to have more private

6   conversation.

7   *Q*   All right.  Were you involved in actually pulling any of

8   those inmates that you identified out of their cells for those

9   purposes you described?

10  *A*   No, I was not.

11  *Q*   There were other SIS members who did that?

12  *A*   Yes.

13  *Q*   All right.  You talked about searching the cells.  Is that

14  part of protocol as well, that those individual inmate cells

15  would be searched?

16  *A*   Yes.  That is part of protocol.

17  *Q*   Who conducts the search itself of the cells?

18  *A*   I believe that day SIS conducted those searches.

19  *Q*   What are you looking for in looking through an inmate's

20  cell?

21  *A*   Any kind of evidence that would be related to the incident,

22  whether it's in writing or if there's physical evidence such as

23  weapons.  Anything of that nature.

24  *Q*   All right.  Is that a standard practice that an inmate

25  would be pulled out of their cell and their property would be

AMY KELLEY - Direct

1    searched?

2    A    Yes.

3    Q    So what were your tasks?  You described what's going on.

4    What were your tasks, Lieutenant, that day?

5    A    So that day I was tasked with conducting an area search of

6    joker alpha unit where the incident had occurred.

7    Q    Let's pull up Exhibit 2 that's already been admitted.

8         MS. SPENCER:  The jury can see that, then?  Page 2, to

9    the lower tier.

10   Q  (By Ms. Spencer)  Is that the unit you went to -- I'm sorry.

11   You can look at the screen.  If you can touch the screen and

12   show us where you came into the unit and where you went from

13   there?

14   A    Okay.  So entering into the unit, you enter right out here.

15   Prior to that, the control center is right here.  I don't know

16   if I can circle.  You walk down this corridor downstairs, and

17   this entire area here is an open grill area that is controlled

18   by the control center.  That's how we enter into the unit.

19   Q    Okay.  You all go in at once, what did you say, seven or

20   eight of you go in at once?

21   A    Yes.

22   Q    And then what do you do once you have gone through those

23   doors and now you're inside the range?

24   A    So at that point in time, I start conducting the area

25   search of the unit, and it was a meticulous search around the

1    doors, on top of the doors, anywhere there could be potential

2    evidence.

3    Q    And do you have a checklist in mind or some idea what

4    evidence would be consisting of in this matter?

5    A    I don't at this time just because the situation had just

6    occurred.  So it was really just a methodical top to bottom

7    search and collecting anything that may or may not be relevant.

8    Q    Okay.  In terms of our terminology, where you have marked

9    you're coming in at the front of the range; is that correct?

10   A    Yes, ma'am.

11   Q    And the back side, there's a back of the range.  So we're

12   using the same terms.  All right.

13          Lieutenant Kelly, how much time did you spend down on

14   the main level of the tier looking around?

15   A    Probably five to ten minutes on one side searching every

16   single door, searching the walls, and I made my way down.  This

17   is the lower level, the right side, this one.

18   Q    As you're going by each of the cell doors where there's

19   inmates located, do you stop and talk to any inmates in their

20   cell?

21   A    No.

22   Q    Did any inmates reach out to you calling out your name,

23   they want to talk to you?

24   A    No.

25   Q    Nothing like that.  All right.  As you're making your way

1  through, did you see anything unusual?

2  *A*   As I made my way down the right side of the day hall, I

3  stopped right around this camera 746 at cell 109.

4  *Q*   We're going to enlarge that part where you just marked.

5  *A*   Okay.

6  *Q*   You said camera 746.  It's 764?

7  *A*   Yes, ma'am.  I was in this corner by cell 109 by camera

8  746.

9  *Q*   Was there an inmate in cell 109 on March 18, 2015?

10  *A*   No, there was not.

11  *Q*   What did you notice, if anything, that was unusual about

12  around the area of cell 109?

13  *A*   I'm looking at and attempting to do a meticulous search.  I

14  noticed that something seemed off about the light switch cover

15  to the left of that door.  It didn't appear to be metallic or

16  made of metal.  I actually had to reach out and touch it to

17  realize it was not, in fact, metal.

18  *Q*   What was it about it that drew your attention?  Was it you

19  were just looking at it, or was there something off?

20  *A*   There was just something off about it, the way it appeared.

21  *Q*   I'm going to ask you to look at the exhibit notebook at

22  Exhibits 4, 5, and 6.

23       *MR. HUTT:*  Your Honor, I have an objection to where I

24  know Ms. Spencer is going at this point, that these next photos

25  in the effort to introduce them are irrelevant and there is no

1    connection between them and Mr. Shields or the offense of this

2    case.

3            THE COURT:  Your objection, by definition, is

4    premature.  Your clairvoyance may prove to be true.  For now,

5    the objection is overruled as premature.  The examination, for

6    now, may continue.

7    Q  (By Ms. Spencer)  Have you had a chance to review Exhibits

8    4, 5, and 6, Lieutenant Kelley?

9    A   Yes, ma'am.

10   Q   Do you recognize what those are?

11   A   Yes.  They're the pictures of the fake light switch cover

12   that I observed that day.

13   Q   Are they accurate photos of the items that you observed and

14   you've just spoken about from March 18, 2015?

15   A   Yes, ma'am.

16   Q   Were you actually there when those pictures were taken?

17   A   Yes.

18            MS. SPENCER:  Move to admit Exhibits 4, 5, 6.

19            THE COURT:  Response.

20            MR. HUTT:  Objection, Your Honor; relevance.

21            THE COURT:  Reply.

22            MS. SPENCER:  Your Honor, may we approach the bench?

23            THE COURT:  You may.

24            Ladies and gentlemen of the jury, please excuse us.

25   We shall not be long.

AMY KELLEY - Direct

1           Counsel, at my bench, please.

2       **(At the bench:)**

3           *MS. SPENCER:*  The witness is having a problem with

4   coughing.  She wanted to know if she could step out momentarily

5   to get a drink.  Is that okay?

6           *THE COURT:*  Yes.

7           *MS. SPENCER:*  Thank you.

8           *THE COURT:*  Counsel for Mr. Shields, may we proceed in

9   his absence?

10          *MR. HUTT:*  Yes, Your Honor.

11          *THE COURT:*  Very well.  Mr. Hutt, this is an

12  opportunity to further explicate your objection as to the

13  proffered exhibits.

14          *MR. HUTT:*  There is no connection that can be made

15  between this light switch and anything having to do with

16  Mr. Shields or the -- or the prohibited item that's the subject

17  of the Indictment or that was found in Mr. Shields and,

18  consequently, it is irrelevant, and it's also unfairly

19  prejudicial to him since there is no connection that can be

20  made.

21          *THE COURT:*  Government's reply.

22          *MS. SPENCER:*  Your Honor, we believe that there's

23  inferences that can be drawn.  When you see the shank that has

24  come out of Mr. Shields, you can see that there are some

25  indentations that look like a light switch piece.  That's one

1    thing.

2          The second thing is, we'll have testimony that

3    Mr. Shields was an orderly in J unit starting on March 13.  So

4    for five days he had access to the unit that no other inmates

5    had, including to that light switch cover.

6          We will have testimony that it took -- it doesn't take

7    a minute to make a shank.  It takes some period of time.  So

8    when this opening statement is that this defendant had to take

9    immediate action for imminent harm, we believe that our

10   evidence will show that, in fact, he had the shank for a period

11   of time to make it; that it came from the light switch to which

12   he had access.

13         It's clear from watching the tape from the morning of

14   the 18th, that he was never down at that end of the range

15   in the back of the range near A109.  He didn't fashion it that

16   morning after the threat was made by Mr. Heisler; that it was

17   made previous to that; that he possessed it before.

18         Now, is there a direct link?  We admit there is not a

19   direct link.  We believe inferentially he had access to it.  It

20   is clearly what the shank was made from, a light switch cover.

21   We believe that those links can be made and that this evidence

22   is probative and is not substantially unfair to the defendant

23   under any kind of 403 analysis.

24         THE COURT:  I respectfully disagree.  I don't discern

25   relevance implicating a consequential fact at issue in this

AMY KELLEY - Direct

1    case.  To the extent there is relevance, its attenuated

2    probativity is substantially outweighed by the danger under

3    Rule 403 of unfair prejudice to the defendant and actually

4    confusing the jury.  Therefore, I sustain the objection on

5    those bases as to this photograph in evidence.

6            MR. HUTT:  Your Honor, I just want to make one other

7    note for the record because I just learned for the first time

8    in what Ms. Spencer said at the bench here of the existence of

9    any evidence or potential testimony regarding Mr. Shields being

10   an orderly and having access out on the range.  I don't know

11   whether or not that's something else that's going to come in.

12           THE COURT:  Then, by definition, it's premature,

13   Mr. Hutt.  We're not going to guess, and I'm not going to give

14   you an advisory opinion.

15           MR. HUTT:  I understand.  I wanted to bring what I

16   believe to be a discovery problem to the Court's attention at

17   the earliest time I could.  That's why I make note of it to the

18   Court.

19           THE COURT:  Well, we'll see if the Government intends

20   to pursue this line in view of the Court's ruling of the

21   photographic exhibits.

22           MR. HUTT:  Yes, sir.

23           THE COURT:  Very well.

24           MR. HUTT:  Thank you.

25           (In open court:)

1        *THE COURT:*  Thank you, ladies and gentlemen, of the

2   jury for the your patience and indulgence.  As a result of the

3   business transacted at my bench, I sustain the objection to the

4   admission of this photographic evidence, at least for now.

5            The Government may proceed otherwise.

6            *MS. SPENCER:*  Thank you.

7   Q  (By Ms. Spencer)  Lieutenant Kelley, you doing all right?

8   You have a cough drop?

9   *A*   Thank you.

10  *Q*   There's water up there if you need it as well.

11  *A*   Thank you.

12  *Q*   You were testifying in terms of the diagram where you went

13  around and things you were looking for.  Did you ever go

14  upstairs to the upper tier and do any investigation up there?

15  *A*   No.  I was not tasked with searching upstairs.

16  *Q*   Did someone else conduct a search up there, to your

17  knowledge?

18  *A*   I believe they did.

19  *Q*   How long were the SIS technicians within that J unit that

20  morning?

21  *A*   I can only speak about how long I was there.  I was down

22  there approximately an hour.

23  *Q*   Were you involved in removing inmate Shields from his cell

24  for that interview process that you spoke about?

25  *A*   No, I was not.

AMY KELLEY – Direct

1   Q   Were you there when that happened?  Were you observing any

2   of that?

3   A   I don't believe I was.

4   Q   Were you the SIS technician involved in actually

5   interviewing him?

6   A   No, I was not.

7   Q   One of the things you talked about in terms of -- I think

8   you used the phrase pulling the inmates out who were involved

9   out of their cells.  Is that done where you pull those inmates

10   out as a group or individually?

11   A   Those inmates are restrained and removed from their cells

12   individually.

13   Q   Is that something that other inmates can view by looking

14   out the window of their door?

15   A   Yes.  All the other inmates in that unit would be able to

16   see who was being pulled out.

17   Q   All right.

18        MS. SPENCER:  Just a moment, Your Honor.

19        THE COURT:  Certainly.

20      (Pause in proceedings.)

21        MS. SPENCER:  Pass the witness.

22        THE COURT:  Very well.  Cross-examination for

23   Mr. Shields, Mr. Hutt.

24        MR. HUTT:  Thank you, Your Honor.

25        THE COURT:  You're welcome.

AMY KELLEY – Direct

1      *MR. HUTT:*  If I may have just a moment.

2      (Pause in proceedings.)

3                          **CROSS-EXAMINATION**

4  *BY MR. HUTT:*

5  Q    Good morning, Lieutenant Kelley.

6  A    Good morning, sir.

7  Q    There are a number of your colleagues from the Bureau of

8  Prisons ADX in the courtroom today, aren't there?

9  A    There are a few from the ADX.

10  Q    Who came to keep an eye on you, yes?

11  A    To keep an eye on me, sir?

12  Q    Yes.

13  A    I believe they're part of the evidence recovery team.

14  Q    The evidence recovery team in this case?

15  A    No, sir.

16  Q    The J unit you've been talking about was not immediately

17  locked down following this threat by Mr. Heisler against

18  Mr. Shields, right?

19  A    I was not part of locking down the unit, sir.

20  Q    But you were observing what happened on the video

21  recording, right?

22  A    We reviewed what previously happened in the incident, yes,

23  sir.

24  Q    So you know that the last inmate was not returned to his

25  cell until at least 15 minutes had gone by; is that right?

AMY KELLEY - Cross

1    *A*   I don't recall watching that on the tape, but if that's

2    what happened on the tape, it did.

3    *Q*   And you know that the inmates were not locked into their

4    cells as part of anything unusual, a lockdown was not declared,

5    right?

6    *A*   I'm not aware of that, sir.

7    *Q*   You're not aware it was simply the end of the recreation

8    scheduled time that came and they went into their cells?

9    *A*   I was not part of their conversation when they were locked

10   down.  I wasn't the supervisor at that time.  I wasn't privy to

11   that conversation.

12   *Q*   You have since reviewed the video, right?

13   *A*   Yes, sir.

14   *Q*   You know what I'm saying is true?

15   *A*   Yes, sir.

16   *Q*   That during much of that time that the inmates are still

17   out on the range, that both Mr. Shields and Mr. Heisler were

18   out on the range, right?

19   *A*   If they had not been locked down then, yes, they would both

20   still be out there.

21   *Q*   They were physically near one another?

22   *A*   I don't recall seeing that on the tape.

23   *Q*   And that no guard ordered them to be apart; do you remember

24   that?

25   *A*   I wasn't down on the unit, sir.

1    *Q*    But, again, you were reviewing it on video?

2    *A*    I reviewed the immediate incident which occurred in joker

3    unit with the verbal altercation.

4    *Q*    Lieutenant, you told Ms. Spencer when you were testifying

5    on direct examination that you were aware that the guards in

6    the unit at the time had done a great job to isolate and

7    contain a problem.  Do you remember saying that?

8    *A*    Yes, I do.

9    *Q*    Yet when you looked at this video, I want to show you part

10   of what's been received as Government's Exhibit 3D.

11          *MR. HUTT:*  Can you put that up for me?

12   Q    (By Mr. Hutt)  Do you see the monitor in front of you?

13   *A*    Yes, sir.

14   *Q*    You see that's a video of the range, correct?

15   *A*    Yes.

16   *Q*    This is one of the views you looked at both that day and

17   afterwards, right?

18   *A*    Yes.  I reviewed it that morning.

19   *Q*    In fact, you reviewed it that morning right after you got

20   the call saying there was a problem; is that right?

21   *A*    Yes.  When we were notified by our supervisor.

22   *Q*    I want to draw your attention back to the screen here.  Can

23   you see where I'm placing the cursor?

24   *A*    Yes.

25   *Q*    Let me do this better, if I can, here.  What I'm doing is

1   circling the place where Mr. Heisler is standing, right?

2   A   Okay.

3   Q   Do you see that?

4   A   Yes, I do.

5   Q   And I'm going to run it forward.  What you see Mr. Heisler

6   do is go to a table and get an object, right?

7   A   I can't see from this far away what he's grabbing.

8   Q   But you can see he's grabbing something, yes?

9   A   It appears like he's touching the table right now.

10  Q   Okay.  Let me run it back for you again.  Let me stop it

11  here first.  Let me draw another circle and see if you remember

12  from your review of these video recordings that the second

13  circle I've drawn further to the right is where Mr. Shields is?

14  A   Yes.

15  Q   At this point in time in this video, Mr. Shields and

16  Mr. Heisler are verbally engaged with one another, right?

17  A   It appears so on tape, yes.

18  Q   The next thing that happens is that Mr. Shields begins to

19  walk underneath the staircase, right?

20  A   I believe so.

21  Q   Keeping the staircase between himself and Mr. Heisler?

22  A   Okay.

23  Q   And then going immediately up the stairs, right?

24  A   Yes.  He does go up the stairs.

25  Q   And Mr. Heisler does not go directly to those stairs, does

AMY KELLEY - Cross

1  he?

2  A   I would have to watch the tape to answer that question.

3  Q   When you watch it, what happens is Mr. Heisler goes first

4  to the table where his stuff is and grabs something; am I

5  correct about that?

6  A   I can't see from this angle.  I don't know if there's

7  another --

8  Q   Am I correct now that Mr. Shields is putting the staircase

9  between himself and Mr. Heisler?

10 A   Yes.  He's under the staircase.

11 Q   Can you watch for me carefully, please, what happens with

12 Mr. Heisler?  You see that he's looking at Mr. Shields?

13 A   Yes.

14 Q   You see that his right hand is at the table where his stuff

15 is?

16 A   It appears that he touches the table.  I can't see if he

17 picks something up.  He might have.  I can't see that on the

18 video.

19 Q   As the security officer for this unit investigating what

20 happened, you had a big concern about whether he was going for

21 a weapon, didn't you?

22 A   That was not my role that day.

23 Q   Immediately after Mr. Heisler goes to that table and picks

24 something up, he attempts to chase Mr. Shields up the stairs?

25 A   He does attempt to go up the stairs after Shields, yes.

AMY KELLEY - Cross

1    Q   You know from other investigation you had done that

2    Mr. Heisler had previously been caught trying to make a knife,

3    yes?

4    A   I don't believe so, not that I recall.

5    Q   That January 2015 you were involved in investigating and

6    writing up Mr. Heisler for having unauthorized metal that he

7    was attempting to turn into a knife?

8    A   I would have to see the incident report to refresh my

9    memory.

10   Q   You didn't bring that with you?

11   A   I do not have it with me, sir.

12   Q   You are aware that the guards present on the unit did not

13   ask Mr. Heisler to produce what he got off that table?

14   A   I'm not aware of any conversation like that.

15   Q   You didn't ask him to produce what he got off the table?

16   A   I didn't speak to any of the inmates that day, sir.

17   Q   You didn't direct any of your colleagues in the SIS who did

18   speak to the inmates to find out what it was that Mr. Shields

19   went and got off that table to chase Mr. -- I'm sorry -- what

20   Mr. Heisler went and got off that table to chase Mr. Shields

21   with?

22   A   No.  That was not my role that day, sir.

23   Q   You agree with me it was somebody's role?

24   A   Yes, sir.

25   Q   You have no knowledge of anyone ever asking Mr. Heisler

AMY KELLEY - Cross

1   that question?

2   A    Like I stated, I was not involved in any conversation with

3   the inmates that day.

4   Q    What time was it that morning you went down to J unit?

5   A    I believe we responded after the incident occurred,

6   probably about an hour after the incident occurred.

7   Q    You remember testifying and telling the jury you went down

8   there just after it happened?

9   A    After we reviewed the film, sir.

10  Q    You spent the time to run it back and look at what

11  happened, right?

12  A    To identify who was involved, yes, sir.

13  Q    And you have the ability to do just exactly what we were

14  doing here, which is to run it back multiple times, right?

15  A    Yes, sir.

16  Q    To stop it, right?

17  A    Yes, sir.

18  Q    I'm guessing that your equipment there also has the ability

19  to zoom in, even though we can't do that here, right?

20  A    There are capabilities to zoom in.

21  Q    But nobody looked to see what it was that Mr. Heisler went

22  for on that table?

23  A    Like I said, I was not involved in that, sir, that role.

24  My role was to search that day.

25  Q    So you said sometime an hour or so later?

AMY KELLEY - Cross

1   A   Within the hour, yes, sir.

2   Q   You went down, but you don't remember what time?

3   A   I don't recall specific time.

4   Q   But it wasn't until after the commissary people came to

5   pass out commissary items to the other inmates that you went,

6   right?

7   A   I'm not aware of when they were down there, sir.

8   Q   Let me ask you, if I could, to take a look at portions of

9   Government's Exhibit 3C.  The people that we can see on the

10  video screen now, there's a guard on the lower portion of the

11  unit; is that right?

12  A   Yeah.  It does appear to be an officer.

13  Q   Is that Officer Hill?

14  A   I'm not sure, sir.

15  Q   And then there's another individual on the upper tier who

16  is in the process of taking something over in a bag to one of

17  the inmate's cell doors, right?

18  A   It appears that way, sir.

19  Q   And that person has a bin, a rolling bin, that he's using

20  that he has the items in, right?

21  A   Yes.  I see the bin.

22  Q   That person is delivering commissary, right?

23  A   I believe so.

24  Q   And he's not a guard?  He's not a correctional officer; is

25  that right?  Does he have a different title?

1   A   He would probably just be named commissary officer.

2   Q   Let's roll this back a little bit so we can show the jury.

3   He's dropping a bag off at somebody's door, right?

4   A   It appears to be.

5   Q   Getting another bag and delivering it to another inmate's

6   door; is that right?

7   A   Yes.  That appears to be what he's doing.

8   Q   And then the next thing that happens is the guard comes up

9   and ultimately the items are handed through the doors to the

10  inmates, right?

11  A   Yes.

12  Q   Thus, adding new stuff into this environment that you're

13  going to be coming to search, yes?

14  A   I only searched the lower common area, sir.

15  Q   Somebody searched the upper?

16  A   I'm not aware of who, but yes.

17  Q   It would have been the right thing to do, right?

18  A   Yes.

19  Q   And you believe that it happened?

20  A   I believe it did happen.

21  Q   Is it fair to say the investigative purpose that you and

22  the rest of the team from SIS going to the J unit was to

23  determine the extent of a threat that existed?

24  A   That is part of the investigative process, yes.

25  Q   And if no threat existed, if it was all over and done with,

AMY KELLEY - Cross

1   there would have been no reason to go, right?

2   A   We would have still investigated the incident.

3   Q   Would you have sent eight or nine people, the entire unit?

4   A   Yes, sir.

5           THE COURT:  Counsel, excuse the interruption, but

6   we've arrived at a propitious time for us to declare and take

7   our mid-morning recess for this morning of trial, during which,

8   Lieutenant, you may stand down.  At the conclusion of the

9   recess, please return to conclude your testimony.

10          Counsel, you may be seated at your convenience.

11          Ladies and gentlemen of the jury, in preparation for

12  this mid-morning recess, two things, the same two important

13  things.  During this recess, please store your note-taking

14  materials in your suite, and, second, please be mindful of and

15  sensitive to those critically important rules that continue to

16  govern you as jurors in this trial.

17          We are in recess for 15 minutes.

18          Madam Clerk.

19      (Recess taken from 10:15 a.m. to 10:36 a.m.)

20          THE COURT:  Thank you.  Again, as you choose, either

21  be seated or remain standing for the jury.

22          Madam Clerk, please retrieve the jury, and thank you.

23      (Pause in proceedings.)

24          THE COURT:  All rise for the jury, please.

25      (Jury in at 10:36 a.m.)

1        *THE COURT:*  Again, thank you, Madam Clerk.

2            Ladies and gentlemen, again, please be seated.

3            Mr. Hutt, when prepared, you may continue and resume

4    your cross-examination.

5            *MR. HUTT:*  Thank you very much, Your Honor.

6            *THE COURT:*  You're welcome.

7    Q   (By Mr. Hutt)  Lieutenant, I'd like you to take a look at a

8    portion of Government's 3B, B as in boy, for me, if you would.

9    This is, again, another view from a camera on the second tier,

10   right?

11   A   Yes, sir.

12   Q   And it is -- shows Mr. Heisler, the big guy on the right,

13   and Mr. Shields on the left walking toward the staircase,

14   right?

15   A   It appears to be inmate Shields, yes.

16   Q   Tell me if I'm correct that what I'm seeing happens here is

17   before they go down the stairs, that a guard at the grill,

18   which is over here on the left of this particular video,

19   summons them over to talk; is that right?

20   A   I can't see an officer on the screen, sir.

21   Q   Right.  I know you can't see the officer on the screen, but

22   you know the grill is there, right?

23   A   There is a grill there, yes.

24   Q   And you know from your review of the recording that what's

25   happening is that an officer is summoning them over, right?

AMY KELLEY - Cross

1    A    It appears that way.  I just can't see an officer in this

2    view.

3    Q    I'm right that before that happens, that they appear to

4    be -- Mr. Heisler especially is getting ready to go down the

5    stairs and he stops because his attention is drawn by something

6    at that grill, right?

7    A    It appears to be so.

8    Q    The only thing on the other side of that grill will be a

9    corrections officer, right?

10   A    Yes.

11   Q    At that point, both he and Mr. Shields walk over, right?

12   A    Appears to be, yes.

13   Q    I'm going to switch up here and show you a different view,

14   if I can.  Okay.  Let me have you take a look at the screen, if

15   you could, please.  I want to show you a different angle of

16   this.  That's Mr. Heisler and Mr. Shields, the same thing,

17   coming over to the grill, right?

18   A    Yes.

19   Q    And if I showed you the camera from the other angle, am I

20   correct that what we will see is that there's a guard standing

21   there talking to both of them?

22   A    I don't know who is there.  It could be a counselor, an

23   officer.  I'm not sure who was standing there.

24   Q    Okay.  You can tell from this angle as you watch it that

25   Mr. Heisler is doing all of the talking; am I correct?

AMY KELLEY - Cross

1    A   It appears that he is talking right now, yes.

2    Q   And that Mr. Shields then turns and walks away?

3    A   Yes.

4    Q   You know from the investigation training that you have had,

5    that when you're investigating a crime, you never interview

6    witnesses together, right?

7    A   Correct.

8    Q   But that's exactly what's happening right there, isn't it?

9    A   I don't know if they were interviewing them.  I don't

10   believe so.

11   Q   You don't believe so?

12   A   That would have been included in the threat assessment if

13   that was an interview, sir.

14   Q   So you do not believe that the officers were asking them

15   what happened, what's going on?

16   A   I wasn't there for that conversation, sir.

17   Q   But your belief is that's not what was going on?

18   A   I can't say with all certainty because I was not there,

19   sir.

20   Q   I just want to show you one other image.  Take a look for

21   me, please, at the screen at Government's Exhibit 3C.  This is

22   the other angle looking from the far end of the range down to

23   where Mr. Heisler and Mr. Shields are being interviewed by an

24   officer, right?

25   A   It appears that they are talking to an officer right now at

AMY KELLEY - Cross

1    the grill, sir.

2    Q   Where I have the cursor, that's the officer on the right?

3    A   It appears to be, yes.

4    Q   Next to him, the bigger guy is Mr. Heisler?

5    A   Yes.

6    Q   The smaller guy is Mr. Shields?

7    A   It appears to be Heisler and inmate Shields.

8           MR. HUTT:  That's all I have.  Thank you, ma'am.

9           THE COURT:  Ms. Spencer, redirect examination for the

10   Government.

11          MS. SPENCER:  Thank you, Your Honor.

12          THE COURT:  You're welcome.

13                         REDIRECT EXAMINATION

14   BY MS. SPENCER:

15   Q   Lieutenant Kelley, when Mr. Hutt was asking you about

16   inmate Heisler and inmate Shields at the end of the grill and

17   talking to a correctional officer, he asked if they were being

18   interviewed, and you responded they were talking.  Is there a

19   term of art to the word "interview" within your work as an SIS

20   lieutenant?

21   A   Yes.  As it relates to an investigation.

22   Q   What does that mean?

23   A   Primarily, it means that we're going to be dissecting the

24   incident, dissecting who, what, why, when, where, why the

25   potential incident took place.  That will be conducted by SIS

1    personnel.

2    *Q*   Mr. Hutt asked you if one of the cardinal rules of doing

3    interviews is you do not interview witnesses together; is that

4    accurate?  You do not do that?

5    *A*   We tend to try not to.

6    *Q*   Why is that?  Why would you want to interview someone

7    alone?

8    *A*   There's several reasons, first being if an inmate does wish

9    to speak freely with us, we don't want another person there

10   coercing or intimidating or interjecting themselves in that

11   conversation in the interview.

12   *Q*   So there's a privacy to the event?

13   *A*   Yes, ma'am.

14   *Q*   Mr. Hutt began asking you questions about people who are

15   here in the courtroom today.  Are there people from the Bureau

16   of Prisons who are present today?

17   *A*   Yes, ma'am.

18   *Q*   Why is that?

19   *A*   Our Evidence Recovery Team, or ERT team, are normally the

20   individuals who will come in in a large-scale incident, collect

21   the evidence, and appear as a witness in court.  It is a great

22   learning opportunity for those staff members.

23   *Q*   They're just here to watch you testify?

24   *A*   They're here to observe the entire process so they

25   understand what they're doing in evidence recovery if they're

AMY KELLEY - Redirect

1   ever called to the courtroom.

2   *Q*   Mr. Hutt asked you about the commissary being delivered in

3   the unit, and you spoke of the individual as a commissary

4   officer.   Is the commissary officer still a corrections

5   officer?

6   *A*   Yes.   Everybody in the bureau is a correctional officer

7   first.

8   *Q*   When you say "everyone," that's A to Z?

9   *A*   Everybody is taught the basics about being a correctional

10  officer before their other assignments.

11  *Q*   Regardless of their title within the bureau?

12  *A*   Yes, ma'am.

13          *MS. SPENCER:*  Thank you.

14          *THE COURT:*  Very well.  May Lieutenant Kelley be

15  excused and released from subpoena, if any?  Any objection by

16  the Government?

17          *MS. SPENCER:*  No, Your Honor.

18          *THE COURT:*  Or by Mr. Shields?

19          *MR. HUTT:*  She can be released, Your Honor.  Thank

20  you.

21          *THE COURT:*  Very well.  Lieutenant, you are excused

22  and released from subpoena with our thanks.

23          *THE WITNESS:*  Thank you, sir.

24          *THE COURT:*  You're welcome.

25          Very well.  When prepared, the Government may call its

1    next witness, Mr. Cook.

2              *MR. COOK:*  Your Honor, the Government calls Terral

3    Anderson.

4              *THE COURT:*  Very well.

5              Terral Anderson, good morning.  If you'll come forward

6    to be sworn by the Court.  To accomplish that, if you'll make

7    your way to stand in this open area in front of my bench.

8    There is fine.  Please face me and raise your right hand to be

9    sworn.  Thank you.

10             May I have your attention in the courtroom.

11         (**TERRAL ANDERSON** was sworn.)

12             *THE WITNESS:*  I do.

13             *THE COURT:*  Thank you.  Please be seated in that

14   witness stand.

15             Mr. Cook.

16             *MR. COOK:*  Thank you.

17             *THE COURT:*  You're welcome.

18                         **DIRECT EXAMINATION**

19   *BY MR. COOK:*

20   *Q*   Good morning.

21   *A*   Good morning.

22   *Q*   Would you state your name and spell your last name.

23   *A*   My name is Terral Anderson, A-N-D-E-R-S-O-N.

24   *Q*   Where are you presently employed?

25   *A*   At the united States Penitentiary Administrative Maximum in

TERRAL ANDERSON - Direct

1   Florence, Colorado.

2   Q   Are you employed by the federal Bureau of Prisons at that

3   facility?

4   A   Yes.

5   Q   How long have you been employed by the BOP, the federal

6   Bureau of Prisons?

7   A   Since April 2012.

8   Q   Approximately six years?

9   A   Yes.

10  Q   What is your current position?

11  A   I'm a senior officer specialist.

12  Q   What was your position on March 18, 2015?

13  A   Senior officer.

14  Q   Is there a difference between senior officer and senior

15  officer specialist?

16  A   Yes.

17  Q   What is a common difference?

18  A   It is a promotable spot.

19  Q   So a senior officer specialist is a higher rank than senior

20  officer?

21  A   Yes.

22  Q   Okay.  You're employed by the United States Penitentiary

23  Administrative Maximum?

24  A   Yes.

25  Q   Is a common term for that prison known as the ADX?

1   A   Yes.

2   Q   Where have you worked while you've been employed by the BOP

3   for the past six years?

4   A   I've been employed at the ADX.

5   Q   Only at the ADX for six years?

6   A   Yes.

7   Q   Prior to working for the BOP, what other employment did you

8   have?

9   A   Four years at the United States Army and also worked one

10  year at the State of Colorado Department of Corrections.

11  Q   On March 18 were you employed at ADX as a senior officer?

12  A   Yes.

13  Q   Do you recall the events of March 18, 2015?

14  A   Yes.

15  Q   Do you know the defendant, Shawn Shields?

16  A   Yes, I do.

17  Q   How are you familiar with the defendant?

18  A   I worked on the same units where he's been housed.

19  Q   What type of interaction would you have with the defendant?

20  A   Taking him to recreation, feeding the inmate.

21  Q   Would you conduct rounds during your daily interactions?

22  A   Yes.

23  Q   In the housing unit, okay.  What institution was the

24  defendant housed in on March 18, 2015?

25  A   He was housed at the ADX.

TERRAL ANDERSON – Direct

1    Q    Generally, can you explain the layout of the ADX, how it's

2    broken down into housing units?

3    A    Yes.  There's five general population units, a control

4    unit, a Special Housing Unit, and then two step-down units and

5    a secret secured unit.

6    Q    On March 18, 2015, what housing unit was the defendant

7    housed in?

8    A    He was in J unit.

9    Q    Is that also known as joker unit?

10   A    Yes.

11   Q    Was he housed on the joker alpha side?

12   A    Yes, he was.

13   Q    Is ADX Florence a federal correctional facility?

14   A    Yes.

15   Q    Do you recognize the defendant, Shawn Shields, in the

16   courtroom today?

17   A    Yes, I do.

18   Q    Would you please point to him and describe an article of

19   clothing he's wearing.

20   A    Right here in a purple and white striped shirt.

21          *MR. COOK:*  Your Honor, may the record reflect an

22   in-court identification of the defendant by the witness?

23          *THE COURT:*  Your request is granted.  The record may

24   subject, of course, to cross-examination.

25   Q   (By Mr. Cook)  Officer, what is the Special Housing Unit at

TERRAL ANDERSON – Direct

1  the ADX?

2  *A*  The Special Housing Unit takes the more disruptive inmates

3  and secures them and is more restrictive than either the

4  general population or the step-down units.

5  *Q*  Is the Special Housing Unit often referred to as SHU, SHU?

6  *A*  Yes.

7  *Q*  Is the SHU used for administrative holding or temporarily

8  housing of inmates undergoing investigation?

9  *A*  Yes.

10  *Q*  Were you assigned as a senior officer in the SHU on March

11  18, 2015?

12  *A*  Yes.

13  *Q*  Can you describe some of the duties that you have as a

14  housing unit officer in Special Housing Unit?

15  *A*  Accountability of all the inmates, conducting rounds,

16  recreation, feeding of the inmates, and then processing any

17  inmates in or out depending on how long they're housed there.

18  *Q*  Okay.  We'll talk about processing here in a few minutes.

19  *A*  Okay.

20  *Q*  In the Special Housing Unit, how are the inmates housed

21  together?

22  *A*  They are housed separately.

23  *Q*  In separate cells?

24  *A*  Yes.

25  *Q*  Do they ever have any physical interaction with each other?

TERRAL ANDERSON – Direct

1  *A*    No.

2  *Q*    During recreation time, no interaction?

3  *A*    No.

4  *Q*    On March 18, 2015, who was escorted into the Special

5  Housing Unit?

6  *A*    Inmate Shawn Shields.

7  *Q*    Was also inmate Heisler escorted to the Special Housing

8  Unit that day?

9  *A*    Yes, he was.

10 *Q*    Do you know why the defendant was escorted to the Special

11 Housing Unit on March 18, 2015?

12 *A*    I had been told that there was a possible fight that had

13 taken place.

14 *Q*    Can you describe a -- excuse me.  What machine is located

15 within the Special Housing Unit?

16 *A*    The SecurPASS machine.

17 *Q*    Okay.  And you mentioned previously the intake processing

18 of inmates that come into the Special Housing Unit.  Can you

19 describe that process?

20 *A*    Yes.  They're brought into the unit, and, at that point, if

21 there's no officers available, they are placed in the

22 observation cell.  But on that specific day, we weren't busy so

23 we just took the inmate directly into the SecurPASS room to be

24 scanned like any other inmates, and then you're taken to your

25 cell once you go through the machine.

TERRAL ANDERSON – Direct

1  Q   Is it standard procedure for all inmates that enter in the

2  Special Housing Unit to go through a SecurPASS scan?

3  A   Yes.

4  Q   Can you briefly describe the SecurPASS machine?

5  A   The SecurPASS machine is like a giant x-ray machine but for

6  humans instead of just objects and...

7  Q   What is the purpose of a SecurPASS machine?

8  A   To detect any illegal contraband on or in an inmate.

9  Q   You say "on or in."  Can you be more specific?

10 A   If they're trying to conceal it within their body.

11 Q   So an inmate may have an item concealed on his clothing; is

12 that correct?

13 A   Yes.

14 Q   Or inside of a body cavity?

15 A   Yes.

16 Q   And the SecurPASS machine would detect both of those

17 locations?

18 A   Yes.

19 Q   In the binder, Officer Anderson, in front of you, please

20 turn to Government's Exhibits 7 through 10.  When you get to

21 those exhibits, 7 through 10, would you please look at them and

22 review them.  Have you completed review of them?

23 A   Yes.

24 Q   Without describing each of the exhibits, generally what's

25 depicted in Government's Exhibits 7 through 10?

TERRAL ANDERSON – Direct

1    A    That's the SecurPASS machine.

2    Q    How do you recognize these exhibits?

3    A    It's the one that is located in the Special Housing Unit

4    where I work.

5    Q    How many times have you been inside of this room where the

6    SecurPASS machine is located?

7    A    Hundreds of times.

8    Q    How many times have you operated the SecurPASS machine?

9    A    I've operated it over 50 times.

10   Q    Do these photos fairly and accurately reflect the SecurPASS

11   machine as it looked on March 18, 2015?

12   A    Yes, they do.

13        MR. COOK:  Your Honor, the Government moves to admit

14   Government's Exhibits 7 through 10 into evidence.

15        THE COURT:  Response.

16        MR. BELLER:  Thank you, Your Honor.  There's no

17   objection.

18        THE COURT:  Government's Exhibits 7, 8, 9, 10 for

19   identification admitted in evidence with leave to publish and

20   discuss in the presence of the jury.

21        MR. COOK:  Thank you, Your Honor.

22        THE COURT:  You're welcome.

23   Q   (By Mr. Cook)  I want you to take a look at Government's

24   Exhibit No. 7, which is on the screen in front of you.  You

25   mentioned before the purpose of the SecurPASS machine was to

1  detect contraband; is that correct?

2  A    Yes.

3  Q    Looking at Government's Exhibit 7 on the screen, can you

4  highlight the area where the inmate would stand on the machine?

5  If you would just touch the screen in front of you.

6  A    It's kind of hard to see the platform specifically in this

7  picture.

8  Q    And then what looks like a doorway, can you describe what

9  that doorway is?

10  A    The doorway is detecting instruments when an inmate passes

11  through it.

12  Q    Can you describe the full process of when an inmate is

13  brought into the SecurPASS room during intake, the process that

14  you would use to place an inmate on the machine and have him

15  pass through that machine?

16  A    The inmate is placed over here to the left of the machine.

17  He steps up on to the platform that has two footprints on it

18  and a dot on the floor.  The inmate is told to stand still and

19  direct his attention and eyes down at the floor on to the dot

20  and to hold still while the platform moves through the two

21  beams while it scans.  It takes about five to six seconds to go

22  through the machine.

23  Q    And the inmate is carried on that platform through the

24  doorway mechanism?

25  A    Yes.

TERRAL ANDERSON – Direct

1    Q    Is there a period of time that the machine has to warm up

2    or be tested before it's used?

3    A    Yes.  It usually takes about five minutes before.

4    Q    Can you describe that warm-up and testing process?

5    A    Well, the machine is turned on, and then it goes through

6    the warm-up process on its own, and then there's a little metal

7    black box located in there that you can set on to the machine

8    and send it through and it will show that it detects a metal

9    object so you know it's working properly.

10   Q    How does the metal object show up on the computer screen?

11   A    It shows up brightly, almost glowing.

12   Q    I would like to direct your attention to Government's

13   Exhibit No. 9.  When an inmate is scanned on the SecurPASS

14   machine, where are the images displayed?

15   A    They are displayed on the computer screen right here.

16   Q    Government's Exhibit 9 reflects the computer screen on that

17   SecurPASS machine?

18   A    Yes.

19   Q    Can you describe the room where the SecurPASS machine is

20   located within the Special Housing Unit?

21   A    The room is 142 alpha.  It's used for interviewing purposes

22   between either -- it can be unit team or psychology to talk to

23   inmates one on one.

24   Q    Now, I'd like to show you Government's Exhibit No. 8.  Can

25   you describe what's depicted in Government's Exhibit 8, please?

TERRAL ANDERSON – Direct

1   A   It's the SecurPASS machine as a whole.

2   Q   And down there towards the lower left-hand portion, is that

3   the two footprints and the mark you were talking about earlier?

4   A   Yes.

5   Q   Can you circle that?

6   A   (witness complied.)

7   Q   Thank you.  I would like to show you Government's Exhibit

8   No. 10.  Can you describe Government's Exhibit No. 10 briefly,

9   please.

10  A   This is the platform that the inmate stands on before going

11  through the SecurPASS machine.

12  Q   So is it fair to say Government's Exhibits 7, 8, 9, 10 show

13  the same SecurPASS machine from various angles?

14  A   Yes.

15  Q   Have you received training on how to properly use this

16  SecurPASS machine?

17  A   Yes, I have.

18  Q   I think you mentioned before, but you have operated the

19  SecurPASS machine before, correct?

20  A   Yes.

21  Q   I believe you testified dozens of times; is that right?

22  A   Yes.  Over 50 times.

23  Q   Had you operated the SecurPASS machine prior to March 18,

24  2015?

25  A   Yes.

1    *Q*   Approximately, how many times?

2    *A*   At least 20 plus times.

3    *Q*   Based on your prior experience operating the SecurPASS

4    machine, I think you mentioned this before, when a metal object

5    is detected on a person, what does that metal object look like?

6    *A*   The screen is kind of like a black and white, but it's dark

7    black or when the metal object passes through it it's almost

8    like a bright white.

9    *Q*   Does the computer allow you to contrast the image from

10   black to white?

11   *A*   Yes, it does.

12   *Q*   I'm sorry?

13   *A*   Yes, it does.

14   *Q*   Sorry.  I interrupted you.  Can you describe the reason why

15   they would have -- why the machine would have the ability to

16   contrast black and white for various objects?

17   *A*   Determining what type of contraband it may be.  The

18   contrasting images tend to help differentiate what it is.

19   *Q*   You mentioned a few minutes ago that the metal objects

20   glow.  Would they glow white?

21   *A*   Yes, they do.

22   *Q*   Would they also glow black?  Would it be a glowing black

23   object, too?

24   *A*   No.

25   *Q*   So it just glows white?

TERRAL ANDERSON - Direct

1   *A*   Yes.

2   *Q*   Turning your attention back to March 18, 2015, you

3   previously mentioned the defendant was escorted to the Special

4   Housing Unit, correct?

5   *A*   Yes.

6   *Q*   After the defendant arrived in the Special Housing Unit,

7   did you interact with him?

8   *A*   Yes, I did.

9   *Q*   What interactions do you recall having with the defendant?

10  *A*   I had to talk to him about when you intake an inmate, you

11  have to ask him his name and number to ensure it's him, and

12  then compare it to an ID card.  At that point, I escort -- I

13  helped assist him to the SecurPASS room, and, overall, it

14  seemed like a normal routine.

15  *Q*   So, in your opinion, at that point, it was a routine intake

16  into the Special Housing Unit?

17  *A*   Yes.

18  *Q*   I want to show you again Government's Exhibit No. 8.  On

19  March 18, 2015, who operated the SecurPASS machine when the

20  defendant was brought into the Special Housing Unit?

21  *A*   I did.

22  *Q*   And was Shields placed -- was the defendant placed on the

23  machine on the footprints as reflected in Government's Exhibit

24  No. 8?

25  *A*   Yes, he was.

TERRAL ANDERSON - Direct

1   Q   When he was placed -- when the defendant entered the

2   Special Housing Unit, did the defendant have hand restraints or

3   handcuffs on?

4   A   Yes, he did.

5   Q   Now, is it normal escort procedure for an inmate to remain

6   in handcuffs as he's escorted throughout the institution?

7   A   Yes.

8   Q   When you placed the inmate into the -- excuse me -- the

9   defendant into the SecurPASS machine, did he remain in

10  handcuffs?

11  A   Yes, he did.

12  Q   Who, besides you, was present when the inmate -- excuse

13  me -- when the defendant was scanned through the SecurPASS

14  machine?

15  A   A couple officers and a couple lieutenants.

16  Q   Do you recall who the escorting officers were?

17  A   I believe they were SIS Tech Munoz and SIS Lieutenant

18  Alvarez were the only ones I can recall.

19  Q   In looking at Government's Exhibit No. 8, can you describe

20  for the jury the process that you used to have the defendant

21  scanned on the SecurPASS machine?

22  A   The inmate is directed to stand where the footprints are on

23  the platform, to remain still, and look at the black dot on the

24  floor.  At that point, the machine is started for the scan

25  process.  It moves from left to right, and then it returns back

TERRAL ANDERSON - Direct

1    to the left once it's complete.

2    Q   Were you present in the SecurPASS room each time the

3    defendant was scanned on the SecurPASS machine?

4    A   Yes, I was.

5    Q   If you would please turn to Government's Exhibits 11 and

6    12, please.  Would you please take a look at and review those

7    exhibits.  Let me know when you've completed review of them.

8    A   Okay.

9    Q   Again, without describing each of the exhibits

10   individually, generally what is reflected in Government's

11   Exhibits 11 and 12?

12   A   Scans of the defendant from that day.

13   Q   From the SecurPASS machine?

14   A   Yes.  From the SecurPASS machine.

15   Q   How do you recognize Government's Exhibits 11 and 12?

16   A   I was the one operating the SecurPASS machine.

17   Q   Do these photos fairly and accurately reflect two of the

18   SecurPASS images on March 18, 2015, of the defendant?

19   A   Yes, they do.

20        MR. COOK:  Your Honor, the Government moves to admit

21   Government's Exhibits 11 and 12 into evidence.

22        THE COURT:  Response.

23        MR. BELLER:  Thank you, Your Honor.  There's no

24   objection.

25        THE COURT:  Government's Exhibits 11 and 12 for

TERRAL ANDERSON - Direct

1    identification admitted in evidence with leave to publish and

2    discuss in the presence of the jury.

3                MR. COOK:  Thank you, Your Honor.

4                THE COURT:  You're welcome.

5    Q  (By Mr. Cook)  I'd like to show you what's been marked

6    Government's Exhibit 11, which should be on the screen in front

7    of you.  Can you describe what this scan picture shows?

8    A   It shows something being concealed in the abdominal region.

9    Q   Who is the individual in the scan picture?

10   A   It's inmate Shields.

11   Q   Can you circle the area you identify as an unknown object

12   in the abdominal region?

13   A   (Witness complied.)

14               MR. COOK:  Can we enlarge this a little bit?

15   Q  (By Mr. Cook)  Can you circle it one more time?  I'm sorry.

16   A   (Witness complied.)

17   Q   When you saw this image on the screen, what did you think?

18   A   At that point, I figured it to be metal because of the way

19   it stood out on the image, but I did not know exactly where it

20   was located on him.

21   Q   After the SecurPASS machine takes an image like

22   Government's Exhibit 11, are you able to delete that image from

23   the machine?

24   A   No, I'm not.

25   Q   After you view this image on the screen and identified the

1    unknown object, did you ask the defendant any questions?

2    A    Yes, I did.

3    Q    What did you ask him?

4    A    I asked him what he was trying to conceal.

5    Q    How did he respond?

6    A    He stated that he had nothing on him.

7    Q    How did the fact the defendant had handcuffs on impact the

8    image that you were looking at?

9    A    Well, the handcuffs will sometimes give a false positive by

10   being in the way.

11   Q    Did you see that with this image?

12   A    They kind of looked like they were obstructing the object.

13   Q    Looking at Government's Exhibit No. 11, you mentioned the

14   hand restraints or handcuffs are partially obstructing the

15   metal object; is that right?

16   A    Yes.

17   Q    Can you identify for the jury kind of the color of the

18   handcuffs versus the color of the unknown object?  Are they

19   similar?

20   A    Yes, they are.

21   Q    What are the handcuffs made of?

22   A    They're made of metal.

23   Q    Who, if anybody, did you inform of the image -- of the

24   defendant's image of the unknown object at that time?

25   A    At that time, I let Lieutenant Alvarez know.

1  *Q*   Is Lieutenant Alvarez a higher ranking correctional staff

2  member?

3  *A*   Yes, he is.

4  *Q*   What did you and Lieutenant Alvarez do to remedy the

5  problem of the handcuffs partially obstructing the view?

6  *A*   We instructed the inmate to adjust his hand placement on

7  his back and sent him through the SecurPASS machine once again.

8  *Q*   How did you ask him to adjust his hands?

9  *A*   By bending his elbows more and bring his hands up further

10  on his back.

11  *Q*   I'm going to show you Government's Exhibit No. 12.  Does

12  Government's Exhibit 12 reflect the image after the defendant

13  was ordered to raise his hands up?

14  *A*   Yes.

15  *Q*   Did he, in fact, raise his hands up during this scan?

16  *A*   Yes.

17  *Q*   Can you describe what is shown on Government's Exhibit

18  No. 12?

19  *A*   It still shows the object being concealed.

20  *Q*   Is there any obstruction from the handcuffs?

21  *A*   No, there is not.

22  *Q*   What, if anything, did the defendant say after the scan was

23  taken?

24  *A*   He stated that if we showed him the screening, he would

25  give it up.

1  Q   What did you take that to mean?

2  A   He wanted us to show him the screen to verify that he --

3  that we saw the object being concealed, and that he would give

4  it to us at that point.

5  Q   Did the defendant, in fact -- was the defendant, in fact,

6  allowed to see the SecurPASS screen at that point?

7  A   I could not recall that.

8  Q   Did the defendant speak with Lieutenant Alvarez?

9  A   Yes, he did.

10  Q   After he spoke with Lieutenant Alvarez, where did the

11  defendant go?

12  A   He was escorted to interview room 142.

13  Q   Is interview room 142 the room that's adjacent to 142A?

14  A   Yes, it is.

15  Q   That's where the SecurPASS machine is located?

16  A   Yes.

17  Q   In the binder again in front of you, would you please turn

18  to Exhibits Nos. 13, 14, and 15, please.  Please let me know

19  when you've had a chance to review those.

20  A   Okay.

21  Q   Generally, what is reflected in Government's Exhibits 13,

22  14, 15?

23  A   It's room 142 in the SHU.

24  Q   How do you recognize this particular room?

25  A   By working in that unit numerous times.

TERRAL ANDERSON – Direct

1   *Q*   How many times have you been in this room?

2   *A*   Hundreds of times.

3   *Q*   Do these photos fairly and accurately reflect interview

4   room 142 on March 18, 2015?

5   *A*   Yes, they do.

6          *MR. COOK:*  Your Honor, at this time the Government

7   moves to admit Government's Exhibit's 13, 14, 15 into evidence.

8          *THE COURT:*  Response.

9          *MR. BELLER:*  Thank you, Your Honor.  Judge, I have no

10  objection to 13.  14 and 15 my objections are cumulative and

11  relevance.

12         *THE COURT:*  I discern the objection but overrule them

13  on relevance as defined by Rule 401.  That makes the exhibits

14  ostensibly admissible under Rule 402.  The cumulative objection

15  implicates Rule 403 which says, although relevant, evidence may

16  be excluded if its probative value is substantially outweighed

17  by -- there are six dangers.  One of them is the needless

18  presentation of cumulative evidence.  I also overrule that

19  objection as well.

20         Thus, Government's Exhibits 13, 14, 15 are admitted in

21  evidence with leave to publish and discuss in the presence of

22  the jury.

23         *MR. COOK:*  Thank you, Your Honor.

24         *THE COURT:*  You're welcome.

25  Q   (By Mr. Cook)  What was the purpose of escorting the

TERRAL ANDERSON - Direct

1    defendant into interview room 142?

2    A    At that point, the inmate was going to give up the

3    contraband that was being concealed.

4    Q    When you say "give up the contraband," what do you mean?

5    What was he expected to do in that room?

6    A    He was going to remove it from his body.

7    Q    If we look at Government's Exhibit 13, can you describe

8    this interview room for the jury, please?

9    A    Yes.  It's located on just the other side of the clear

10   windows of the SecurPASS room.  It's where inmates are taken to

11   be interviewed for multiple reasons.

12   Q    As you look through the window that's depicted on

13   Government's Exhibit 13, is that, in fact, the SecurPASS

14   machine on the other side of that window?

15   A    Yes, it is.

16   Q    How does the door mechanism work for room 142?

17   A    It is controlled by the control center.  It is a sliding

18   door that's push button activated.

19   Q    Just to the right of where it says 142, there appears to be

20   four kind of slots cut in the door.  Can you describe what

21   those are?

22   A    You're saying off to the number of 142?

23   Q    Just to the right of 142 there are four cuts in the door.

24   Can you describe what those are?

25   A    To make communication easier as you're standing outside the

TERRAL ANDERSON – Direct

1    door.

2    *Q*   So officers and inmates can speak through the slots?

3    *A*   Yes.

4    *Q*   Just to the right of the slots, it appears to be a window;

5    is that accurate?

6    *A*   Yes.

7    *Q*   Officers and inmates can look through that window into the

8    room and out of the room?

9    *A*   Yes.

10   *Q*   And then just below it looks like in a key hole there's a

11   rectangular slot that's horizontal.  Can you describe what that

12   slot is?

13   *A*   It's a keyed slot.  That's where the inmate is placed in

14   restraints usually but is used to pass documents or anything

15   they need while the inmate needs while being in there.

16   *Q*   Can the slot be opened up?

17   *A*   Yes, it can.

18   *Q*   And be closed again?

19   *A*   Yes, it can.

20   *Q*   How many times was the defendant scanned using the

21   SecurPASS machine on March 18, 2015?

22   *A*   I'm not exactly sure, but more than twice.

23   *Q*   Do you recall what the final scan of the defendant showed

24   on March 18, 2015?

25   *A*   The final scan showed that he was negative for contraband.

TERRAL ANDERSON - Direct

1  Q   Is this after he was taken to interview room 142?

2  A   Yes, it was.

3  Q   After the defendant was placed in the SecurPASS machine the

4  final time and it was negative for contraband, where was the

5  defendant taken at that point?

6  A   The inmate was escorted to a cell in the SHU.

7  Q   I think you mentioned this previously, but how are inmates

8  housed in the Special Housing Unit?

9  A   They are separated at all times.

10 Q   So they have no physical contact with each other, correct?

11 A   No physical contact.

12 Q   I think you mentioned that inmate Heisler was brought into

13 the Special Housing Unit prior to the defendant; is that right?

14 A   I can't recall which one arrived first or second.

15 Q   So if inmate Heisler and the defendant were housed in the

16 Special Housing Unit at the same time, would they be housed

17 together?

18 A   No, they would not.

19 Q   Would there be a physical barrier between them at all

20 times?

21 A   Yes, there would.

22 Q   That includes in their cell?

23 A   Yes, it would.

24 Q   At recreation?

25 A   Yes.

180

TERRAL ANDERSON - Direct

1  Q  Do you know what the defendant did in interview room 142?

2  A  I was told that he produced --

3      MR. BELLER:  Objection; hearsay.

4      THE COURT:  Response.

5      MR. COOK:  I'll move on, Your Honor.

6      THE COURT:  Well, that appears to be a confession of

7  the objection, which is sustained.

8      You may proceed.

9  Q  (By Mr. Cook)  Is there a common expression, in your

10 experience, for an inmate-made weapon?

11 A  Yes.  They refer to it as a shank.

12 Q  Have you ever discovered an inmate in your correctional

13 experience hiding a weapon or a shank in his rectum?

14 A  Yes.

15 Q  What were the circumstances of that incident?

16 A  I worked at the State of Colorado Department of

17 Corrections, and an inmate was in processed at a SHU while

18 working in Limon, Colorado.  While conducting a visual search

19 of him, we were able to detect he had a weapon inside his

20 rectum.

21 Q  When you say a visual search, what does that mean?

22 A  It is where the inmate is completely nude and you visually

23 check him from head to toe.

24 Q  That would include body cavities?

25 A  Yes, it does.

TERRAL ANDERSON – Direct

1    Q   And in that circumstance, how was the weapon packaged?

2              MR. BELLER:  Objection; relevance.

3              THE COURT:  Sustained.

4    Q   (By Mr. Cook)   Are inmates prohibited from having weapons

5    while at the ADX?

6    A   Yes, they are.

7    Q   Reflecting upon your interactions with the defendant on

8    March 18, 2015, how long did your interactions with him last?

9    A   About 15 minutes.

10   Q   During your interactions, what was his demeanor like?

11   A   He seemed to be calm at first.

12   Q   At first.  Did that change at some point?

13   A   After we ran him through the SecurPASS machine two times,

14   he began -- seemed nervous to me.

15   Q   During the time that you interacted with the defendant, did

16   he ever mention to you any safety concerns regarding inmate

17   Heisler?

18   A   No, he did not.

19   Q   Did he tell you about any safety concerns that he had with

20   any other inmates?

21   A   No, he did not.

22   Q   Did you hear him speak with any other staff members

23   regarding safety concerns with inmate Heisler?

24   A   No, I did not.

25   Q   Or with any other inmate?

TERRAL ANDERSON - Direct

1  *A*   No.

2  *Q*   Was this incident on March 18, 2015, the first time that

3  the SecurPASS machine during your time operating it had

4  detected a weapon?

5  *A*   For me personally, yes.

6  *Q*   In your experience, do inmates use their own rectum as a

7  hiding place?

8  *A*   Yes, they do.

9  *Q*   Is there a common slang expression for this hiding spot?

10  *A*   Yes.  They call it the prison purse.

11         *MR. COOK:*  One moment, Your Honor.

12         *THE COURT:*  Certainly.

13     (Pause in proceedings.)

14  Q  (By Mr. Cook)  Officer Anderson, when did the ADX get the

15  SecurPASS machine?  When was it obtained?

16  *A*   I don't know the exact date.

17  *Q*   Was it a relatively new piece of technology on March 18,

18  2015?

19  *A*   Yes, it was.

20  *Q*   Are there other SecurPASS machines located in the ADX?

21  *A*   There's one in the intake.

22  *Q*   In the intake.  Is that the receiving and discharge area?

23  *A*   Yes, it is.

24  *Q*   Is that where inmates come into the facility and inmates

25  leave the facility?

TERRAL ANDERSON - Direct

1   A    Yes.

2   Q    On March 18, 2015, did you operate the SecurPASS machine

3   when inmate Heisler came through the Special Housing Unit?

4   A    I can't recall.

5   Q    Do you recall any other positives that day for contraband?

6   A    No.

7   Q    On March 18, 2015, was the defendant visually searched as

8   you described it earlier?

9   A    We were told to SecurPASS him first as they wanted to start

10  using the SecurPASS machine instead of visually because during

11  a visual search there's still a margin of error of not

12  detecting every piece of contraband coming in.

13  Q    So the SecurPASS machine was used as a means to detect

14  contraband other than a visual search; is that right?

15  A    Yes.

16          MR. COOK:  No further questions, Your Honor.

17          THE COURT:  Very well.

18          Cross-examination for Mr. Shields, Mr. Beller.

19          MR. BELLER:  Thank you, Your Honor.  Briefly.

20          THE COURT:  You're welcome.

21                      **CROSS-EXAMINATION**

22  BY MR. BELLER:

23  Q    Good morning, sir.

24  A    Good morning.

25  Q    For about another 30 minutes, good morning.  Mr. Anderson,

TERRAL ANDERSON - Cross

1   you were asked whether Mr. Shields had ever indicated that

2   there was a threat or a danger, correct?

3   *A*   Yes.

4   *Q*   Did Mr. Heisler that day inform you that he had threatened

5   to break Mr. Shields' jaw?

6   *A*   No.

7   *Q*   So when you're checking somebody in to the SHU, is it fair

8   to say that it would be unusual for an inmate to have confessed

9   to making a threat?

10  *A*   No.

11  *Q*   Inmates oftentimes tell you they make threats?

12  *A*   No, they don't.

13  *Q*   So it would be unusual for an inmate to disclose to you

14  that they had just made a threat?

15  *A*   I don't understand the question.

16  *Q*   To be fair, it's because it was a terrible question on my

17  part.  Let me try that again, okay?

18        In this case, Mr. Heisler did not disclose a threat to

19  you?

20  *A*   No, he did not.

21  *Q*   Likewise, Mr. Shields did not disclose having been the

22  victim of a threat?

23  *A*   No, he did not.

24  *Q*   You've indicated that -- I believe you said that

25  Mr. Heisler had been run through the machine approximately five

TERRAL ANDERSON - Cross

1    times in order to isolate the weapon; is that right?

2    A    That was not inmate Heisler.

3    Q    It's because I'm going too quickly.  Let me try that again.

4    That it was Mr. Shields that went through the machine at least

5    five times?

6    A    Yes.

7    Q    And that's because the imaging needed to be redone several

8    times in order to really identify and isolate the weapon?

9    A    Yes.

10   Q    The first image was not completely clear; is that right?

11   A    Yes.

12   Q    And the second image, still a little unsure?

13   A    No.  At that point, it was determined that it was not the

14   restraints that were obstructing the view.

15   Q    That there was something inside him?

16   A    Yes, correct.

17   Q    And that the reason for the third image was what?

18   A    I believe that it was to -- I can't recall.

19   Q    Well, then what about the fourth image?  Why have a fourth

20   scan done of Mr. Shields?

21   A    I think the subsequent scans were to determine what exactly

22   it could be, if it was located on him or inside him.

23   Q    Okay.  So let me go back to my earlier question, then.  The

24   initial scans, it was not completely clear what the item was?

25   A    Yes.

TERRAL ANDERSON - Cross

1  *Q*   And the second scan, it was not completely clear what it
2  was or where it was located?
3  *A*   The scan showed where it was located.  It just didn't show
4  what exactly it was.
5  *Q*   So there were multiple scans that were necessary to isolate
6  the image?
7  *A*   Yes.
8  *Q*   Mr. Heisler, how many times did Mr. Heisler go through?
9  *A*   I don't recall that.
10 *Q*   Did it require multiple scans of Mr. Heisler to identify
11 whether or not he had a weapon hidden inside his rectum?
12 *A*   I don't believe so.
13       *MR. BELLER:*  Your Honor, if I may have just a moment,
14 please.
15       *THE COURT:*  You may.  Thank you.
16       *MR. BELLER:*  Thank you.
17    (Pause in proceedings.)
18       *MR. BELLER:*  Thank you, Your Honor.  I pass the
19 witness.
20       *THE COURT:*  Very well.
21       Mr. Cook, we direct examination for the Government?
22                    **REDIRECT EXAMINATION**
23 BY MR. COOK:
24 *Q*   Officer Anderson, you were asked about the threats --
25 excuse me -- the threat -- whether inmates commonly tell you

TERRAL ANDERSON - Redirect

1   they make threats to other inmates, right?

2   A   Yes.

3   Q   You stated it was not all that common, right?

4   A   No.  It's not common at all.

5   Q   Now, in your experience, is it unusual for an inmate to

6   state that he was threatened?

7   A   In most cases, they do come out.

8   Q   What methods do they use to let staff know they've

9   experienced a threat?

10  A   Either directly, direct communication, or they'll drop a

11  cop-out, a written note to the officers letting them know

12  discreetly.

13  Q   How would an inmate discreetly let officers know there was

14  a threat against him at the ADX?

15  A   Usually in written form.

16  Q   How would he provide that written form to officers?

17  A   He would write it, usually send it in the mail, or pass it

18  directly to an officer during, like, feeding or recreation

19  time, hand it off to the officer.

20  Q   You mentioned this method is discreet?

21  A   Yes.

22  Q   How do you know it's discreet?

23  A   Because usually officers do not want to let something like

24  that be known to other inmates.

25           MR. COOK:  No other questions, Your Honor.

TERRAL ANDERSON - Redirect

1          *THE COURT:*  Very well.  May Officer Anderson be

2    excused and released from subpoena?  Any objection by the

3    Government?

4          *MR. COOK:*  None, Your Honor.

5          *THE COURT:*  Or by Mr. Shields?

6          *MR. BELLER:*  No objection.  Thank you.

7          *THE COURT:*  Officer Anderson, you are both excused and

8    released from subpoena with our thanks.

9          *THE WITNESS:*  Thank you.

10          *THE COURT:*  You're welcome.

11          Very well.  When prepared, the Government may call its

12    next witness, Mr. Cook.

13          *MR. COOK:*  Thank you, Your Honor.  The Government

14    calls Charles Alvarez.

15          *THE COURT:*  Thank you.

16          Charles Alvarez, good morning.  If you would come

17    forward to be sworn by the Court.  To accomplish that, if

18    you'll make your way to stand in this open area in front of my

19    bench, please.  There is fine.  Please face me and raise your

20    right hand to be sworn.  Thank you.

21          May I have your attention in the courtroom.

22      (**CHARLES ALVAREZ** was sworn.)

23          *THE WITNESS:*  Yes, Your Honor.

24          *THE COURT:*  Thank you.  Please be seated in that

25    witness stand.

1        Mr. Cook.

2              *MR. COOK:*  Thank you, Your Honor.

3              *THE COURT:*  You're welcome.

4                          **DIRECT EXAMINATION**

5    *BY MR. COOK:*

6    *Q*   Good morning.

7    *A*   Good morning.

8    *Q*   Would you please state your name and spell your last name.

9    *A*   Charles Alvarez, A-L-V-A-R-E-Z.

10   *Q*   Are you currently employed?

11   *A*   Yes, I am.

12   *Q*   Who is your employer?

13   *A*   Bureau of Prisons.

14   *Q*   Is that commonly referred to as BOP?

15   *A*   Yes, it is.

16   *Q*   What is your current position?

17   *A*   I'm an SIA, special investigative agent.

18   *Q*   What are the duties of a special investigative agent?

19   *A*   They oversee the SIS department, which is Special

20   Investigative Services.

21   *Q*   What are the general duties of the SIS department?

22   *A*   The general duties of the SIS department is gang

23   validations; basically, investigating component for the Bureau

24   of Prisons.

25   *Q*   How long have you been an SIA?

CHARLES ALVAREZ - Direct

1   A   SIA, 2016 to present.

2   Q   Approximately two years?

3   A   That's correct.

4   Q   Where are you located?

5   A   FCC Victorville, in Victorville, California.

6   Q   What does FCC stand for?

7   A   Federal Correctional Complex.

8   Q   How long have you been employed by the BOP?

9   A   Since 2007, 11 years.

10  Q   Where have you worked while you've been employed by the

11  BOP?

12  A   I've worked -- 2007 I started FCC Tucson, which is a

13  complex as well.  Then I transferred to FCI Mendota, a Federal

14  Correctional Institution in Mendota, California, and then

15  that's when I got transferred to FCC Florence, Colorado.

16  Q   Have you worked at ADX Florence?

17  A   Yes, I have.

18  Q   What time period did you work at the ADX?

19  A   That would have been December 2012 through January 2016.

20  Q   What other experience do you have -- what other

21  correctional experience do you have prior to the BOP?

22  A   Prior to the BOP, 2003 I worked for a county jail.  Then in

23  2004, I worked -- from 2004 to 2007 I worked with the New

24  Mexico Department of Corrections.

25  Q   Turning your attention to your background with the BOP now,

1   what position did you hold while you were at the ADX?

2   A   I was an SIS lieutenant.

3   Q   What are the differences between an SIA special

4   investigative agent and SIS lieutenant?

5   A   So the SIS lieutenant would have straight oversight of the

6   SIS technicians.  Again, the SIA would have overall -- pretty

7   much -- SIA would be in charge of the SIS lieutenants to

8   include SIS techs.

9   Q   During your time as an SIS lieutenant at the ADX, did you

10  oversee the SIS technicians?

11  A   Yes, I did.

12  Q   So you would oversee the work that they were doing amongst

13  the SIS department?

14  A   Correct.

15  Q   On March 18, 2015, were you employed as an SIS lieutenant

16  at the ADX?

17  A   Yes, I was.

18  Q   What are some of the means that inmates can use to get the

19  attention of the SIS?

20  A   You know, they can reach out to any staff member and ask to

21  speak to anybody in the SIS department.  They can write a

22  cop-out requesting to speak to anybody in the SIS department.

23  The ADX is unique.  You can hit your duress panel and speak to,

24  you know, the control room officer and get the attention that

25  you want to speak to the SIS technicians or SIS department.

CHARLES ALVAREZ - Direct

1    Q   Can an inmate directly express any safety concerns with

2    members of the SIS department?

3    A   Absolutely.  Yes, they can.

4    Q   Through any of those various --

5    A   Through any of those means, yes.

6    Q   Do you recall the events of March 18, 2015?

7    A   I do.

8    Q   Do you know the defendant, Shawn Shields?

9    A   Yes, I do.

10   Q   How are you familiar with him?

11   A   He was involved in the verbal altercation down there on

12   that specific day.

13   Q   Prior to March 18, 2015, did you have any interactions with

14   the defendant?

15   A   No actual interaction, but I did know him when I would do

16   my lieutenant rounds, just glancing into his cell.

17   Q   What are lieutenant rounds?

18   A   Basically, you pick a housing unit one shift and walk a

19   range or two, and you would check in with the officers, fill in

20   their log books, and stuff like that.

21   Q   Where was the defendant housed on March 18, 2015?

22   A   That would have been joker unit.

23   Q   Is joker unit contained within the ADX?

24   A   Yes, it is.

25   Q   Is it also a stepdown unit at ADX?

CHARLES ALVAREZ – Direct

1  *A*  Yes.

2  *Q*  Is ADX Florence a federal correctional facility?

3  *A*  Yes.

4  *Q*  On March 18, 2015, the defendant was incarcerated at ADX?

5  *A*  Correct.

6  *Q*  Now, you mentioned you're familiar with the defendant.  Do

7  you recognize him in the courtroom today?

8  *A*  Yes, I do.

9  *Q*  Would you please point to him and identify an article of

10  clothing he's wearing?

11  *A*  Right there.  He has -- I believe it is a brown striped

12  shirt.

13        *MR. COOK:*  Your Honor, may the record reflect an

14  in-court identification of the defendant by the witness?

15        *THE COURT:*  It may, subject, of course, to

16  cross-examination.

17  Q  (By Mr. Cook)  Directing your attention back to March 18,

18  2015, on that date, did the SIS department go to joker unit?

19  *A*  Yes, they did.

20  *Q*  What were the circumstances that drew the SIS department's

21  attention to joker unit?

22  *A*  There was some sort of verbal altercation that had taken

23  place down in J unit.

24  *Q*  Who was involved in that verbal altercation?

25  *A*  Would have been inmate Shields and inmate Heisler.

CHARLES ALVAREZ - Direct

1  Q   What were you told about the verbal altercation, if you

2  recall?

3  A   Can you repeat that question?

4  Q   Sure.  When the SIS department was notified of the verbal

5  altercation, what were you told?

6  A   I wasn't told anything.  That was directed at -- something

7  appeared to be -- something out of the norm happened in joker

8  unit, and that we needed to review video cameras, which we did.

9  Q   Sir, you reviewed video of joker unit?

10 A   Correct.

11 Q   Do you recall what you reviewed?

12 A   Would have been that verbal altercation, and we witnessed

13 inmate Shields running up the stairwell.

14 Q   Did you review other video on that day?

15 A   No.  That was the only video.

16 Q   You mentioned on that date that SIS staff entered joker

17 unit; is that right?

18 A   Correct.

19 Q   What was the purpose of the SIS department entering joker

20 unit on that day?

21 A   We knew there was some sort of verbal altercation and that

22 it was our responsibility and our job to pretty much do an

23 administrative investigation to determine what was -- what

24 caused the verbal altercation.

25 Q   What was the status of joker unit when you arrived?

CHARLES ALVAREZ - Direct

1   A   When I arrived, it was already locked down and inmates were

2   in their cells.

3   Q   When you say "locked down," what do you mean?

4   A   The inmates were placed in their cells and doors were

5   secured and there was no movement.

6   Q   When SIS department staff enter a housing unit such as

7   joker unit, what is the protocol in that unit moving forward?

8   A   The inmates know when the SIS department comes in is that

9   the more likely there's going to be a shakedown of the housing

10  unit.  Their cells are going to be searched.  There will be

11  interviews that will be conducted.  They know the routine.

12  Q   Now, when you say "shakedown," what do you mean by

13  shakedown?

14  A   Their cells will be searched for any contraband to include

15  the common areas, meaning the stairwell or any area where an

16  inmate has any access to will be searched.

17  Q   You mentioned an inmate would be taken out for interviews.

18  Who would conduct the interviews?

19  A   The SIS department would conduct the interviews.

20  Q   How would those interviews be conducted?  As a group?

21  Separately?

22  A   No.  They would be separate interviews.

23  Q   Is locking down a housing unit, doing cell searches,

24  inmates being interviewed, the unit being searched, is that

25  common when the SIS goes into a housing unit at the ADX?

CHARLES ALVAREZ - Direct

1   *A*   Yes.  If you have the whole SIS department down there, it

2   is common, yes.

3   *Q*   On March 18, 2015, did you participate in any escorts of

4   the inmates from joker unit?

5   *A*   Yes, I did.

6   *Q*   Who did you help escort?

7   *A*   I escorted inmate Heisler first, and then I escorted inmate

8   Shields.

9   *Q*   Who helped you escort the defendant from joker unit on

10  March 18, 2015?

11  *A*   That would have been SIS Tech Munoz.

12  *Q*   Can you briefly describe the escort procedures that you

13  used?

14  *A*   So the inmate is again restrained from the back.  He's

15  restrained.  He's got his -- I believe he has the leg irons on

16  as well.  Prior to exiting the housing unit he was in, which

17  would have been joker unit, he would have been pat searched and

18  we would have escorted him to Special Housing Unit.

19  *Q*   What is the Special Housing Unit?

20  *A*   Special Housing Unit is -- it's a separate secure housing

21  unit.  It is not a general population unit.  It is a Special

22  Housing Unit.  That's where we put inmates in there for

23  administrative investigations and stuff like that.

24  *Q*   You mentioned earlier that you escorted inmate Heisler

25  first from joker unit; is that right?

1    A    Correct.

2    Q    Was he escorted separately from the defendant?

3    A    Yes, he was.

4    Q    Is that typical of the ADX, to escort inmates separately?

5    A    Yes.  They try to get one inmate out of the corridor,

6    meaning the hallways, per -- one inmate per hallway.

7    Q    Why did you escort the defendant to the Special Housing

8    Unit on March 18, 2015?

9    A    Because there was going to be some sort of administrative

10    investigation that was going to be opened up on him.

11    Q    Can you briefly describe the procedures when an inmate is

12    admitted into the Special Housing Unit?

13    A    Yeah.  The procedures are, once we get inside the Special

14    Housing Unit, the inmate is positively identified by the

15    officers, which would be SHU officers.  We would turn over

16    custody to the SHU officers.  They pat search the inmates and

17    then they proceed to take them into the room which is where the

18    SecurPASS machine is at and they place the inmate in the

19    SecurPASS machine, run them through there.

20    Q    I want to show you what's been previously admitted and

21    marked as Government's Exhibit 7.  It will come up on the

22    screen momentarily.  You mentioned the SecurPASS machine.  Is

23    this a depiction of the SecurPASS machine?

24    A    Yes, it is.

25    Q    Can you briefly describe what the SecurPASS machine does or

CHARLES ALVAREZ - Direct

1   its purpose?

2   A   Basically, it is a whole body imaging system.  It's x-rays.

3        MR. HUTT:  Excuse me, Your Honor.  Objection.  This is

4   cumulative.

5        THE COURT:  Response.

6        MR. COOK:  Your Honor, it's setting up the SecurPASS

7   machine.  He briefly identified it, talked about it.  I want to

8   go through the exhibits and talk about it in more depth.

9        THE COURT:  Well, I'll give you that opportunity,

10  overruling the objection for now but without prejudice.  But we

11  hope that you will present evidence about the SecurPASS machine

12  in addition to that which has already been presented without

13  objection.

14       MR. COOK:  Thank you, Your Honor.

15  Q   (By Mr. Cook)  Who was working in the Special Housing Unit

16  on March 18, 2015?

17  A   That would have been officer Anderson and Officer Gomez.

18  Q   After arriving in Special Housing Unit with the defendant,

19  did you interact with Officers Anderson and Gomez?

20  A   Yes, I did.

21  Q   What types of interactions did you have with them?

22  A   Again, they identified inmate Shields as he came into the

23  housing unit.  They pat searched him.  Then I went into a

24  separate room where I was going to call the control center and,

25  basically, tell them I had just moved inmate Shields from joker

CHARLES ALVAREZ - Direct

1  unit to Special Housing Unit so they could make the move in the

2  system.  That's when Officer Gomez came up to me and said there

3  was what appeared to be something hidden in his lower abdomen.

4  Q   Now, was that after an initial scan on the SecurPASS

5  machine?

6  A   Correct.  That would have been after the first scan, yes.

7  Q   Were you present during that scan?

8  A   No, not the first scan, no.

9  Q   Did the defendant remain in handcuffs when he was placed

10  onto the machine?

11  A   Yes, he was.

12  Q   Who operated the SecurPASS machine when the defendant was

13  on the machine?

14  A   That would have been Officer Anderson.

15  Q   You mention that you were away during that first scan.

16  What prompted your attention to come into the SecurPASS room?

17  A   That would have been Officer Gomez coming in saying there

18  was something in his lower abdomen.  It looked abnormal.

19  Q   I want to show you what's been marked Government's

20  Exhibit 11.  On Government's Exhibit 11, can you identify that

21  object in the lower abdominal region?

22  A   You can see it.  You just can't clearly see it, correct.

23  Q   Now, can you circle it on the screen in front of you?

24  A   (Witness complied.)

25  Q   When you saw this image, what did you believe it to be?

CHARLES ALVAREZ – Direct

1  *A*   My first initial thought is he would have had some lower

2  back surgery which would have had some screws or metal plate

3  put in him.

4  *Q*   Did you ask the defendant about the potential to have back

5  surgery in his history?

6  *A*   Yes, I did.

7  *Q*   How did the defendant respond?

8  *A*   He had one screw, a screw, placed in his lower back.

9  *Q*   After the defendant told you he had a screw in his lower

10  back, what did you do?

11  *A*   I proceeded to step onto the SecurPASS machine itself and

12  lifted up his shirt to see if there was any sort of evidence of

13  scarring or some sort of scar.

14  *Q*   What did you observe on the defendant's back?

15  *A*   There was no scarring.

16  *Q*   After you confirmed he had no scarring on his back, what

17  did you direct the defendant to do?

18  *A*   So we ran it a couple more times, and then I gave him a

19  direct order -- not a direct order.  I had him lift his hands

20  up, which would have been on the fourth time that we scanned

21  him.  I had him lift his hands up above the waist line to get a

22  clearer picture.  I initially thought the hand restraints were

23  impeding the x-ray.

24  *Q*   After you instructed the defendant to lift up his hands

25  that were handcuffed, did he, in fact, do that?

CHARLES ALVAREZ - Direct

1    A    Yes, he did.

2    Q    Was he scanned thereafter?

3    A    Yes, he was.

4    Q    What did that image show?

5    A    That showed a clear picture, yes, he was concealing

6    something.

7    Q    What did you believe the object was at that point?

8    A    Probably a weapon is what my first initial thought was.  He

9    had some sort of weapon in there.

10   Q    Did you instruct the defendant to do anything at that

11   point?

12   A    No.  At that point I exited the room and was going to call

13   medical to see if there were medical records that indicated he

14   had a lower back surgery with plates and screws in him.  That's

15   when the officer came and said, hey, if you show him the

16   screen, he'll give it to you.  I exited the room and gave him a

17   direct order to give me what he had in him.  Inmate Shields

18   said, "If you show it to me on the screen, I'll give it up to

19   you."

20   Q    Did you, in fact, let the defendant look at the screen?

21   A    Correct.  I escorted him off the machine and to a TV

22   monitor.

23   Q    After you showed him the screen, what did he do?

24   A    His response was, "Okay.  You got me.  Technology is a

25   bitch nowadays.  Just escort me to the holding tank there, and

CHARLES ALVAREZ - Direct

1   I'll give it to you plus I don't want Osagie's fat fingers in

2   my ass."

3   Q   Okay.  Was that a direct quote from the defendant?

4   A   Yes.  It was a direct quote, yes.

5   Q   You mentioned "Osagie."  Who is Osagie?

6   A   Osagie is a PA, which is a physician's assistant.

7   Q   Now, at that point when he made the statement he wanted to

8   go to another room to give it to you, what did you do?

9   A   I escorted him down to that holding cell.  While I was

10  escorting him, I asked Mr. Shields if he -- if it was metal.

11  The reason for me asking that was because, again, staff safety

12  was paramount at that time if I knew it was metal in his rectum

13  or what.

14  Q   I want to show you what's been previously admitted as

15  Government's Exhibit No. 13.  It will come up on the screen

16  momentarily.  Is this the room where the defendant was

17  escorted?

18  A   That's correct.

19  Q   What was the purpose of escorting the defendant to

20  interview room 142?

21  A   He said he was going to give it up to us willingly if we

22  move him to that escort room.  It was to retrieve whatever he

23  had in his rectum.

24  Q   Did you observe the defendant when he was inside the room?

25  A   Yes, I did.

CHARLES ALVAREZ – Direct

1    *Q*   I want to show you what's been marked Government's

2    Exhibit 15, which has also been previously admitted.  Can you

3    identify on Government's Exhibit No. 15 where you would have

4    been standing?

5    *A*   Yeah.  I would have been right there in front of the

6    window.

7    *Q*   Right of the window or left of the window?

8    *A*   No.  Directly in front of it.

9    *Q*   Directly in front of the window?

10   *A*   Correct.

11   *Q*   When you observed the defendant inside the room, what did

12   the defendant do?

13   *A*   The inmate was given a plastic bed pan with a trash bag

14   over it.  The defendant went to that little bench that was

15   right in front of there and squatted down and pulled something

16   out of his rectum.

17   *Q*   Approximately, how long did it take him to remove it?

18   *A*   It was between two to three seconds.  It was quick.

19   *Q*   What did the defendant do with the object once he removed

20   it from his rectum?

21   *A*   He placed it into that bed pan, along with that trash bag

22   as well.  Just left it there.

23   *Q*   What eventually happened with that unknown object?

24   *A*   That would have been retrieved by SIS Tech Munoz, and it

25   would have been placed into evidence.

CHARLES ALVAREZ - Direct

1  Q   After Officer Munoz had removed the unknown object, what

2  did you do with the defendant to ensure that he had produced

3  all the contraband?

4  A   The inmate was scanned for a fifth time, which was the

5  final time, to ensure everything was removed from the lower

6  abdomen area to make sure there was nothing else left in there.

7  Q   What was the result of that final scan?

8  A   It was clear.  It was a normal picture.

9  Q   Clear of any contraband?

10  A   Clear.  No contraband, no.

11  Q   After the defendant was placed on the SecurPASS machine a

12  final time, cleared for contraband, where did he go?

13  A   The officers would have moved him down to his assigned

14  housing unit -- assigned cell, I should say.

15  Q   What unit?

16  A   Special Housing Unit.

17  Q   How are the inmates housed in the Special Housing Unit?

18  A   They're single cells.  They rec alone and stuff like that

19  so there's no other inmates that could get to them or anything

20  like that.

21  Q   Do you know what the defendant produced from his rectum on

22  March 18, 2015?

23  A   Yes.  It was a metal sharpened edge weapon, also referred

24  to as a shank.

25  Q   In your experience, in your correctional experience, have

1  you discovered an inmate hiding contraband in his rectum?

2  A   Yes, I have.

3  Q   What were the circumstances of that?

4          MR. HUTT:  Objection, Your Honor; irrelevant.

5          THE COURT:  Response.

6          MR. COOK:  Your Honor, during the opening, defense

7  counsel made a point that there would be only one reason for an

8  item to be concealed in a rectum.

9          THE COURT:  Well, I'm going to permit it as relevant

10 once you demonstrate through this witness or otherwise that

11 this was the -- that this was the state of affairs on or before

12 March 18, 2015.  If he's going to describe events subsequent to

13 that, then, by definition, it's irrelevant.

14         MR. COOK:  Thank you, Your Honor.

15 Q  (By Mr. Cook)  Prior to March 18, 2015, in your prior

16 correctional experience, have you discovered an inmate hiding a

17 weapon or another piece of contraband in his rectum?

18 A   Yes, I have.

19 Q   What were the circumstances of that incident?

20 A   That would have been an inmate that was getting visually

21 searched, and he produced -- it would have been a cigarette

22 lighter out of his rectum.

23 Q   If you know, during the course of that incident, what was

24 the purpose of the inmate hiding the lighter in his rectum?

25 A   That would have been the purpose, to introduce it to the

CHARLES ALVAREZ - Direct

1   facility because it is contraband.  Lighters are not permitted.

2           THE COURT:  Counsel, please inquire of this witness

3   whether he considered it, in his opinion, this contraband,

4   cigarette lighter, to be a weapon.

5   Q  (By Mr. Cook)  Mr. Alvarez, did you consider the lighter in

6   that prior experience to be a weapon?

7   A   Potentially it could be used as a weapon, start a fire or

8   even melt plastic into a hardened shank or something like that.

9   Yes.  I would consider it hard contraband.

10  Q   Based on your prior correctional experience and looking

11  back before March 18, 2015, when an inmate conceals a weapon in

12  his rectum, what is he attempting to do?

13  A   Trying to introduce it, you know, to a facility.

14  Basically, trying to not alert staff, to get away from staff,

15  and hoping to, you know, keep it a secret and nobody knows.

16          THE COURT:  Counsel, excuse me.  We've arrived at our

17  noon recess for this day of trial.

18          During this noon recess, sir, you may stand down.

19  Please return at 1:00 p.m. as measured by the courtroom clock

20  in the rear of the courtroom to complete your testimony.  Can

21  you and will you do that?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Very well.  You're excused until then and

24  may stand down.

25          Counsel, you may be seated at your convenience.

CHARLES ALVAREZ - Direct

1           Ladies and gentlemen of the jury, in preparation for

2  our noon recess, two things.  First, over the recess, store,

3  leave behind in your suite your note-taking materials and, once

4  again, take the time reasonably necessary to read and heed

5  those important rules that continue to govern your conduct as

6  jurors in the trial of this case.

7           With those matters in place, you will not be

8  sequestered but free to separate and leave the federal

9  courthouse and go your separate ways.

10          Thus, we are in recess until 1:00 p.m.

11          Madam Clerk.

12     (Recess taken from 11:59 a.m. to 1:06 p.m.)

13          *THE COURT:*  Good afternoon.  Again, as you choose,

14  either remain standing or be seated as you choose.

15          Madam Clerk, once again, please, and thank you.

16     (Pause in proceedings.)

17          *THE COURT:*  Deputy marshals, good afternoon.

18     (Pause in proceedings.)

19          *THE COURT:*  All rise for the jury, please.

20     (Jury in at 1:07 p.m.)

21          *THE COURT:*  Thank you, Madam Clerk.

22          Ladies and gentlemen, please be seated.  Good

23  afternoon.

24          Very well.  Mr. Cook, when prepared, you may resume

25  your direct examination.

1    MR. COOK:  Thank you, Your Honor.

2    THE COURT:  You're welcome.

3  Q  (By Mr. Cook)  Mr. Alvarez, after the SIS department was

4  notified about the verbal altercation in J unit, what video did

5  you review?

6  A   I reviewed the video of the incident.

7  Q   Specifically, what did you review on the video?

8  A   So what I reviewed is inmate Shields running up the

9  stairwell and inmate Heisler was in pursuit of him when

10  another, a third inmate, was able to stop inmate Heisler from

11  pursuing inmate Shields at the stairwell.

12    I watched where Shields went around to his cell door

13  and retrieved something underneath the cell door, and then he

14  walked away towards the back where the showers were.  That was

15  the end -- that's as far as I watched.

16  Q   You didn't view any of the incident that happened before

17  that or after that small portion?

18  A   No, not at all.

19  Q   Earlier you testified that you asked the defendant whether

20  the item that he, had concealed in his rectum was made out of

21  metal.  Do you recall that?

22  A   Yes.

23  Q   I failed to ask you, what was the defendant's response?

24  A   He stated it was.

25  Q   What was the defendant's demeanor when he said it was

CHARLES ALVAREZ – Direct

1  metal?

2  A   He was cool, calm, collected.  He was respectful.

3  Q   Did he have an explanation for why he had a metal object in

4  his rectum?

5  A   No, he did not.

6  Q   You also testified that the defendant said after reviewing

7  the image on the screen, "Damn technology nowadays is a bitch."

8  Do you recall that?

9  A   Yes.

10  Q   What was his demeanor like when he said that?

11  A   Cool, calm, collected, respectful.

12  Q   Reflecting upon your interactions with the defendant on

13  March 18, 2015, did his demeanor change at all?

14  A   No, not at all.

15  Q   So he remained cool, calm, and collected the entire time?

16  A   Yes, he did.

17  Q   During the time you interacted with him, did he ever

18  mention any safety concerns he had with inmate Heisler?

19  A   No, not at all.

20  Q   Or any other inmate in joker unit?

21  A   No, no at all.

22        MR. COOK:  One moment, Your Honor.

23        THE COURT:  Certainly.

24     (Pause in proceedings.)

25        MR. COOK:  No other questions.

CHARLES ALVAREZ - Direct

1          *THE COURT:*  Thank you.

2          Cross-examination of this witness for Mr. Shields,

3    Mr. Hutt.

4          *MR. HUTT:*  Thank you very much, Your Honor.

5          *THE COURT:*  You're welcome.

6                          **CROSS-EXAMINATION**

7    *BY MR. HUTT:*

8    *Q*   Is it Agent Alvarez?  Is that the right way to address you

9    with your present rank, sir?

10   *A*   You can address me as Mr. Alvarez.  That's fine.

11   *Q*   Okay.  Thank you, sir.  Mr. Alvarez, Mr. Cook was just

12   asking you about your review of the video recording of some of

13   these events, right?

14   *A*   Correct.

15   *Q*   And you told him that you reviewed the video recording at

16   the time -- close in time to when it all happened, right?

17   *A*   Correct.

18   *Q*   Like that day?

19   *A*   Yes.

20   *Q*   Mr. Alvarez, you have testified previously in this case,

21   have you not?

22   *A*   Yes, I have.

23   *Q*   In this courtroom from that witness stand?

24   *A*   Correct.

25   *Q*   Also under oath?

CHARLES ALVAREZ - Cross

1   *A*   Correct.

2   *Q*   You know that anytime that you are in court and you

3   testify, that there's a person whose job it is to take down

4   everything that you say verbatim, correct?

5   *A*   Correct.

6   *Q*   On that day, when you testified in this case before, you

7   were asked very specifically about your review of the video.

8   Do you recall that?

9   *A*   I don't recall.  I mean, briefly recall.

10  *Q*   Okay.  At page 10, line 18, of the hearing that occurred on

11  the 22nd of June, 2017, am I not correct that you were

12  asked the following question and gave the following answer:

13          "Question:  Did you review a recording of this whole

14  business after it happened at anytime?

15          "Answer:  No.

16          "Question:  Never did?

17          "Answer:  No."

18          You gave that testimony, didn't you?

19  *A*   Is there a way I could see that?

20  *Q*   Yes, sir.  With the Court's permission, I will show you a

21  transcript.  Or ask the clerk to show you the transcript.

22          *THE COURT:*  Leave is granted with the aid of the

23  clerk.

24  *A*   You said what line now?

25  Q   (By Mr. Hutt)  Page 10, line 18.

1          Do you see that's a transcript of that hearing?

2    *A*   Correct.

3    *Q*   And you see that I read it word for word, yes?

4    *A*   Correct.  It says "this whole business after it happened."

5    I never seen the whole videotape.

6    *Q*   Okay.  Would you please read the question that you were

7    asked.

8    *A*   "Question:  Did you review a recording of this whole

9    business after it happened at anytime?  My response was, "No."

10   *Q*   What was the next question?

11   *A*   "Never did?"  I said, "No."

12   *Q*   What you're telling the jury and judge is that what you

13   meant by that that day is, oh, I watched a piece of it.  I just

14   didn't watch the entire thing?

15   *A*   Correct.  I was, basically, answering the question.  The

16   question is "whole business after."  I just watched a portion

17   of it.

18          MR. HUTT:  Your Honor, may I ask to retrieve the

19   transcript?

20          THE COURT:  You may.  Your request is granted.  Thank

21   you, Madam Clerk.

22   Q   (By Mr. Hutt)  I take it that under oath today what you said

23   to Mr. Cook and what you're telling the jury is you reviewed

24   the part of the video recording that had to do with the direct

25   altercation between Mr. Shields and Mr. Heisler; is that true?

1    *A*    Correct.  Just that portion.

2    *Q*    Do you remember in that same testimony being asked the

3    question at page 11, line 4.

4              "Question:  So at no time did my client or the other

5    person that say he had an altercation with lay hands on each

6    other?

7              "Answer:  No.  By the time we looked at the screen,

8    that's when we seen inmate Shields run up the stairs along with

9    the other inmate in pursuit of him.  We didn't catch what would

10   have happened prior to that."

11             That was your testimony?

12   *A*    That's correct.

13   *Q*    But you're telling the jury today that the truth is you

14   looked at that very piece of recording?

15   *A*    Correct.  Just not the whole piece, correct.  Just that one

16   portion.

17   *Q*    I'm going to make sure I understand this right.  When you

18   said under oath, "By the time we looked at the screen, that's

19   when we seen inmate Shields run up the stairs along with the

20   other inmate in pursuit of him," it doesn't sound like you're

21   talking about rewinding and reviewing and being able to look as

22   many times as you want, does it?

23   *A*    Can you repeat that question?

24   *Q*    Sure.  When you said, "By the time we looked at the screen,

25   that's when we seen inmate Shields run up the stairs along with

CHARLES ALVAREZ - Cross

1  the other inmate in pursuit of him," you're not indicating

2  you're reviewing the recording as slowly and as many times as

3  you want?

4  A   To the best of my recollection, the staff member called up

5  there to the SIS department who was working in joker unit,

6  Officer Hill, and asked if we could review video camera.  I

7  happened to be in the SIS area giving a passdown to my techs.

8  That's when they pulled the video screen, and when I looked

9  over and said, hey, you might want to see this.  That's when we

10 reviewed the portion, inmate Shields running upstairs and

11 inmate Heisler running after him.

12 Q   You didn't review what happened before?

13 A   No.

14 Q   You didn't review what happened after?

15 A   No.

16 Q   Because it wasn't important?

17 A   It was important.

18 Q   When you were testifying to the jury on direct examination,

19 you described five or six times that what happened was a verbal

20 altercation, right?

21 A   Correct.

22 Q   Let me ask you, Mr. Alvarez.  If I threatened to kill you,

23 grab a weapon, chase you, and someone has to tackle me from

24 getting to you, do you think a verbal altercation is a fair

25 description of that?

1   *A*   In the BOP, yes.  That's a verbal altercation.  If anything

2   was physical, that would be a physical altercation.

3   *Q*   Inmate Basciano physically tackled inmate Heisler.  It was

4   not physical?

5   *A*   I wouldn't say he physically tackled him.  He grabbed

6   inmate Heisler, yes, but he didn't tackle him.

7   *Q*   And you've watched the video?

8   *A*   Correct.

9   *Q*   Mr. Alvarez, you told the jury, I believe, that it's

10  standard protocol to interview everyone on the unit after

11  something like this happens; is that right?

12  *A*   That is correct.

13  *Q*   That didn't happen here, did it?

14  *A*   I don't recall.

15  *Q*   You do know that if inmates are interviewed, that is

16  reported, right?

17  *A*   Correct.

18  *Q*   And that the only reports of any interviews of any inmates

19  in this case were of Mr. Basciano and Mr. Heisler; is that

20  right?

21  *A*   Again, I didn't do the investigation.  I wouldn't recall.

22  *Q*   You've had access and the ability to review everything that

23  was investigated?

24  *A*   I did.

25  *Q*   You are the agent in charge of the SIS unit?

CHARLES ALVAREZ – Cross

1  A   No.  I was a special investigative service lieutenant.

2  Q   You, after that, became the agent in charge of the SIS

3  unit?

4  A   Not the SIS department in Florence, no.

5  Q   Elsewhere?

6  A   Correct.

7  Q   But you were a lieutenant?

8  A   Correct.

9  Q   As a lieutenant, you have the ability to review the

10  investigation?

11  A   Absolutely.

12  Q   You have said under oath that the unit was immediately

13  locked down, right?

14  A   Correct.  To the best of my recollection, yes.

15  Q   But that's wrong, isn't it?  It's not?

16  A   Again, I don't know.  I only watched that portion of the

17  video.  I can't say -- it should have been immediately locked

18  down, yes.

19  Q   Distribution of commissary would not be part of immediate

20  lockdown, would it?

21  A   Well, normal stuff like that -- the routine is that stuff

22  like that is still going to be -- deliveries of commissary will

23  still be taking place.  Lockdown means the inmates will not

24  come out of their cells to interact with each other or go to

25  recreation or stuff like that.

CHARLES ALVAREZ - Cross

1   Q   What you just described is the inmates going into their

2   cells and not coming out.  That's what happens everyday at the

3   end of rec?

4   A   Correct.

5   Q   That's not an immediate lockdown because we've had an

6   incident, is it?

7   A   Rephrase that question.

8   Q   That's not an immediate lockdown because we've had an

9   incident, is it?

10  A   Well, once rec is over, yes, they would secure that one

11  side of the housing unit and release the other one, correct.

12  Q   You are now aware that some 15 minutes passed between the

13  time of Mr. Heisler's death threat and chase of Mr. Shields to

14  when the last inmate was locked in his cell?

15  A   Again, I don't know what the -- the death threats or not.

16  I wasn't present down there.

17  Q   And you haven't investigated?

18  A   Correct.

19  Q   And no one told you?

20  A   Correct.

21  Q   You were aware as a lieutenant in the SIS that Mr. Heisler

22  prior to this event had been investigated for cutting pieces of

23  metal in his cell?

24  A   No.  I was never aware of that.

25  Q   And are you telling us that you did not ever review that

CHARLES ALVAREZ - Cross

1    portion of the video in which Mr. Heisler goes to the table to

2    grab something before chasing Mr. Shields?

3    *A*   No.  I never reviewed that at all, no.

4           *MR. HUTT:*  I don't have any other questions for this

5    witness.

6           *THE COURT:*  Redirect examination of this witness by

7    the Government, Mr. Cook?

8           *MR. COOK:*  No, Your Honor.  Thank you.

9           *THE COURT:*  Accordingly, may Mr. Alvarez be excused

10   and released from subpoena?  Any objection by the Government?

11          *MR. COOK:*  No, Your Honor.

12          *THE COURT:*  Or by Mr. Shields?

13          *MR. HUTT:*  No, Your Honor.

14          *THE COURT:*  Sir, you are both excused and released

15   from subpoena with our thanks.

16          *THE WITNESS:*  Thank you, Your Honor.

17          *THE COURT:*  You're welcome.

18          When prepared, the Government may call its next

19   witness.

20          Mr. Cook.

21          *MR. COOK:*  Your Honor, the Government calls Jaime

22   Munoz.

23          *THE COURT:*  Thank you.

24          Mr. Munoz, good afternoon.  If you would come forward

25   to be sworn by the Court.  To accomplish that, if you'll make

CHARLES ALVAREZ – Cross

1   your way to be stand in this open area in front of my bench.

2   There is fine.  Please face me and raise your right hand to be

3   sworn.  Thank you.

4          May I have your attention in the courtroom.

5       (**JAIME MUNOZ** was sworn.)

6          *THE WITNESS:*  Yes, Your Honor.

7          *THE COURT:*  Thank you.  Please be seated in that

8   witness stand.

9          Mr. Cook.

10         *MR. COOK:*  Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12  *BY MR. COOK:*

13  *Q*   Good afternoon, Mr. Munoz.

14  *A*   Good afternoon.

15  *Q*   Would you please spell your last name.

16  *A*   M-U-N-O-Z.

17  *Q*   Where are you presently employed?

18  *A*   At Florence Correctional Complex.

19  *Q*   Is that located in Florence, Colorado?

20  *A*   Yes, sir.

21  *Q*   Who is your employer?

22  *A*   Federal Bureau of Prisons.

23  *Q*   How long have you been employed by the federal Bureau of

24  Prisons?

25  *A*   Approximately ten years.

JAIME MUNOZ - Direct

1    Q    What is your current position?

2    A    Correctional counselor.

3    Q    Briefly, what are some duties of a correctional counselor?

4    A    Administrative sanctions, administrative remedies, cell

5    assignments, providing Social Security numbers, cards, or

6    certificates.

7    Q    Are you a counselor for the inmates?

8    A    Yes, I am.

9    Q    How long have you been in that position?

10   A    Approximately one year.

11   Q    Where are you currently employed?

12   A    The USP, United States Penitentiary.

13   Q    Where have you worked while you've been employed by the

14   BOP?

15   A    United States Penitentiary, ADX, Administrative

16   Penitentiary, and I'm back at the United States Penitentiary,

17   USP.

18   Q    Prior to working for the BOP, what other employment did you

19   have?

20   A    Crowley County Correctional Facility as a private and

21   United States Army.

22   Q    How long were you a correctional officer in the private

23   prison?

24   A    From 1999 to 2008.

25   Q    While you were at the ADX, what position did you hold?

JAIME MUNOZ - Direct

1   *A*   SIS tech.

2   *Q*   SIS technician?

3   *A*   Yes, sir.

4   *Q*   On March 18, 2015, were you employed at the ADX as an SIS

5   technician?

6   *A*   Yes.

7   *Q*   Do you recall the events of March 18, 2015?

8   *A*   Yes.

9   *Q*   On March 18, 2015, did you go to the joker unit?

10  *A*   Yes.

11  *Q*   Did you participate in any escorts of inmates from the

12  joker unit?

13  *A*   Yes.

14  *Q*   Who did you help escort?

15  *A*   Inmate Shields.

16  *Q*   Where did you escort the defendant?

17  *A*   From joker unit to Special Housing, which is Charlie unit.

18  *Q*   Inside of the Special Housing Unit, is there a SecurPASS

19  machine?

20  *A*   Yes.

21  *Q*   Did you observe the defendant being scanned on the

22  SecurPASS machine?

23  *A*   Yes.

24  *Q*   Following some of the scans on the SecurPASS machine, did

25  the defendant request to be taken to a cell to remove an

JAIME MUNOZ - Direct

1  object?

2  A   Yes, he did.

3  Q   Was, in fact, the defendant taken to a room to remove that

4  object?

5  A   Yes, he was.

6  Q   Where did he go?  Where did the defendant go?

7  A   I believe it was -- can I look at my memo?

8  Q   If you recall.

9  A   I don't recall the cell number.

10  Q   Was it a cell?  Was it a room?

11  A   Yes.  It was a room.

12  Q   Was it interview room 142?

13  A   Yes, it was.

14  Q   Did you observe the defendant in this interview room?

15  A   Yes.

16  Q   I want to show you what's been marked Government's Exhibit

17  No. 15.  It will come up on the screen in front of you.  Can

18  you identify by either pointing on the screen or circling where

19  you were standing?  There's a stylus pen up there.

20  A   (Witness complied.)

21  Q   From that position, could you see into the room?

22  A   Yes.

23  Q   Could you see the entire room?

24  A   Yes.

25  Q   Were you able to see the defendant clearly in the room from

JAIME MUNOZ - Direct

1    where you were standing?

2    A   Yes.

3    Q   I want to show you what's been marked Government's

4    Exhibit 14.  Can you identify the same way, either a circle or

5    mark on the screen, where the defendant was standing in that

6    room?

7    A   (Witness complied.)

8    Q   Is this a photo of the inside of room 142?

9    A   Yes, I believe so.

10   Q   As you were observing the defendant inside interview room

11   142, what did he do?

12   A   He took two breaths, tilted his head slightly, and removed

13   an object from his lower orifice.

14   Q   How did he remove that object?

15   A   With his right hand, just reached around.

16   Q   Prior to -- sorry for the interruption.

17   A   Reached around and just dropped it down in the medical bin

18   inside a plastic bag.

19   Q   When he went through the SecurPASS machine, he was

20   handcuffed; is that right?

21   A   Yes.

22   Q   Were the handcuffs removed once he was placed in the

23   interview room?

24   A   The first time he wasn't.  He said, "I'm having a difficult

25   time trying to remove it me being handcuffed."  So the

JAIME MUNOZ - Direct

1    restraints were removed.  That's when he just took two breaths

2    and removed it with his right hand.

3    Q    Approximately, how long did it take for the defendant to

4    remove the object from his rectum?

5    A    Probably less than 10 seconds, 15 seconds.

6    Q    You mentioned that the defendant placed the object inside

7    of a bucket, I think you said?

8    A    It was a medical bin, pink, and then inside of it was a

9    plastic bag.  He placed it in there.

10   Q    At the time the defendant placed the item in the plastic

11   bag, did you take custody of the object?

12   A    Yes.

13   Q    In the binder in front of you, if you could turn to

14   Government's Exhibits 16 through 23.  Please look and review

15   those exhibits and let me know when you've had a chance to

16   review them.

17   A    I'm done.

18   Q    Without describing each of the photos individually,

19   generally, what is depicted in Government's Exhibits 16 through

20   23?

21   A    It's a plastic bag.  Inside the plastic bag --

22   Q    Just generally, what do all the exhibits depict?

23   A    A weapon.

24   Q    So what do those Exhibits 16 through 23, what do they show?

25   A    Shows a plastic bag and what appears to be feces.

JAIME MUNOZ - Direct

1    *Q*   Are they photos --

2    *A*   Yes.

3    *Q*   -- of the object?

4    *A*   Yes.  They are photos of the object.

5    *Q*   How do you recognize the photos?

6    *A*   It is the object I took control of.

7    *Q*   Were you physically present when these photographs were

8    taken?

9    *A*   Yes.

10   *Q*   Do those photos fairly and accurately depict the object on

11   March 18, 2015?

12   *A*   Yes.

13            MR. COOK:  Your Honor, at this time the Government

14   moves to admit Exhibits 16 through 23 into evidence.

15            THE COURT:  Response.

16            MR. HUTT:  No objection.

17            THE COURT:  Government's Exhibits 16, 17, 18, 19, 20,

18   21, 22, and 23 for identification are admitted in evidence with

19   leave to publish and discuss in the presence of the jury.

20            MR. COOK:  Thank you, Your Honor.

21            THE COURT:  You're welcome.

22   Q   (By Mr. Cook)  At the point the defendant placed the item in

23   the plastic bag and you secured it, what happened to the object

24   at that point?

25   *A*   At that time, I took it to the SI shop upstairs.  That's

JAIME MUNOZ - Direct

1   when Ms. Turner and I -- I was given instructions by her how to

2   open it while she photographed it.

3   Q   During the time the object was being photographed, who

4   handled the object?

5   A   I did.

6   Q   I want to show you what's been marked Government's

7   Exhibit 16.  If you would look at Government's Exhibit 16, what

8   does this photo show?

9   A   A plastic bag on top of a brown bag with the contraband

10  wrapped in what appears to be feces.

11  Q   Is that the contraband you testified earlier you received

12  from the defendant?

13  A   Yes.

14  Q   Look at Government's Exhibit 17.  Can you describe what

15  we're seeing in Government's Exhibit 17?

16  A   The contraband that's wrapped in plastic with blood and

17  what appears to be feces.

18  Q   Okay.  Government's Exhibit 18, please again, what does

19  this photo show?

20  A   A close-up view of the contraband wrapped in plastic with

21  appears to be blood and feces.

22  Q   If we could go to Exhibit No. 19.  What does Government's

23  Exhibit 19 show?

24  A   This is when I took it apart.  So the plastic bag and the

25  sheath with the cardboard on the other side, and it's wrapped

JAIME MUNOZ - Direct

1  with toilet paper.

2  Q   So the white portion we're seeing, is that the toilet

3  paper?

4  A   That's toilet paper.

5  Q   If we could go to Government's Exhibit No. 20, please.

6  A   Here the toilet paper was removed, and the cardboard with

7  the metal objects were inside it.

8  Q   What is on the outside wrapping of what looks like the

9  cardboard object?

10  A   Plastic.

11  Q   If we could move to Government's Exhibit No. 21, please.

12  Could you describe what this photo shows?

13  A   So I removed the items from the plastic cardboard, the

14  sheath, and there was two -- 4 1/2 metal and another one that

15  was a 1 1/2 metal sharpened to a bullet -- sharpened to a

16  point.

17  Q   You say a 4 1/2-inch metal object?

18  A   Sharpened to a point and a 1 1/2 metal object sharpened to

19  a point.

20  Q   If we can go to Government's Exhibit 22, please.  Can you

21  describe what this photograph shows?

22  A   That's the 1 1/2 metal object sharpened to a point and

23  showing the other side of the other one sharpened to a point

24  and the cardboard with the plastic on it.

25  Q   I want you to take a look at Government's Exhibit 23.  Can

JAIME MUNOZ – Direct

1   you describe what this photograph shows?

2   A   That's the 4 1/2 metal object or metal that's sharpened to

3   a point.

4   Q   Once you completed taking photographs of the weapon, what

5   did you do with the actual weapon?

6   A   At that time, I secured the weapon.  I did a chain of

7   custody, and I personally put it inside the evidence safe in

8   evidence lockerroom.

9   Q   What other markings did you make, if any, on the container

10  that you put the weapon in?

11  A   You said container?

12  Q   Container or bag.

13  A   Well, I'm the one that secured it.  The date and time, who

14  it came out of, where the weapon came out of it, what was the

15  inmate's name on there, and what location.

16  Q   Did you place the defendant's name on the bag?

17  A   Yes.

18  Q   Did you still have the bag in question?

19  A   Yes.

20  Q   After securing the defendant's weapon inside the paper bag,

21  did you retain custody of the bag and its contents?

22  A   Yes.  Until it was placed inside the evidence lockerroom.

23  Q   Who has access to the evidence lockerroom?

24  A   The SIA or sometimes a lieutenant, SIS lieutenant.

25  Q   Did anybody just go into that lockerroom and kind of peruse

1    what they have in there?

2    A    No.

3    Q    Would you describe the condition of the bag when you placed

4    it in the evidence locker?

5    A    New.

6    Q    A new bag?

7    A    A new bag.

8    Q    When you previously marked the bag that you brought in,

9    Government's Exhibit No. 24, could you look at that quickly?

10   It's actually the bag you walked in with, I believe.  How do

11   you know that's the same bag that you secured in the evidence

12   locker?

13   A    My signature is on there, and the evidence tape that I

14   provided I put on there.

15   Q    The chain of custody form you described before, is that

16   affixed to the bag?

17   A    Yes.  It's stapled to it.

18   Q    You testified you filled out the form only, correct?

19   A    Yes.

20   Q    Is the chain of custody form affixed to that bag the same

21   form that's in the binder in front of you marked as

22   Government's Exhibit No. 25?  If you want to take a look at 25.

23   A    Yes, it is.

24        MR. COOK:  Your Honor, at this time I would ask

25   permission of the Court to allow the witness, Mr. Munoz, to

1   open up the bag -- to put on rubber gloves, open the bag out of

2   the presence of the jury to inspect the contents of the bag.

3           THE COURT:  Any response by Mr. Shields?

4           MR. HUTT:  No objection.

5           THE COURT:  Very well.  Leave is granted as requested.

6           Ladies and gentlemen of the jury, while we complete

7   this exercise, you shall be in recess.  Please remain in or

8   near your jury deliberation suite so that we may resume

9   altogether as soon as practicable.  During whatever time you

10  are in temporary recess, please store your note-taking

11  materials in your suite, and please continue to be mindful of

12  those critically important rules that govern your conduct as

13  jurors in this trial.

14          As concerns you, ladies and gentlemen, we are in

15  recess.

16          All rise pending the exit of this jury.

17      (Jury out at 1:44 p.m.)

18          THE COURT:  Thank you.  Please be seated.  We proceed

19  on the record in open court operating as requested outside the

20  presence and hearing of the jury, which is in temporary recess.

21          We convene and proceed as constituted to allow the

22  witness, Mr. Jaime Munoz, to remove from the bag that he has at

23  the witness stand the specified items for inspection.

24          Mr. Munoz, you may proceed.

25          MR. COOK:  Mr. Munoz, would you please put on the

JAIME MUNOZ - Direct

1   rubber gloves you have.  Thank you.

2        (Pause in proceedings.)

3   *A*   You want me to take it out?

4   *Q*   (By Mr. Cook)  Just look inside the bag.

5   *A*   Okay.

6   *Q*   Have you had a chance to inspect it?

7   *A*   Yes.

8        *MR. COOK:*  Your Honor, I think the Government is ready

9   to proceed with the jury.

10        *THE COURT:*  Is Mr. Shields?

11        *MR. HUTT:*  Yes, Your Honor.

12        *THE COURT:*  Very well.  Thank you.

13        Madam Clerk, please retrieve the jury, and thank you.

14   You may be seated, Mr. Munoz.

15        *MR. HUTT:*  Actually, Your Honor, can we look in the

16   bag before the jury comes back?

17        *THE COURT:*  Any objection by the Government?

18        *MR. COOK:*  No objection.

19        *THE COURT:*  Leave is granted as requested.

20        *MR. HUTT:*  Thank you, Your Honor.

21        *THE COURT:*  You're welcome.

22        (Pause in proceedings.)

23        *MR. HUTT:*  Thank you very much, Your Honor.

24        *THE COURT:*  You're welcome.

25        Madam Clerk, now please retrieve the jury.  Thank you.

232

JAIME MUNOZ - Direct

1        (Pause in proceedings.)

2            THE COURT:  All rise for the jury, please.

3        (Jury in at 1:48 p.m.)

4            THE COURT:  Thank you, Madam Clerk.

5            Thank you, ladies and gentlemen.  You may be seated.

6            Mr. Cook, you may proceed.

7            MR. COOK:  Thank you, Your Honor.

8            THE COURT:  You're welcome.

9    Q   (By Mr. Cook)  Mr. Munoz, would you please describe the

10   contents of the paper bag without removing the contents at this

11   point that's been marked Government's Exhibit 24.

12   A   The cardboard with the wrapping around it, the sheath, and

13   the two weapons, the 4 1/2 sharpened to a point and 1 1/2

14   sharpened to a point.

15   Q   Are the outer wrappings, the plastic and toilet paper,

16   included in that bag?

17   A   No, sir.  Not the toilet paper or outer.  Just the outside

18   and inner.

19   Q   Is the weapon inside the labeled bag the same weapon you

20   secured on March 18, 2015, that you received from the

21   defendant?

22   A   Yes.

23   Q   How do you know the weapon is the same?

24   A   Same one that I handled and the same one when I logged it

25   in.

JAIME MUNOZ – Direct

1    Q   Is the weapon inside the labeled paper bag in the same or

2    substantially the same condition as it existed on March 18,

3    2015?

4    A   Yes.

5    Q   Is there anything different about the weapon today as it

6    existed then?

7    A   No.

8         MR. COOK:  Your Honor, at this time the Government

9    moves to admit Government's Exhibits 24 and 25 into evidence.

10        THE COURT:  Response.

11        MR. HUTT:  Your Honor, may I voir dire on the exhibit?

12   I have some issues to raise with regard to chain of custody.

13        THE COURT:  Well, voir dire is limited to determining

14   authenticity; that is, is the object what it is purported.

15   I'll allow you to voir dire but as to authenticity only.

16   That's a different query than chain of custody.

17        MR. HUTT:  Then I will not object at this point.

18        THE COURT:  Very well.  Government's Exhibits 24 and

19   25 for identification admitted in evidence with leave to

20   publish and discuss in the presence of the jury.

21        MR. COOK:  Thank you, Your Honor.

22        THE COURT:  You're welcome.

23   Q   (By Mr. Cook)  Mr. Munoz, would you please remove from the

24   bag the sheath, please.

25   A   (Witness complied.)

JAIME MUNOZ - Direct

1    *Q*   Will you hold it up so the jury can see?

2    *A*   (witness complied).

3    *Q*   Would you remove from the bag the smaller weapon?  Can you

4    hold that up as well?

5    *A*   (Witness complied.)

6    *Q*   Finally, can you remove from the bag the larger weapon and

7    hold it up for the jury to see?

8    *A*   (Witness complied.)

9    *Q*   Thank you.  Now, previously you referred to this object as

10   a weapon.  How do you know that it is a weapon?

11   *A*   It's sharpened to a point.

12   *Q*   How can you tell that it's been sharpened?

13   *A*   By looking at it and just pointing.

14   *Q*   Do you know how it's been sharpened?

15   *A*   Ordinarily, you would use paper clips or the concrete

16   floor.

17   *Q*   So are the two weapons you have, along with the sheath, are

18   they the same weapons you retrieved from the defendant on

19   March 18, 2015?

20   *A*   Yes, they are.

21   *Q*   During the time that you interacted with the defendant on

22   March 18, 2015, did he ever mention to you any safety concerns

23   with inmate Heisler?

24   *A*   No.

25   *Q*   Did he ever mention to you any safety concerns with any

JAIME MUNOZ - Direct

1    other inmate?

2    *A*   No.

3              *MR. COOK:*  One moment, Your Honor.

4              *THE COURT:*  Certainly.

5         (Pause in proceedings.)

6              *MR. COOK:*  No further questions.

7              *THE COURT:*  Cross-examination for Mr. Shields,

8    Mr. Hutt.

9              *MR. HUTT:*  Thank you, Your Honor.

10             *THE COURT:*  You're welcome.

11                         **CROSS-EXAMINATION**

12   *BY MR. HUTT:*

13   *Q*   Mr. Munoz, you have had some training in collection of

14   evidence?

15   *A*   Yes.

16   *Q*   Because it's an important function, yes?

17   *A*   Yes.

18   *Q*   Training is very specific about things that have to be done

19   correctly?

20   *A*   Yes.

21   *Q*   Because it's all about the details, right?

22   *A*   Yes.

23   *Q*   It's all about finding, collecting, and then document,

24   right?

25   *A*   Yes.

1  Q   Very important to document very precisely what you do, when

2  you do it, how you do it when you're collecting evidence,

3  right?

4  A   Yes.

5  Q   And that's what you did or endeavored to do in this case;

6  is that right?

7  A   Yes.

8  Q   The documenting, in part, has to do with photographing,

9  right?

10  A   Yes.

11  Q   So if you would, I would like you, please -- there is a

12  binder over there near you that says "Defense Exhibits."  It

13  actually says "United States versus Shawn Shields jury trial"

14  and toward the bottom it says "Shawn Shields defendant" and

15  says "Copy."  Do you see that?

16  A   Yes.  This binder, yes.

17  Q   Can you take a look, please, at defense Exhibit 8?  Do you

18  see that?

19  A   Yes.

20  Q   It is a form that you created to document this evidence,

21  right?

22  A   Yes.  The form was prepared by me.

23  Q   Got your name at the top?

24  A   Yes.

25  Q   And the date and time at which you created it, right?

JAIME MUNOZ – Cross

1   *A*   Yes.

2   *Q*   And is the copy that appears in that notebook an accurate

3   copy of the document that you, in fact, prepared?

4   *A*   Can you say that again?

5   *Q*   Is the one you're looking at a true and accurate copy of

6   the one you prepared?

7   *A*   I don't recall.

8   *Q*   You don't know?

9   *A*   I don't recall.

10   *Q*   Did you give the original of it to the prosecutor's office?

11   *A*   The actual form itself is the one that I created, but the

12   pictures are done by Ms. Turner.

13   *Q*   I understand.  I'm talking about the form itself.  Is that

14   form an accurate copy of the form?

15   *A*   Yes.

16   *Q*   This is a form you use in the regular course of your

17   business?

18   *A*   Yes.  The form is.

19   *Q*   And this is how you document evidence?

20   *A*   This is how you take pictures of evidence.

21   *Q*   Very good.

22        *MR. HUTT:*  Move the admission, please, of defense

23   Exhibit 8.

24        *THE COURT:*  Response.

25        *MR. COOK:*  No objection, Your Honor.

1          *THE COURT:*  Defendant's Exhibit 8 for identification

2     admitted in evidence with leave to publish and discuss in the

3     presence of the jury.

4     Q  (By Mr. Hutt)  Do you now see that same form on the screen,

5     Mr. Munoz?  Do you see that same form on the screen?

6     *A*   Yes.

7     *Q*   Okay.  Before we talk about that, would you please take a

8     look for me at defense Exhibit 18 in the binder.  Do you see

9     that?

10    *A*   18, yes.

11    *Q*   Do you also see that it is a chain of custody log or form

12    that you filled out and signed in this case?

13             *THE COURT:*  Excuse me?

14             *THE JUROR:*  We can't see.

15             *MR. HUTT:*  I haven't introduced.

16             *THE COURT:*  Not in evidence yet.  Hold that thought.

17             *THE JUROR:*  Sorry.

18    Q  (By Mr. Hutt)  Do you see defense 18?

19    *A*   Yes.

20    *Q*   Do you see it's a chain of custody log form that you filled

21    out and signed?

22    *A*   Yes.

23    *Q*   Is it an accurate copy of the one that you originally

24    created?

25    *A*   No.

JAIME MUNOZ – Cross

1    *Q*   It's not an accurate copy?

2    *A*   No, it's not.

3    *Q*   And you're saying that because you have the original with

4    you and it's different?

5    *A*   Yes, it is.

6          *MR. HUTT:*  May I ask to approach, Your Honor, so I can

7    examine the original and compare it to the copy provided to me

8    by the Government?

9          *THE COURT:*  Madam Clerk, with your assistance, please.

10         (Pause in proceedings.)

11   Q  (By Mr. Hutt)  Thank you, Mr. Munoz.  Can you please look at

12   the other binder at Government's Exhibit 25, the other binder,

13   Government's Exhibit 25, please.  You see that?

14   *A*   Yes, I do.

15   *Q*   It's the same form, right?

16   *A*   No, it's not.

17   *Q*   Okay.  The difference between Government's 25 and

18   defendant's 8 is that there are additions on -- I'm sorry.  The

19   difference between the one that you have with you in court

20   today and 25 is that there are things that have been added for

21   today; is that correct?

22   *A*   They're different signatures.

23   *Q*   Different signatures.  Okay.  Then can I please take a look

24   again at what you have brought to court with you today.

25         *THE COURT:*  Again, Madam Clerk, your assistance,

JAIME MUNOZ - Cross

1    please, and thank you.

2        (Pause in proceedings.)

3    Q  (By Mr. Hutt)  Showing you, Mr. Munoz, on the screen what

4    has been admitted as defense Exhibit 6 is the form that you

5    created, am I correct, for the photographs of the evidence?

6    A   The actual form I created, but the photographs and all that

7    inside was not prepared by me, done by me.

8    Q   Where it says your name at the top and the date and the

9    time, that's all you, correct?

10   A   Well, the actual form -- there's a form that's created by

11   me.  The date and time was entered by SIS Turner.

12   Q   The time that was entered here after your name and the date

13   is 10:11 a.m. on March 18, 2015, right?

14   A   Yes.

15   Q   And the problem is that none of this evidence was

16   discovered until sometime after 11:00 a.m. on that date,

17   correct?

18   A   I am not positive on the time.

19   Q   Right.  You signed a document saying these things were not

20   found until after 11:00 a.m., correct?

21   A   On the chain of custody, yes.

22   Q   That's what has been admitted as defense Exhibit 25 -- as

23   Government's Exhibit 25, correct?

24   A   Yes.

25   Q   Now, Government's Exhibit 25, it's got your signature,

1  right?

2  A    Yes.

3  Q    And it's got something saying that -- that you filled in

4  saying that the item was found at 11:20 a.m., correct?  You see

5  11:20 on the document?

6  A    Yes.  I see that.

7  Q    You see it's right by your signature?

8  A    Yes.

9  Q    You see going back to defense Exhibit 6 is something by

10 your name saying you created the form at 10:11 a.m.?

11 A    The form was actually created by me, and it wasn't at that

12 time.  The time -- those blocks right there were filled out by

13 SIS Turner.  The actual form itself, I created that form so

14 others can use.

15 Q    Okay.

16 A    So when the photos are placed on there, she places the

17 photos on there.  She's the one taking the photos.

18 Q    This is the technician you're talking about whose job it is

19 to assist you with the collection and the documentation of this

20 evidence?

21 A    Yes.

22 Q    The person who took the photographs that are depicted in

23 defense Exhibit 6, right?  Is that right?

24 A    Yes.  SIS Turner.

25 Q    Her name is right there, right?

JAIME MUNOZ – Cross

1    A    Yes.

2    Q    Right next to the times that the pictures were taken,

3    right?

4    A    Yes.

5    Q    12:33 p.m., 12:34 p.m., right?

6    A    Yes.

7    Q    And you're saying that she's the same person who put in

8    that the time that the form was created was 10:11 a.m.?

9    A    Yes.

10   Q    40 minutes before the evidence was discovered?

11   A    That's the form that Ms. Turner created.  I mean, the

12   photos.  All I did was collect the evidence.

13   Q    You do see at the top where it says "Form prepared by J.

14   Munoz"?

15   A    Yes.

16   Q    That is you?

17   A    Yes.  I created that form.

18   Q    Let me have you take a look, please, at defense Exhibit 7.

19   Do you see it?

20   A    Yes.

21   Q    It is another similar photo array form created by you, yes?

22   A    I didn't take this photo.

23   Q    You see at the top where it says the form was prepared by

24   you?

25   A    There's nothing on here.  It's a photo.

JAIME MUNOZ – Cross

1    *Q*    I'm sorry?

2    *A*    Are you talking about this photo?

3    *Q*    Defense Exhibit 7.  There's two different binders.  I'm

4    sorry I keep switching back and forth between them.  The one

5    I'm asking you to look at should say towards the bottom "Shawn

6    Shields defendant" on the front.

7             *THE COURT:*  It's the other notebook, sir.

8    Q  (By Mr. Hutt)  So look, please, at No. 7.

9    *A*    Yes.

10   *Q*    Am I right that it is a similar form?

11   *A*    This is the form.

12   *Q*    Okay.  And that the form was created by you even though the

13   photographs were not?

14   *A*    Yes.

15   *Q*    And that it's an accurate depiction of the form you

16   created?

17   *A*    It appears to be, yes.

18            *MR. HUTT:*  Move the admission of defense Exhibit 7.

19            *THE COURT:*  Response.

20            *MR. COOK:*  No objection, Your Honor.

21            *THE COURT:*  Defense Exhibit 7 for identification

22   admitted in evidence with leave to publish and discuss in the

23   presence of the jury.

24   Q  (By Mr. Hutt)  Do you see defense Exhibit 7 on the screen

25   now, Mr. Munoz?

JAIME MUNOZ - Cross

1  A   Yes.

2  Q   Do you see again that at the top it has your name and the

3  date and time and creation of that form as 10:11 a.m., yes?

4  A   The form that I created is a Word document where other

5  techs use in placement of the photos.  So this form was

6  e-mailed to her so she can have a photo document where she can

7  place the photos in this form.

8  Q   Right.  She then put in the time 10:11 a.m.?

9  A   I can't speak for Ms. Turner.

10 Q   But you put your name on the form, right?

11 A   Yes.  I created the document.

12      MR. COOK:  Objection to the last question.  Asked and

13 answered.

14      THE COURT:  Overruled.

15 Q  (By Mr. Hutt)  You put your name and signed the form?

16 A   I didn't sign the form.

17 Q   No, no.  You put your name and signed the form saying that

18 the evidence was not found until after 11:00 a.m.?

19 A   I didn't sign this form.

20 Q   Take a look, please, at Government's Exhibit 25.  Different

21 binder.  We have to switch to the other binder.  I'm sorry.

22 That's confusing.  You see Government's Exhibit 25 both in the

23 binder and on the screen in front of you?

24 A   Yes.

25 Q   Do you see that you have signed that form?

JAIME MUNOZ – Cross

1   *A*   The chain of custody, yes.

2   *Q*   You see that immediately above where you signed it it says

3   that the evidence was found at 11:20 a.m.?

4   *A*   Yes.

5   *Q*   Okay.  You also see -- I'm sorry.  That's sufficient.

6           Your purpose in creating these forms was to be able to

7   document the evidence?

8   *A*   I created that form so when a tech or anyone else wants to

9   put any -- it makes it a lot neater in that Word document,

10  which is the form.

11  *Q*   You're provided with forms in order to make the job of

12  gathering, photographing, preserving, and documenting evidence

13  easier and more accurate, aren't you?

14  *A*   Yes.  That form, yes.

15  *Q*   And it is your job to ensure that they are, in fact, used

16  accurately?

17  *A*   Yes.

18          *MR. HUTT:*  Those are all my questions.

19          *THE COURT:*  Redirect examination for the Government,

20  Mr. Cook?

21          *MR. COOK:*  Nothing further, Your Honor.

22          *THE COURT:*  May Mr. Munoz be excused and released from

23  subpoena?  Any objection by the Government?

24          *MR. COOK:*  None, Your Honor.

25          *THE COURT:*  Or by Mr. Shields?

1           *MR. HUTT:*  No, sir.

2           *THE COURT:*  Mr. Munoz, you are both released and

3    excused from subpoena with our thanks.  That's all right.

4    We'll do the housekeeping.

5           Very well.  The Government may proceed.  Ms. Spencer.

6           *MS. SPENCER:*  The Government rests, Your Honor.

7           *THE COURT:*  Very well.

8           Ladies and gentlemen of the jury, the Government has

9    completed the presentation of its case in chief and has rested.

10          It now becomes necessary for Mr. Shields, counsel, and

11   the Court to consider mid-trial motions, petitions, requests,

12   and other appropriate business.

13          My best guesstimate is it will take approximately 15

14   minutes for us to complete these mid-trial proceedings, during

15   which you shall be in recess, remaining, please, in or near

16   your jury deliberation suite.

17          During this recess, regardless of its length, please

18   store and leave your note-taking materials in your suite, and,

19   once again, on this occasion take the time reasonably necessary

20   to read and heed those critically important rules that continue

21   to govern you as jurors in the trial of this case.

22          Thus, as concerns you, ladies and gentlemen of the

23   jury, you are now in recess.

24          All rise pending the exit of the jury.

25          (Jury out at 2:17 p.m.)

1        *THE COURT:*  Thank you.  Again, please be seated.  We

2   resume on the record in open court operating, for now, outside

3   the presence and hearing of the jury, which is in momentary

4   recess.

5        We convene as constituted to conduct mid-trial

6   proceedings, during which the Court shall entertain and

7   resolve, to the extent necessary and appropriate, any mid-trial

8   motions, petitions, or requests.

9        Are there any such matters by the Government,

10  Ms. Spencer?

11       *MS. SPENCER:*  No, Your Honor.

12       *THE COURT:*  Any such matters on behalf of Mr. Shields?

13  Mr. Hutt?

14       *MR. HUTT:*  Yes, Your Honor.  Honestly, pro forma to

15  ask the Court to dismiss the case at the close of the

16  prosecution's evidence applying the appropriate standard.

17       *THE COURT:*  Thank you.  Response by the Government,

18  Ms. Spencer.

19       *MS. SPENCER:*  From that scanty offer, I believe that

20  this is a Rule 29 motion under the Federal Rules of Criminal

21  Procedure.

22       Being as such, the critical inquiry on this motion for

23  judgment of acquittal is whether the record of evidence could

24  reasonably support a finding of guilt beyond a reasonable

25  doubt.  The inquiry does not require this Court to ask itself

1    whether it believes the evidence at trial established guilt

2    beyond a reasonable doubt.

3            Instead, the relevant question is whether, after

4    viewing evidence in a light most favorable to the prosecution,

5    any rational trier of fact could have found essential elements

6    of the crime beyond a reasonable doubt.

7            In this case, the elements of the crime are stipulated

8    in jury instruction -- stipulated instruction No. 18.  That's

9    under document 94 that lists the elements.  First, the

10   defendant was an inmate of a prison.  The testimony established

11   that on March 18, 2015, Mr. Heisler [sic] was an inmate of a

12   federal correctional institute; that is, the United States

13   Penitentiary Administrative Maximum in Florence, Colorado.

14           Secondly, that he knowingly possessed an object.  In

15   this case, the defendant retrieved from his own rectum an

16   object, clearly indicating a knowing, since he admitted, yes,

17   once he had seen the screen that that's what he had, he took a

18   couple breaths and, apparently, was able to pull it out.

19           Third, that the object is a prohibited object.  We've

20   had testimony from several witnesses that this object is a

21   weapon designed or intended to be used as a weapon.  Most

22   recently, we had Mr. Munoz testify about the sharpened nature

23   of the weapon, the shank as it's been called.  It has been

24   brought into evidence, those metal pieces.  So the Government

25   has established these elements beyond a reasonable doubt at

1    this juncture of the case.

2          We'd ask the Court to deny that pro forma motion

3    that's been made.

4          *THE COURT:*  Thank you.

5          Mr. Hutt, reply, if any?

6          *MR. HUTT:*  No.  Thank you, Your Honor.

7          *THE COURT:*  Very well.

8          After the Government completed its chase in chief and

9    rested and during mid-trial proceedings, the defendant, by his

10   counsel, moved orally for entry of judgment of acquittal,

11   implicating the provisions of Federal Rules of Criminal

12   Procedure 29(a), both as codified and as construed.

13         Having reviewed and considered all relevant evidence

14   educed at trial pro tanto, both direct and circumstantial, as a

15   whole, in a light most favorable to the Government, I find and

16   conclude that the evidence is adequate, substantial, and

17   sufficient to support a conclusion by a reasonable juror that

18   Mr. Shields is guilty beyond a reasonable doubt of the offense

19   charged in Count 1 of the indictment, and, thus, this mid-trial

20   motion should be denied.

21         Therefore, it is ordered that the mid-trial order for

22   motion for entry of judgment of acquittal under Rule 29(a) by

23   the defendant is respectfully denied.

24         Done in open court effective forthwith.

25         Further mid-trial motions, petitions, or requests on

1   behalf of Mr. Shields?

2           *MR. HUTT:*  We have no other motions, Your Honor.

3           *THE COURT:*  Will Mr. Shields be able to commence

4   momentarily the presentation of his defense?

5           *MR. BELLER:*  May I be heard, Your Honor?

6           *THE COURT:*  You may.  Thank you.

7           *MR. BELLER:*  Thank you, Your Honor.  The answer to

8   your question is yes, we will.

9           If I may request of the Court a couple minutes to deal

10  with housekeeping matters.  The defense does have three

11  individuals who are present here today under subpoena.  One of

12  them, based upon the Government's case, we do believe that it

13  would be appropriate to release her from her subpoena.  That is

14  Ms. Turner.  If the Court would allow us just enough time to be

15  able to accomplish that so we are not further inconveniencing

16  her, that would be our request.

17          There are two other witnesses who are present today,

18  Your Honor.  One of them is Mr. Heisler.  As the Court inquired

19  of us yesterday, we had an opportunity to speak to Mr. Heisler.

20  Your Honor, it is my understanding that Mr. Heisler is

21  intending to offer testimony if he is called, and it is our

22  intention to call him.  I absolutely have no information at all

23  to suggest Mr. Heisler is planning on invoking his right to

24  remain silent.

25          The third and final witness under subpoena is

1    Mr. Thompson.  Your Honor, he would be necessary only if

2    Mr. Heisler does not testify the way we are anticipating him

3    to.  So for that reason, we would ask him to stay here, and we

4    are not releasing him at this time.

5         *THE COURT:*  Very well.  How quickly can the defendant

6    quickly advise technician R. Turner that as a witness he or she

7    may be excused and how quickly can we present in the courtroom

8    Donald Heisler?

9         *MR. BELLER:*  Your Honor, as to Ms. Turner, the answer

10   is quickly.  As to Mr. Heisler, if the Court would allow me to

11   inquire of the marshals.

12        *COURTROOM DEPUTY CLERK:*  Your Honor, I've spoken to

13   the marshals.  They're ready to bring Mr. Heisler up.

14        *THE COURT:*  Here's what I propose.  If that completes

15   our mid-trial business, and apparently it does, then we shall

16   be in recess long enough for counsel to advise and release the

17   one witness identified and discussed on the record.

18        Second, to allow the marshals to bring Mr. Heisler

19   into the courtroom and have him at or near the witness stand

20   ready to proceed.

21        We shall be in recess for the time necessary to

22   accomplish those two matters.

23        Madam Clerk.

24     (Recess taken from 2:25 p.m. to 2:33 p.m.)

25        *THE COURT:*  Thank you.  Once again, as you choose,

 1    either remain standing or be seated for our jury.

 2            Madam Clerk, please retrieve our jury once again, and

 3    thank you.

 4        (Pause in proceedings.)

 5            THE COURT:  All rise for the jury, please.

 6        (Jury in at 2:34 p.m.)

 7            THE COURT:  Thank you, Madam Clerk.

 8            Ladies and gentlemen, once again, please be seated.

 9            Ladies and gentlemen of the jury, we thank you for

10    your patience and indulgence on this and all similar occasions.

11            While you were waiting patiently, indeed, we were

12    working diligently.

13            We have completed the required mid-trial proceedings

14    and may resume trial all together.

15            Thus, if Mr. Shields is prepared to proceed, he may

16    call his first witness, Mr. Hutt.

17            MR. HUTT:  Thank you very much, Your Honor.

18            THE COURT:  You're welcome.

19            MR. HUTT:  The defense calls Donald Heisler, Your

20    Honor.

21            THE COURT:  Mr. Heisler, good afternoon.  Would you

22    please stand and, to the extent possible, please raise your

23    right hand to be sworn.  Thank you.

24            May I have your attention in the courtroom.

25        (**DONALD HEISLER** was sworn.)

1          *THE WITNESS:*  Yes.

2          *THE COURT:*  Thank you.  Please be seated.

3          Mr. Hutt.

4          *MR. HUTT:*  Thank you.

5          *THE COURT:*  You're welcome.

6                        **DIRECT EXAMINATION**

7     *BY MR. HUTT:*

8     *Q*   Would you please state your name and spell your last name

9     for the court reporter, please.

10    *A*   Donald Heisler, H-E-I-S-L-E-R.

11    *Q*   Where are you presently an inmate, Mr. Heisler?

12    *A*   At ADX Florence.

13    *Q*   I want to ask you about a number of things, including an

14    incident on the 18th of March, 2015, between you and Shawn

15    Shields, okay?

16    *A*   Yes.

17    *Q*   Do you remember the incident I'm talking about?

18    *A*   Yes, I do.

19    *Q*   At that time in 2015, do you know if you had a reputation

20    inside the Bureau of Prisons as a knife maker?

21    *A*   Yes, I do.  I did.

22    *Q*   You did have that reputation?

23    *A*   Yes.  Yes.

24    *Q*   Why?

25    *A*   It's just part of the file they have on me.

DONALD HEISLER - Direct

1   *Q*   Is it accurate?

2   *A*   Yes.

3   *Q*   Please tell the jury how it's accurate.

4   *A*   Staff have searched my cell in the past and have found

5   pieces of steel cut out in the shape of knives.

6   *Q*   Have you, in fact, stabbed people while you've been an

7   inmate at the Bureau of Prisons?

8   *A*   Yes.

9   *Q*   More than once?

10  *A*   Yes.

11  *Q*   Is that something that Mr. Shields and the other inmates in

12  the J unit of the ADX knew about you in March 2015?

13  *A*   Yes, sir.

14         *MS. SPENCER:*  Objection; lack of foundation.

15         *THE COURT:*  For now, 602 is offended, lack of personal

16  knowledge.  That can be established by further examination.

17  But, for now, the objection is sustained.

18  Q   (By Mr. Hutt)  Is reputation something that happens inside a

19  prison?

20  *A*   Reputation is pretty much all you have.

21  *Q*   When you say it's all you have, is it important for you to

22  fashion and know what your own reputation is?

23  *A*   Yes.

24  *Q*   And, to your knowledge, had you appropriately received the

25  reputation in March 2018 [sic] as a knife maker?

255

DONALD HEISLER - Direct

1    *A*    Yes.

2    *Q*    Am I correct that, for lack of a better phrase, you lost it

3    with regard to Mr. Shields on March the 18th?

4    *A*    Yes, I did.

5    *Q*    In that moment when you lost it, would you tell the jury,

6    please, what your intention was with regard to Mr. Shields?

7    *A*    Well, I have a problem with anger, you know.  It's been

8    like that frustration, but on that day I was withdrawing from

9    medication, narcotics for my back pain, and I was just fed up,

10    tired, mad, in pain.  And he just happened to be the one around

11    that I unleashed it on or I vented on.

12    *Q*    When you vented, did you intend to kill him?

13    *A*    I intended to try to hurt him as best I could, yes.

14    *Q*    Would that have included killing him?

15    *A*    If need be.

16    *Q*    Mr. Heisler, how tall are you?

17    *A*    6'2".

18    *Q*    How much do you weigh?

19    *A*    265.

20    *Q*    What was Mr. Shields' nickname that he went by in prison?

21    *A*    Shorty.

22    *Q*    Shorty?

23    *A*    Yes, sir.

24    *Q*    Did that have to do with his stature and his size?

25    *A*    Yes.

256

DONALD HEISLER - Direct

1   Q   What kept you from hurting Mr. Shields potentially to the

2   point of killing him that day on March the 18th, 2015?

3   A   I was restrained by another inmate.

4   Q   Who was that?

5   A   Vincent Basciano.

6   Q   If Mr. Basciano -- am I right that he pretty much tackled

7   you as you ran up the stairs after Mr. Shields?

8   A   Yes.  Yes.  Bear hugged me from behind.

9   Q   What would have happened if Mr. Basciano hadn't gotten to

10  you in time?

11  A   I'd probably be sitting in that chair instead of him.

12  Q   Charged with?

13  A   Probably murder.

14  Q   Right before you charged up the stairs to go after

15  Mr. Shields, you went to a table where you had your stuff,

16  right?

17  A   Yes.

18  Q   And you grabbed a weapon off the table, didn't you?

19          MS. SPENCER:  Objection; leading.

20          THE COURT:  Sustained.

21  Q   (By Mr. Hutt)  Did you grab something off the table?

22  A   Yes.

23  Q   What was it?

24  A   An ice pick.

25  Q   Now, when you say an "ice pick," you're not talking about

DONALD HEISLER - Direct

1    an ice pick that I might go buy at the store, are you?

2    A    No.

3    Q    Can you describe, please, to the jury how you made what you

4    just referred to as an ice pick?

5    A    I was the orderly at the unit.  I'm in charge of sweeping

6    and mopping, and I stole a piece of the dry dust mop.  It is a

7    steel oval and cut it and straightened it and sharpened to an

8    edge approximately 10 inches long.

9    Q    Are there ways of -- that you had of turning an object like

10   a pen into a weapon or a pencil?

11   A    Yes.  Yes.

12   Q    Is that something that you have done?

13   A    Yes.

14   Q    How?

15   A    Well, take the inside of the leads out of the pencils, long

16   colored pencil.  Certain brands are harder than other brands,

17   the wood, and take out the colored lead and put a pen in the

18   middle of it and usually wrap it real tightly with some kind of

19   nylon string and they usually think it's just a pen.

20   Q    When you say "they usually think it's just a pen," who are

21   we talking about?

22   A    The officers.

23   Q    Mr. Heisler, have you and I ever met before today?

24   A    No.

25   Q    Have we ever talked before today?

DONALD HEISLER - Direct

1    *A*    No.

2    *Q*    Did you get brought from Florence to the federal courthouse

3    by guards?

4    *A*    Yes, sir.

5    *Q*    Did they tell you what was going on?

6    *A*    I was sleeping.  They come to my cell this morning about

7    7:00 this morning, woke me up, and told me, Why ain't you

8    ready, and I had no idea where I was going, and they gave me

9    five minutes to brush my teeth and told me I had to go.  I

10   didn't know I was coming here.

11   *Q*    Your problem with anger, your temper, has the rage that

12   caused you to threaten to kill Mr. Shields happened before?

13   *A*    Yes.

14   *Q*    Does it happen to you sometimes when you're not expecting

15   it?

16   *A*    It's why I'm in ADX.

17   *Q*    You have a felony conviction for armed bank robbery?

18   *A*    Yes.

19   *Q*    And you also have a felony conviction for assaulting a

20   guard in another prison?

21   *A*    Yes.

22   *Q*    Is that what you're talking about?

23   *A*    No.  After that assault on the officer, I was convicted of

24   that and sent to USP Florence across the road from ADX.

25   *Q*    When you -- was the event where you assaulted the guard an

DONALD HEISLER - Direct

1    example of this --

2    *A*    Yes.

3    *Q*    -- uncontrollable rage of yours?

4    *A*    Yes.

5    *Q*    What happened?

6    *A*    I just --

7            *MS. SPENCER:*  Objection; relevance.

8            *THE COURT:*  Response.

9            *MR. HUTT:*  Goes to Mr. -- goes to the defense of

10   necessity, Your Honor.

11           *THE COURT:*  In what way?

12           *MR. HUTT:*  Mr. Heisler's both ability and reputation

13   for uncontrollable, violent, assaultive, homicidal behavior.

14           *THE COURT:*  If that's the response, the objection is

15   sustained.

16   Q   (By Mr. Hutt)  Mr. Heisler, you said that there was other

17   behavior that got you personally placed at the ADX?

18   *A*    Yes.

19   *Q*    What was that?

20           *MS. SPENCER:*  Objection; relevance.

21           *THE COURT:*  Response.

22           *MR. HUTT:*  Goes to his reputation, Your Honor.

23           *THE COURT:*  Reputation for what?

24           *MR. HUTT:*  Violent, uncontrollable rage, assaultive,

25   homicidal behavior that --

DONALD HEISLER - Direct

1          THE COURT:  Now, make it fit under Rule 404(a) which

2     generally makes character evidence inadmissible.

3          MR. HUTT:  That Mr. Shields was, in this circumstance,

4     aware of the reputation.

5          THE COURT:  Now you're testifying.  This witness has

6     not established that fact, nor has anyone else yet.

7          MR. HUTT:  It was my belief, Your Honor, that his

8     testimony about reputation in prison and his knowledge of his

9     own reputation would satisfy that.

10         THE COURT:  It does not satisfy the requirement that

11    there be some evidence that Mr. Shields was aware of this

12    evidence on or before March 18, 2015, and his opinion about his

13    reputation is, by definition, incapable of establishing that.

14         I think I should be on the New England Patriots

15    because I'm a heck of a wide receiver.  Unfortunately, hardly

16    anyone else shares that belief about my own-built reputation.

17    The objection, again, is sustained.

18         MR. HUTT:  I believe I understand, Your Honor.  Thank

19    you.

20    Q  (By Mr. Hutt)  Mr. Heisler, do you know if the other inmates

21    in J unit were aware of your reputation?

22    A   Yes, sir.

23    Q   Did you want them to be aware of your reputation?

24    A   To an extent, yes.

25    Q   And had you talked to other inmates, including Mr. Shields,

DONALD HEISLER – Direct

1    such that it would be known why you were there?

2    A   I have talked to others, but I wouldn't necessarily have

3    to.

4    Q   Why is that?

5    A   There are several inmates that already -- that were with me

6    at USP Florence.

7    Q   And what about that would you expect to have generated

8    information to the J unit where Mr. Shields was at?

9    A   Excuse me?

10   Q   Sorry.  Why would the fact that those people were in the

11   prison make you think that people on J unit would know about

12   you?

13   A   Because the people I was on J unit with, I was in units

14   with prior to the step-down program.

15            MR. HUTT:  May I inquire why he was placed in the ADX,

16   Your Honor, with that foundation?

17            THE COURT:  You're not going to get an advisory

18   opinion from me.  However, you may ask your next question, and

19   we'll see how it fares.

20            MR. HUTT:  Thank you, Your Honor.

21   Q   (By Mr. Hutt)  Mr. Heisler, why were you placed in the ADX?

22   A   Serious assault and attempted escape.

23            MS. SPENCER:  Hang on.  My objection still stands in

24   terms of relevance.  There hasn't been an establishment that

25   this defendant knew about any of this and how it ties into the

1    defense of necessity.

2         THE COURT:  Well, it is relevant as to the credibility

3    of this witness because it may implicate the commission of one

4    or more felony offenses.  Counsel may impeach his own witness

5    and, therefore, I overrule the objection.

6         That means, Mr. Heisler, you may answer Mr. Hutt's

7    last question on two conditions.  One, after all this, you

8    remember his question.  Two, if you do, that you can answer it

9    of your own personal knowledge.  Do you recall his question?

10        THE WITNESS:  Yes, sir.

11        THE COURT:  Can you answer it?

12        THE WITNESS:  Yes.

13        THE COURT:  Please.

14   A   I was placed in ADX in 2004 for serious assault with a

15   weapon and attempted escape.

16   Q   (By Mr. Hutt)  Serious assault with a weapon is something

17   that occurred inside prison?

18   A   Yes, sir.

19   Q   And with a weapon?

20   A   Yes.

21   Q   I'd like to ask you about what happens inside prison when

22   one inmate has threatened to kill another.  Does the inmate

23   that has been threatened routinely report that to authorities?

24        MS. SPENCER:  Objection.  There is a lack of personal

25   knowledge here.  This is not type of a particular instance.

DONALD HEISLER - Direct

1  I'm not sure if Mr. Heisler is being offered as an expert at

2  this point.

3          THE COURT:  Well, it certainly implicates opinion

4  evidence.  Even under 701(a) it's not been established this is

5  based on his rational perceptions.  Therefore, the objection,

6  for now, is sustained.

7  Q  (By Mr. Hutt)  Mr. Heisler, how long have you been in

8  prison?

9  A   19 years.

10 Q   19 consecutive years, like all of that time?

11 A   Yes, sir.

12 Q   All of the last 19 years up until today?

13 A   Yes.

14 Q   Are you familiar with how prisons operate from the

15 standpoint of a person who's been in them for 19 years?

16 A   Yes.

17 Q   Do you know how inmates interact?

18 A   Yes, I do.

19 Q   Do you know whether or not it's routine for an inmate who's

20 been threatened by another inmate to report that to guards?

21 A   Some do, but it's probably best not to.

22 Q   Why?

23 A   Well, I mean, everything in prison comes out -- is known.

24 Everything's known.  Everything is known, and if an inmate

25 feels threatened and goes, you know, to the authorities, he's

1    labeled a snitch, a rat.

2    Q    And what happens to a snitch in prison?

3    A    He will be dealt with as soon as someone can get to him.

4    Q    Dealt with how?

5    A    Stabbed, killed, strangled, beat.

6    Q    Tortured?

7    A    Possibly.

8    Q    It happens?

9    A    It does.

10   Q    Am I correct that most inmates will go to very great

11   lengths not to be known as a snitch or a rat?

12          MS. SPENCER:  Objection; leading.

13          THE COURT:  Sustained.  My concern, Mr. Hutt, and it

14   will probably draw an objection sooner or later is, we've now

15   elevated Mr. Heisler to the status of an expert witness on

16   prison life.  As far as I know, he's never been endorsed, let

17   alone offered or qualified, as an expert witness on many of the

18   matters about which he is now testifying.

19          I'm concerned about that lack of competence and

20   qualifications.

21   Q   (By Mr. Hutt)  Answering just from your personal knowledge

22   and your interactions, would you consider it to be dangerous to

23   be known as a snitch or a rat?

24   A    Yes.

25   Q    Have you encountered inmates smaller and with less

DONALD HEISLER - Direct

1   reputation for -- smaller than you are -- who would also be

2   scared, who would also be scared of being known as a snitch?

3   A   Oh, yes.  Size has nothing to do -- if you're labeled a

4   snitch, you've got trouble.

5   Q   Have you used and come across the term "putting someone to

6   sleep" or "rocking someone to sleep" in describing how inmates

7   sometimes interact?

8   A   Yes.

9   Q   Can you describe what it means?

10  A   It means if you have an issue with another prisoner,

11  personal or whatever it's about, shake his hand and smile in

12  his face and help him out with whatever he needs and pretend

13  you're his friend until he drops his guard and you do what you

14  have to do to him.

15  Q   After you threatened to kill Mr. Shields and chased him up

16  the stairs with that ice pick, did you wind up talking to him

17  through his cell door later?

18  A   Yes.

19  Q   Do you remember what you said?

20  A   Yes.  I told him we both were probably going to be locked

21  down to segregation, the hole.  I apologized to him for messing

22  up his program and told him to get rid of whatever he has

23  because I thought we would be going to segregation.

24  Q   If someone had been saying that to you in that

25  circumstance, Mr. Heisler, might you have concluded that they

1    were trying to rock you to sleep?

2    A    Definitely.

3    Q    Why do you say that?

4    A    Because that's what you do in prison.  That's how you get

5    who you're going to target because as long as you make him feel

6    safe, he's not going to run from you, he's not going to tell on

7    you, he's not going to try to make a weapon.

8    Q    Have you seen other inmates who have been suspected by

9    other inmates who have been suspected of giving a cop-out or

10   kite to a guard?

11          MS. SPENCER:  Objection under 701, Your Honor.

12          THE COURT:  Well, he's not asking for an opinion.

13   He's asking have you seen it in the capacity of a percipient

14   witness.  If the objection is lodged under Rule 701, it misses

15   the mark and is overruled.

16   Q   (By Mr. Hutt)  Have you seen that, Mr. Heisler?

17   A    Yes.

18   Q    What was the consequence to that inmate?

19   A    That was one of my serious assaults.

20          MS. SPENCER:  Objection to relevance.

21          THE COURT:  Sustained.

22   Q   (By Mr. Hutt)  Did Mr. Shields do anything to cause you to

23   go off and want to kill him?

24   A    No, he didn't.  Truthfully, no.

25   Q    Have you gone off similarly against other people in the

DONALD HEISLER - Direct

1   same way?

2          *MS. SPENCER:*  Objection; relevance.

3          *THE COURT:*  Sustained.

4   Q  (By Mr. Hutt)  Right after you charged up the stairs after

5   Mr. Shields, you had a conversation with Vincent Basciano?

6   A   Yes, sir.

7   Q   And shortly after that you went up the stairs again?

8   A   Yes.

9   Q   When you went up the stairs, you went to Mr. Shields,

10  right?

11  A   Yes.

12          *MS. SPENCER:*  Objection to his continued leading, Your

13  Honor.

14          *THE COURT:*  Sustained.

15  Q  (By Mr. Hutt)  Where did you go when you went up the stairs?

16  A   I approached Mr. Shields.

17  Q   And at some point did you move from one part of the second

18  tier to a different part of the second tier?

19  A   Yes, sir.

20  Q   Why?

21  A   I approached him and told him I wanted to talk to him, and

22  where we were standing to begin with was right toward the front

23  of the unit, the bars, where the officers could see us.  I

24  asked him to walk to the back which is 60 or 70 feet from the

25  bar, maybe more, so I could talk to him there.

DONALD HEISLER - Direct

1   Q   Was Mr. Shields trying to talk you down from your rage at

2   that point?

3   A   He just -- he looked at me kind of like -- like he was

4   uncertain, unsure, and when we were walking toward the back of

5   the unit, he just told me, "I thought we were better than

6   that."

7   Q   Were you thinking about whether or not your rage might come

8   back at that point?

9   A   No.

10  Q   Were you thinking about what might happen and being further

11  from the guards or closer to the guards?

12  A   I was still mad.  I was taking him back there for a reason.

13  Q   Why?

14  A   I was initially taking him back there to talk so the COs

15  could see us talking so they knew there wouldn't be a problem.

16  Q   You said "initially."  Was there --

17  A   Yeah.  If something would have happened or if he said

18  something I didn't like, we would have went to the next --

19  whatever happens happens.

20  Q   What does that mean?

21  A   I was going to try to hurt him.

22  Q   Was there a reason that you thought you had a better chance

23  of hurting him back there rather than --

24  A   Yes.

25  Q   -- up by the grill?

DONALD HEISLER - Direct

1   *A*   Yes.

2   *Q*   Why?

3   *A*   Because if you're all the way in the back of the unit, the

4   officers -- the officers are not going to run into the unit to

5   help anybody.

6   *Q*   Why do you say that?

7   *A*   Because it's ADX.  We don't have any contact, personal or

8   direct contact, with the officers, with the guards.

9   *Q*   Are you telling the jury that no matter what happened the

10  guards --

11  *A*   They were not going to run in that unit.  They will not do

12  that.  If you're close to the bar, they will gas you and spray

13  you with pepper spray, shoot pepper balls at you until you give

14  up.  Sometimes that don't work.  That's why I took him to the

15  back of the unit so they couldn't gas me or shoot me from that

16  far away.

17  *Q*   At that point, did Mr. Shields continue to try and talk you

18  down?

19  *A*   He wasn't aggressive.  He wasn't disrespecting.  He didn't

20  even say nothing to set me off, and, obviously, I didn't think

21  of that to begin with, but weeks later when I was sitting in

22  the SHU, I realized -- I just blew up on him.  He didn't do

23  anything.

24        *MR. HUTT:*  May I have just a moment, Your Honor?

25        *THE COURT:*  You may.  Thank you.

DONALD HEISLER - Direct

1        (Pause in proceedings.)

2   Q   (By Mr. Hutt)   During the period of time that you and

3   Mr. Shields were out on the range together, was he still in

4   danger from you?

5   A   Yes.

6   Q   When you were both in your cells, was he still in danger

7   from you?

8   A   Well, I knew we were coming out the next day.   If we

9   weren't going to go to segregation and get locked up, we would

10  have been out the next day together.

11           MR. HUTT:   Thank you, Mr. Heisler.

12           THE COURT:   Cross-examination for the Government,

13  Ms. Spencer.

14           MS. SPENCER:   Thank you, Your Honor.

15           THE COURT:   You're welcome.

16                    **CROSS-EXAMINATION**

17  BY MS. SPENCER:

18  Q   Good afternoon, Mr. Heisler.   I represent the Government.

19  I'm going to be asking you some questions today to find out

20  more about you and what happened on March 18.   If you don't

21  understand my question, would you let met know?

22  A   Yes, ma'am.

23  Q   I appreciate that.   I want to talk to you about your

24  record, your felony convictions you talked about with Mr. Hutt.

25  You have a felony conviction for armed bank robbery, correct?

271

DONALD HEISLER - Cross

1   A    Yes.

2   Q    A felony conviction for bank robbery?

3   A    Yes.

4   Q    A felony conviction for a use of a firearm?

5   A    That was all the same crime, yes.

6   Q    You got convictions off of each of those --

7   A    Yes.

8   Q    -- counts, okay.  Forcible assault of a BOP employee?

9   A    Yes.

10  Q    Same incident, intimidating a BOP employee?

11  A    Yes.

12  Q    Those two with the BOP employee, that's what got you moved

13  from USP in Florence over to the ADX?

14  A    No, ma'am.

15  Q    Something else.  Okay.  You said in 2004 you moved over to

16  the ADX; is that correct?

17  A    Yes.

18  Q    You've been a federal inmate since 1999, 2000?

19  A    Yes.  '99.

20  Q    1999.  Okay.  Fair to say you kind of know the ropes as a

21  federal inmate?

22  A    Yes.

23  Q    All right.  At ADX, you know that if you don't follow those

24  rules, that there's a protocol in place that's going to happen

25  for failure to follow rules, correct?

DONALD HEISLER - Cross

1    *A*   Yes, ma'am.

2    *Q*   For instance, when you get placed in a step-down unit, if

3    you pick up any kind of incident report, you're going to be

4    moved into segregation, correct?

5    *A*   Not necessarily.

6    *Q*   Maybe not right away, but in this instance you were moved

7    into the SHU, correct?

8    *A*   Yes.  Yes.

9    *Q*   You're calling it segregated housing.  If I call it the

10   SHU, are we talking about the same thing?

11   *A*   Yes, yes.

12   *Q*   In that segregated housing, you're now celled alone,

13   correct?

14   *A*   Yes.

15   *Q*   And you have your own shower in there, correct?

16   *A*   Yes.

17   *Q*   No contact with other inmates, physical?

18   *A*   No physical contact.

19   *Q*   Okay.  You contact them by yelling through the cell doors?

20   *A*   Yes.

21   *Q*   Yelling when you're out in the rec yard separated by --

22   *A*   Well, there is no rec yard in segregation.  You are locked

23   in your cell.  Recreation is another cell.  That's what rec is.

24   *Q*   When you go to recreation in the SHU, they move you into a

25   bubble cell that's removed of anything so you can work out in

DONALD HEISLER - Cross

1    there?

2    A    Yes.  Yes.

3    Q    Again, alone?

4    A    Yes.

5    Q    You were moved into segregation on March 18, 2015, correct?

6    A    Yes.

7    Q    That was for this verbal altercation that you had with

8    Mr. Shields, correct?

9    A    Yes.

10   Q    All right.  Part of that protocol of getting pulled out,

11   you knew if I get pulled to go to segregation, they're going to

12   interview me first, correct?

13   A    For?

14   Q    Well, on March 18 you were interviewed by SIS Technician

15   Thompson, correct?

16   A    Yes, I was.

17   Q    You knew SIS Technician Thompson before that because you

18   were on his caseload?

19   A    I didn't know that.  I knew him when he interviewed me and

20   introduced himself.  Before that I didn't know I was on his

21   caseload.

22   Q    Did he tell you you were on his caseload?

23   A    Yes.

24   Q    So you get pulled out of your cell on March 18, 2015?

25   A    Yes.

DONALD HEISLER - Cross

1    Q   And you get taken to an interview room to talk with SIS

2    Technician Thompson, correct?

3    A   Yes.

4    Q   He talks to you about the incident?

5    A   Yes.

6    Q   And you told him what was going on that day, correct?

7    A   Yes.

8    Q   And you said that you were in a bad mood because of your

9    medications, as you told us?

10   A   Yes, ma'am.

11   Q   You were in pain.  You had some back issues?

12   A   Back, yes.

13   Q   You're in pain, putting you in a bad mood, and you say --

14   you call him Shawn -- told you to work out or do something, and

15   that made you mad.  Do you recall that?

16   A   Yes.

17   Q   So there was an exchange of words.  He ticked you off?

18   A   I was already ticked off.

19   Q   Okay.  And --

20   A   I was in withdrawals from methadone.

21   Q   Okay.  And you told Technician Thompson that you started to

22   exchange words, and that's when Shields ran up the stairs?

23   A   Yes.

24   Q   Do you remember telling Technician Thompson, "Come back

25   down here and I'll break your jaw," is what you said to

DONALD HEISLER - Cross

1    Shields?

2    A    Yes.

3    Q    All right.  And then you started to go --

4    A    Well, I told --

5    Q    No.  Just stop.  Inmate Basciano stopped you, correct?

6    A    Yes, ma'am.

7    Q    Is inmate Basciano your size?

8    A    Not as tall.  He's more huskier.

9    Q    And you currently are 265?

10   A    Yes.

11   Q    In your estimation, Basciano was heavier than you?

12   A    He's in shape.

13   Q    Okay.  Have you seen the tape from the incident?

14   A    No, ma'am.

15   Q    You are aware there's cameras within that step-down unit?

16   A    Yes.

17   Q    You knew you could be getting filmed?

18   A    Yes.

19          MS. SPENCER:  I'm going to pull up Exhibit 3A, which

20   has been admitted.

21   Q  (By Ms. Spencer)  If you look at the computer screen in

22   front of you, Mr. Heisler, you'll be able to see.  We'll pull

23   that up.  Do you see yourself on the screen?

24   A    Yes.

25   Q    You're talking to an inmate through the cell door there,

DONALD HEISLER - Cross

1   correct?

2   A   Yes.

3   Q   You see Mr. Basciano in the white tank top.  Is that him?

4   A   Yes.

5   Q   Do you see inmate Shields?

6   A   Yes.

7   Q   What's he doing?

8   A   Dips.

9   Q   Is there a dip bar back there?

10   A   Yes, ma'am.

11   Q   All right.  Everything okay so far?

12   A   Yes.

13   Q   All right.  You're not doing any kind of exercise.  Is that

14   because you're in pain?

15   A   I'm talking.

16   Q   Is that something that you do during inside recreation time

17   generally, that you'd work out?

18   A   Yes -- no.  I don't work out.

19   Q   You don't do that?  Okay.

20   A   No.

21   Q   What's going on now?  You're still at the door?

22   A   Yes, ma'am.

23   Q   Inmates Basciano and Shields are still back by the dip bar.

24   Is inmate Shields pointing at you?

25   A   Yes.

DONALD HEISLER - Cross

1   *Q*   And you're turning towards him?

2   *A*   Yes.

3   *Q*   Are you saying anything to him then?

4   *A*   I think at that time -- yeah.  That's when I told him I'd

5   break his jaw if he said something else to me.

6   *Q*   Okay.  He's running up the stairs.  Inmate Basciano pulls

7   you down?

8   *A*   Yes.

9   *Q*   And then Officer Hill comes out.  Do you see him back

10  there?

11  *A*   Yes.

12          *MS. SPENCER:*  We can stop that for a second.

13  Q  (By Ms. Spencer)  Inmate Basciano reminded you you're in the

14  step-down unit, man.  You want to program out, didn't he?

15  *A*   He just told me to think of my daughter.

16  *Q*   I'm sorry.  He told you to think of your daughter?

17  *A*   He told me to think of my daughter before I went up the

18  steps.

19  *Q*   As a way to stop you?

20  *A*   Right.

21  *Q*   To think about the bigger picture?

22  *A*   Yes.

23  *Q*   The step-down at ADX is the one way to get out of ADX,

24  correct?

25  *A*   Yes.

DONALD HEISLER - Cross

1   Q   It is not a general population unit where you don't have

2   contact with other inmates.  This is your opportunity in J unit

3   to prove to staff that you're capable of going back to a USP,

4   correct?

5   A   Yes.

6   Q   That you are the type of inmate who can be trusted to go

7   back into a United States Penitentiary, correct?

8   A   Yes.

9   Q   That has a yard, what they call a yard, so you can mix and

10  mingle with other inmates, correct?

11  A   Yes.

12  Q   That's the goal?

13  A   Yes.

14  Q   Correct?

15  A   Yes.

16  Q   Inmate Basciano grabbing you there, he could have subjected

17  himself to going to segregation and getting thrown out of

18  step-down, correct, because he's laying hands on you?

19  A   Yeah -- no.

20  Q   But he could have --

21  A   Well, I guess they could find a reason to send him back for

22  that, yes.

23  Q   But, in fact, you know inmate Basciano has stepped down and

24  out of ADX, correct?

25  A   Yes.

DONALD HEISLER – Cross

1    *Q*   You know he's at USP Big Sandy?

2    *A*   Yes.

3    *Q*   He left in 2016?

4    *A*   Yes.

5    *Q*   He was successful in programming out.  All right.  So he

6    calms you down.  He says remember, think of your daughter,

7    correct?

8    *A*   Yes.

9    *Q*   Now, we have Officer Hill who is there and he's asking you

10   what's going on?

11   *A*   Actually, when that was going on I never seen an officer

12   there.

13   *Q*   You weren't focusing on that?

14   *A*   I wasn't focusing at all.

15        *MS. SPENCER:*  Let's play the tape a little bit more.

16   That's 8:10:08, :09.  Is that your water bottle you grabbed

17   there.

18   *A*   Yes.

19   Q   (By Ms. Spencer)  Taking a drink.  Were you talking to

20   Officer Hill there?

21   *A*   I think he asked what's going on, and I told him there's no

22   problem.

23   *Q*   It's almost 8:11.  You are downstairs.  Inmate Shields is

24   upstairs now, correct?

25   *A*   Yes.

280

DONALD HEISLER - Cross

1   *Q*   I want to show you a clip.  This is 3D.  This is a

2   different camera angle.  We'll get you oriented to that and

3   pull that up.  So now it's 8:12:31.  You see yourself heading

4   upstairs?

5   *A*   Yes.

6   *Q*   Looks like you had a little more hair?

7   *A*   Right.

8   *Q*   All right.  This is the front of the range, correct?

9   *A*   Yes.

10  *Q*   You're talking to inmate Shields here, correct?

11  *A*   Yes.

12  *Q*   This ice pick that you mentioned, is that in your hand?

13  *A*   No.

14  *Q*   This is where you testified you wanted to go to the back

15  range to talk.  Is that where you indicated you're heading back

16  there?

17  *A*   Yes.

18  *Q*   We'll switch our angle to 3C which puts us in the back of

19  unit you just talked about.  Now we can see you coming back to

20  the back of the unit, correct?

21  *A*   Yes.

22  *Q*   Okay.  Now you come back.  It's 8:13:30, about three and a

23  half minutes after you've been downstairs.  Now you're up here

24  talking?

25  *A*   Yes.

DONALD HEISLER - Cross

1    *Q*   With inmate Shields.  There's other inmates upstairs as

2    well.  We see Shyrock coming down to the end back there,

3    correct?

4    *A*   Correct.

5    *Q*   Basciano is on his way from the front to the back of the

6    range coming down?

7    *A*   Yes.

8    *Q*   It looks like two African-American inmates who were

9    standing there as well?

10   *A*   One African-American and one white inmate.

11   *Q*   Okay.  Thank you.  So color is hard to tell.  There's six

12   inmates on the upper tier at this point, correct?

13   *A*   Right.

14   *Q*   You guys are still talking.  Are you aware there's a camera

15   right behind you?

16   *A*   Yes.  But you kind of forget about it.

17   *Q*   Okay.  We'll show you 3D again.  8:20.  So if we stop

18   there, we can see you at the back of the unit talking.  It's

19   8:20 now.  You've been back there about seven minutes talking,

20   correct?  Do you remember the times?

21   *A*   I don't remember the time.  It didn't seem that long.

22   *Q*   If I represent to you and show you the tape --

23   *A*   Okay.  Yes.

24   *Q*   8:20.  You're still back there talking.  Now, you're coming

25   back to the front of the unit with inmate Shields, correct?

DONALD HEISLER - Cross

1   A    Correct.

2   Q    Nothing going on?

3   A    That's when they told us to lock down, the officers.

4   Q    Okay.  But you don't go to lockdown.  You come to the front

5   to talk to the officers, correct?

6   A    Correct.

7   Q    Are you telling them everything's good, everything's good,

8   no issues?

9   A    I'm telling you that there's no problems, everything is all

10  right.

11  Q    Potentially, if they believe you that there's no problem,

12  you might not get moved to segregation?

13  A    Well, it wasn't guaranteed we were going to go to begin

14  with.

15  Q    Right.

16  A    I was just letting him know -- when you say "lockdown," I

17  kind of knew we were going to segregation.  I knew that.  I've

18  been to that program many times.

19  Q    Into step-down and back out?

20  A    Yes.  I've been in ADX for 15 years.

21  Q    So you know the protocol?

22  A    Yes.

23  Q    So you know, I'm going to get taken out of the unit?

24  A    Right.

25  Q    That's what's going to happen here?

283

DONALD HEISLER - Cross

1    A   Right.

2    Q   You know so is inmate Shields going to get taken out, too?

3    A   Correct.

4    Q   How about inmate Basciano?  Are you concerned he might get

5    taken out for his role in this?

6    A   Yes.  I told that to Mr. Thompson in my interview, that

7    Basciano had absolutely nothing to do with it.

8    Q   Once this recreation is over, you said the inmates are

9    coming up because they're going to lockdown.  You're still on

10   range.  You will go to lockdown when it's time for your cell

11   door to open, correct?

12   A   Yes.

13          MS. SPENCER:  We'll stop the tape.

14   Q   (By Ms. Spencer)  Once that happens when you're locked back

15   in your cell and you're locked down, that means you have no

16   access to any other inmate at that time, correct?

17   A   Correct.

18   Q   If you're going to get moved to segregation, you won't be

19   part of the recreation in the step-down unit, correct?

20   A   Correct.

21   Q   After some time you know SIS comes down to the unit,

22   correct?

23   A   Yes.

24   Q   And that's kind of a loud thing.  You hear all these staff

25   members coming into the unit?

DONALD HEISLER - Cross

1  *A*   Yeah.  After I locked down, they came and got me about five

2  or ten minutes later.

3  *Q*   So pretty quick into it.  But before you went into your

4  cell, you stopped by the defendant's cell, and you just

5  testified that you told him, because you have all this

6  knowledge, You're going to be locked into segregation.  We're

7  going to be locked into segregation.  I'm sorry for messing up

8  the program for you, meaning he's going to be kicked out of the

9  step-down unit?

10  *A*   Right.

11  *Q*   Get rid of what you have, meaning contraband?

12  *A*   Anything.

13  *Q*   And one of the ways of doing that would be to flush it down

14  the toilet?

15  *A*   Flush it down, yes, or throw it away.  That's anything,

16  extra clothing, extra food, anything.  Anything over the

17  limits.

18  *Q*   How about secreting something in a body cavity?

19  *A*   I haven't done that.

20  *Q*   You've never done that?

21  *A*   I don't do that, no.

22  *Q*   But you know of inmates who do?

23  *A*   I haven't seen it done.  I've heard of it done.  I've never

24  seen it.

25  *Q*   Okay.  That's not something you particularly practice in,

DONALD HEISLER - Cross

1    but you've heard it being done?

2    A    No.

3    Q    Why do you laugh?

4    A    Because that's why I don't do it.  I just don't do it.

5    Q    Kind of distasteful?

6    A    Kind of, yes.

7    Q    So you tell him, get rid of what you have and I'm sorry for

8    messing up the program because that means when you've been

9    thrown out of the step-down unit, you're stepping backwards

10   from that opportunity to leave the ADX, you start over?

11   A    If you get removed from the program for any reason, it's a

12   minimum of 12 months before you could be considered to go back

13   over there.

14        For some inmates, they get kicked out of the program

15   and they haven't been in back in 10 or 12 years.

16   Q    So it's back to square one if you get thrown out of the

17   step-down unit?

18   A    Yes.

19   Q    Okay.  So you said SIS comes to take you out of your cells.

20   So you knew that was going to be happening?

21   A    Yes.

22   Q    Do they give you an opportunity to pack up your stuff and

23   put it in a backpack and take it with you?

24   A    No, ma'am.

25   Q    So the staff actually moves your belongings from your cell

DONALD HEISLER - Cross

1   into segregated housing?

2   A   I don't know the process.  Yeah.  The COs, they pack your

3   property up.  They inventory everything.

4   Q   Okay.  You don't do that?

5   A   No.

6   Q   You don't get to say, "make sure you pack my valuables in

7   these boxes" like you do with a mover?

8   A   No.

9   Q   It happens for you?

10  A   Right.

11  Q   You are in segregated housing.  They bring your stuff you

12  to?

13  A   Right.

14  Q   Okay.  Now, when they take you out of the cell when we're

15  back in J unit and you get taken out of your cell, they pat you

16  down?

17  A   Yes.

18  Q   Okay.  And what does that mean for you?  What's a patdown?

19  A   In ADX we're handcuffed whenever we're around officers.  So

20  I'm handcuffed from behind.  With their hands, they tightly go

21  over your body from head to foot.

22  Q   Okay.  Feeling for any contraband, any weapons, that sort

23  of thing?

24  A   Yes.  Usually wand you with a metal detector.

25  Q   Did you get wanded on March 18, 2015?

DONALD HEISLER - Cross

1    A    I think my shoes did.  I'm not positive.

2    Q    Okay.  Is that something that's happened to you so often

3    you can't really distinguish?

4    A    That's daily.

5    Q    Okay.  So maybe, maybe not on March 18?

6    A    Yes.

7    Q    They take you after the patdown and possible metal

8    detection to the interview room to talk with SIS Technician

9    Thompson, correct?

10   A    Yes.

11   Q    You're in there about ten minutes?

12   A    Yes.

13   Q    Then they take you out and take you to the SHU?

14   A    Yes.

15   Q    Okay.  When you're on the move, you're out of the interview

16   room.  You're out of your cell.  Are there other inmates out on

17   J unit at that time?

18   A    When they moved me to segregation?

19   Q    Yes.

20   A    No.  The whole unit was locked down.

21   Q    That means everybody is in their cells?

22   A    Right.

23   Q    So no opportunity to have any interaction --

24   A    Well, there's always an opportunity.

25   Q    Verbal interaction.  In my mind, I'm thinking physical

DONALD HEISLER - Cross

1   interaction.  No physical interaction with any inmates?

2   A   Well, there's a possibility.  There's been several times

3   I've been in the step-down program in the past sitting at a

4   table and a whole other tier, all their doors open up.  These

5   are people you're separated from.

6   Q   I'm going to stop you there.  I'm talking about March 18,

7   2015, when you get moved.  Opportunity for physical interaction

8   with inmates?

9   A   With me?

10  Q   Yes.

11  A   No.

12  Q   Because they're locked down?

13  A   Yes.

14  Q   All right.  And none of these steps at this point are

15  surprising to you.  Nothing is outside of the protocol?

16  A   No.

17  Q   They take you down to Charlie unit, which is where the

18  segregated housing unit is, correct?

19  A   Yes.

20  Q   That involves going through the corridors of ADX, through

21  some bar doors to move you down?

22  A   Right.

23  Q   You're being escorted by at least two officers, correct?

24  A   Yes.

25  Q   One is holding on to you, the shackles behind your back?

DONALD HEISLER - Cross

1    A    Yes.

2    Q    Do have you a belly band like you do today?

3    A    No.  Just handcuffs.

4    Q    No shackles on your feet?

5    A    No.

6    Q    They take you to segregated housing.  Do they strip search

7    you there?

8    A    Yes.  They strip search you and x-ray your body.

9    Q    Let's talk about that.  First of all, the strip search.

10   They put you in a room.  Do you take your clothes off, or do

11   they take them off for you?

12   A    I take them off in front of them.

13   Q    You're in a room with the shackles off.  You take your

14   clothes off and they're watching through a window?

15   A    Right.

16   Q    And are they -- do they physically touch you as you have

17   your clothes off?

18   A    No.  Not unless they have to restrain you for some reason.

19   Otherwise, no.

20   Q    Put your clothes back on?

21   A    Yes.

22   Q    They secure you again and take you out of the strip-out

23   room, correct?

24   A    Yes.

25   Q    And you said they x-ray you, correct?

DONALD HEISLER - Cross

1    A    Correct.

2    Q    And if I say that the name of it is the SecurPASS

3    machine --

4    A    That's correct.

5    Q    Okay.  So they have you step up onto the machine and put

6    your feet onto the footprints on there?

7    A    Yes.

8    Q    Have you look at the dot by the footprints?

9    A    Right.

10   Q    And the machine actually moves you through and moves you

11   back; is that accurate?

12   A    Yes.

13   Q    You're still shackled hands behind your back?

14   A    Yes.

15   Q    They SecurPASS you more than one time?

16   A    Yes.  Yeah.  They usually do because of the chains and

17   handcuffs or whatever you might have on.

18   Q    Because that's going to show up?

19   A    Right.

20   Q    Did they find anything hidden in a body cavity on you,

21   Mr. Heisler?

22   A    No.

23   Q    You said already that's not your thing?

24   A    Right.

25   Q    You don't do that.  Okay.  So then they actually intake you

DONALD HEISLER - Cross

1    into the segregated housing unit, correct?

2    A    Yes.  After that x-ray, they take you to a cell.

3    Q    So you're escorted by the two guards, you're still

4    shackled, they take you down to your cell.  They have the

5    control unit open your door, you go in, correct?

6    A    Right.

7    Q    Then you back up so your hands are through the slot and

8    they can remove your shackles?

9    A    Right.

10   Q    So now you're unlocked in a cell?

11   A    Yes.

12   Q    You are now physically removed from having any contact with

13   any other inmate?

14   A    Correct.

15   Q    Then you said when Mr. Hutt was questioning you that weeks

16   later when you were in the SHU you were thinking over your

17   behavior on March 18, 2015, correct?

18   A    Yes.

19   Q    So you were still in segregated housing at least several

20   weeks later?

21   A    Couple months.

22   Q    A couple months in segregated housing?

23   A    Yes.

24   Q    No opportunity for physical contact with any other inmates

25   during that time, correct?

DONALD HEISLER - Cross

1   A   Right.

2   Q   Do you recall on March 18, 2015, when they actually brought

3   your property from J unit down to you in segregated housing?

4   A   I got my property approximately two weeks later because

5   they mixed my property and Mr. Shields' property together.

6   Q   How do you know that?

7   A   Because they told us that.  When they brought him his

8   property, he had stuff of mine, my sweat pants and headphones.

9   I had stuff of his like artwork, patterns, commissary.  So we

10  had to give them to the officer.  I had to tell them, hey, this

11  belongs to Shields and he had to send my stuff back to me.

12  Q   Mr. Hutt asked you if he had spoken with you before today;

13  is that correct?

14  A   Yes.

15  Q   He came and spoke to you over the lunch hour here in the

16  courthouse, correct?

17  A   Yes.

18  Q   So he talked to you before being in the courtroom in front

19  of the jury under oath, correct?

20  A   Yeah.  He told me I was going to be in court.

21  Q   You said this morning when they came to get you, you had no

22  idea they were coming to get you?

23  A   None.

24  Q   Isn't it accurate that some officers had told you last week

25  that you'd been writted, and you were going to be moved this

DONALD HEISLER - Cross

1  week to come up?

2  A   No, not at all.

3  Q   If some officers testify to that, you're saying that's not

4  correct?

5  A   I'm saying they're lying.

6  Q   And that you didn't have a negative reaction; that you were

7  upset because you didn't know anything about the writ to bring

8  you up here?

9  A   No, ma'am.

10  Q   Okay.  On March 18, 2015, did you actually lay your hands

11  on inmate Shields in any aggressive manner?

12  A   No.

13  Q   Did you threaten him face-to-face with any kind of weapon?

14  A   No.  If he brought one to me, I was just going to take his.

15  Q   Okay.  You said -- you testified when you and inmate

16  Shields were together in the upper tier as we saw in the

17  tapes -- I think this is when you were walking to the back of

18  the range -- that inmate Shields said to you, "I thought we

19  were better than that"?

20  A   Correct.

21  Q   Meaning the relationship between the two of you, there

22  wasn't that sort of anger thing going on between the two of

23  you?

24  A   Because I've never been aggressive toward him.  I wasn't

25  aggressive to anybody on my tier prior to that day.

DONALD HEISLER - Cross

1  Q   All right.  When you were in your cell in J unit when you

2  got locked down as you describe it to the jury, were you a

3  danger to any other inmate, physical danger?

4  A   No.

5  Q   When you were moved into segregation, were you a physical

6  danger to any other inmate?

7  A   No, ma'am.

8  Q   And your recollection today is you were in the segregated

9  housing unit for months, correct?

10 A   Approximately, two months.  Month and a half or so, two

11 months, yes.

12 Q   Any threat then to any inmate in that two-month period?

13 A   Excuse me?

14 Q   Any threat to any other inmate --

15 A   No.

16 Q   -- physical threat.  Okay.

17         MS. SPENCER:  May I have a moment, Your Honor?

18         THE COURT:  You may.  Thank you, Counsel.

19     (Pause in proceedings.)

20         MS. SPENCER:  Thank you, Mr. Heisler, for your time.

21 Pass the witness.

22         THE COURT:  Redirect examination on behalf of

23 Mr. Shields, Mr. Hutt.

24         MR. HUTT:  Yes, please.  Thank you, Your Honor.

25         THE COURT:  You're welcome.

DONALD HEISLER - Redirect

1                          **REDIRECT EXAMINATION**

2    *BY MR. HUTT:*

3    *Q*   The last questions Ms. Spencer asked you, could you have

4    instantly become a threat if you lost it?

5    *A*   When I was on the tier with him, yes.

6    *Q*   Or at any time after that?

7    *A*   Oh, yeah.

8    *Q*   Is that character trait of yours gone down?  Do you just

9    never go off?

10   *A*   No.  I'm frustrated all the time.

11   *Q*   If I say the wrong thing to you, it can be very dangerous

12   to me; is that true?

13   *A*   Could be.

14   *Q*   Between the time that you grabbed it to charge up the

15   stairs after Mr. Shields and when you talked to him more calmly

16   in the upper tier, you put your ice pick away?

17   *A*   Yes.

18   *Q*   But you said something to Mr. Shields when the two of you

19   were back in the back talking about if he had something, right?

20   *A*   True.  Yes, yes.

21   *Q*   What did you say?

22   *A*   I told him -- what did I say to him?

23   *Q*   Yeah.

24   *A*   I told him if he pulled a knife, I was going to plant it in

25   his chest.

DONALD HEISLER - Redirect

1   *Q*   Now, you're telling us that you believed it was possible

2   that Mr. Shields posed a threat to you, right?

3   *A*   I mean, everybody in ADX can be a threat, but I didn't feel

4   threatened.

5   *Q*   After having that conversation and believing that he was

6   armed and going to your cell, you didn't press your distress

7   button to tell the officers about that?

8   *A*   Excuse me?

9   *Q*   There's a distress button in the cell, right?

10  *A*   Yes.  Yes.

11  *Q*   You didn't use it to say, you know, I think Shields may

12  have a knife --

13  *A*   No.  Definitely not.

14  *Q*   Why?

15  *A*   Because that would get me killed.  That would label me as a

16  rat.

17  *Q*   Is the same thing true for Mr. Shields?

18  *A*   Oh, definitely.

19  *Q*   Did you write a cop-out to the officers?

20  *A*   No, sir.

21  *Q*   Why not?

22  *A*   One, because it leaves a paper trail and, two, because with

23  those of us at ADX -- I been there 15 years.  The only way that

24  I'm aware of anything that goes on with other inmates or

25  anybody is because you hear officers talk.  Sometimes they'll

1    talk amongst themselves and forget you're even there.  So

2    that's a chance you take, if you drop a little note and kite

3    and tell on somebody, that's a chance you take.

4    *Q*   Ms. Spencer asked you about being interviewed by Officer

5    Thompson after this happened and asked if you told him, you

6    said to Mr. Shields, "Come back down here and I'll break your

7    jaw," right?

8    *A*   Yes.

9    *Q*   Do you remember that you also told Officer Thompson, quote,

10   "If Basciano hadn't stopped me, I would have killed Shields"?

11   *A*   Yes.

12   *Q*   Did you mean it when you said it?

13   *A*   Yes.

14   *Q*   "I would have broke his jaw and thrown him off the tier"?

15   *A*   Yes.

16        *MR. HUTT:*  No further questions.

17        *THE COURT:*  May Mr. Heisler be excused and released

18   from writ?  Any objection by Mr. Shields?

19        *MR. HUTT:*  No, Your Honor.

20        *THE COURT:*  Or by the Government?

21        *MS. SPENCER:*  No, Your Honor.

22        *THE COURT:*  Very well.  Mr. Heisler is now excused and

23   released from the writ of this Court.  Thank you.

24        Ladies and gentlemen of the jury, an opportune time to

25   stand and stretch.  We may be recessing shortly.  I need to

1          confer with counsel.

2                    Very well.  Thank you.  Again, please be seated.

3                    Mr. Shields may proceed.

4                    *MR. HUTT:*  May we approach, Your Honor?

5                    *THE COURT:*  Thank you.  You may.  Ladies and gentlemen

6          of the jury, please excuse us.

7             **(At the bench:)**

8                    *MR. BELLER:*  Your Honor, we're simply advising the

9          Court that it's our intention, at this point, to rest.

10                   *THE COURT:*  Pardon me?

11                   *MR. BELLER:*  It is our intention to rest.

12                   *THE COURT:*  I assume that.  This is why I asked you

13         not to call your next witness but that you may proceed.  It's a

14         tip-off that I understand that you're probably going to

15         announce that you rest.

16                   *MR. BELLER:*  Very good.

17                   *MR. HUTT:*  We're slow, Judge, but getting better at

18         picking up the tips and are grateful.

19                   *MR. BELLER:*  Thank you, Judge.

20                   *THE COURT:*  You're welcome.  Thank you, Counsel.

21                   (In open court:)

22                   *THE COURT:*  Thank you for your patience and

23         indulgence.  I rehearse my continuing apology for inundating

24         you with so-called white noise.  It's an annoying noise.  We

25         also have pink noise.  There is no difference that I can

 1  discern between white and pink noise.

 2         Very well.  Counsel, Mr. Shields may proceed.

 3         *MR. BELLER:*  Thank you, Your Honor.  At this time, the

 4  defense rests.

 5         *THE COURT:*  Very well.  Does the Government seek leave

 6  of the Court to present rebuttal evidence?

 7         *MS. SPENCER:*  We do not, Your Honor.

 8         *THE COURT:*  It appears the evidence in the trial of

 9  this cause has, indeed, been presented.  I inquire to confirm.

10  Is the evidence complete from the perspective of the

11  Government?

12         *MS. SPENCER:*  We might need to go over the exhibit

13  list with the court reporter to make sure we're in sync.

14  Otherwise, I think we are.

15         *THE COURT:*  And Mr. Shields the same opportunity.

16         *MR. BELLER:*  We agree with the Government's position.

17         *THE COURT:*  Very well.

18         Ladies and gentlemen of the jury, the evidence in this

19  trial has been presented and, presumably, complete.  Once

20  again, it becomes necessary for Mr. Shields, counsel, and the

21  Court to consider post-evidentiary matters.  It will take us

22  the balance of the afternoon to transact and consummate that

23  important business.  Thus, I'm going to place you now in a

24  state of recess until tomorrow morning at 8:30 a.m. as long as

25  that is not unreasonable or inconvenient.

1          In preparation for this overnight recess, two things.

2   Please store and leave behind your note-taking materials in

3   your suite.  Before you leave this afternoon, once again,

4   please take the reasonable time necessary to read and heed

5   those critically important rules that especially now govern you

6   as jurors in this particular trial.

7          I'm going to ask that you report for further duty and

8   service in this case tomorrow morning at 8:30 a.m., but I

9   inquire.  Will that be unreasonable or terribly inconvenient

10  for any one or more of you?  Presumably not.

11         Ladies and gentlemen of the jury, as concerns you, you

12  are in recess concerning this trial until tomorrow at 8:30 a.m.

13         Good afternoon.

14         All rise pending the exit of this jury.

15     (Jury out at 3:41 p.m.)

16         *THE COURT:*  Thank you.  Please be seated.

17         We again resume on the record in open court operating,

18  for now, intentionally outside the presence and hearing of the

19  jury, which is in recess until tomorrow at 8:30 a.m.

20         Counsel, after the Court, in deference to its staff,

21  takes a 15-minute recess, we will convene on the record for two

22  important purposes.  First, to conduct post-evidentiary

23  proceedings, during which the Court will receive and react to

24  any appropriate motions, petitions, or requests.  Second,

25  thereafter, to conduct its first formal charging conference.

1        During the recess, the Court will make available to

2   counsel for the Government and Mr. Shields its proposed jury

3   instructions and verdict form.

4        Very well.  We are in recess for approximately 15

5   minutes.

6        Madam Clerk.

7     (Recess taken from 3:45 p.m. to 4:08 p.m.)

8        *THE COURT:*  Thank you.  Again, please be seated.

9        Thank you.  Again, we proceed on the record in open

10  court operating deliberately outside the presence and hearing

11  of the jury, which is in recess until tomorrow at 8:30 a.m.

12       We convene as constituted, first, to conduct

13  post-evidentiary proceedings.  Thus, at this time the Court

14  will entertain and resolve, to the extent necessary, any

15  post-evidentiary motions, petitions, or requests.  Are there

16  any such matters by the Government?

17       *MS. SPENCER:*  None, Your Honor.

18       *THE COURT:*  Or by Mr. Shields?

19       *MR. HUTT:*  Yes, Your Honor.  Again, for judgment of

20  acquittal, at the close of all the evidence, again applying the

21  appropriate standard.

22       *THE COURT:*  Again, thank you.  Response, if any, by

23  the Government.

24       *MS. SPENCER:*  Incorporating my previous argument,

25  including the elements and the evidence which I believe

1   satisfies those, I don't believe that the testimony of inmate

2   Heisler, the only defense witness, has moved that needle

3   anywhere such that the Court should grant a motion to acquit at

4   this point.

5            THE COURT:  I presume no reply.  I inquire to confirm.

6            MR. HUTT:  Thank you, Your Honor.  No.

7            THE COURT:  Thank you.

8            Now that the evidence has been presented by both the

9   Government and Mr. Shields and both parties have rested, during

10  these post-evidentiary proceedings the defendant moves orally

11  implicating Rule 29(a) for judgment of acquittal; again, having

12  reviewed and considered all relevant evidence adduced at trial,

13  both direct and circumstantial as a whole but no longer in a

14  light most favorable to the Government.

15           Nevertheless, I find and conclude that the evidence

16  remains adequate, substantial, and sufficient to support a

17  conclusion by a reasonable juror that Mr. Shields is guilty

18  beyond a reasonable doubt of the crime of possessing contraband

19  in prison with which he is charged in Count 1 of the

20  indictment.

21           Therefore, it is ordered that the defendant's oral

22  post-evidentiary motion for judgment of acquittal under Rule

23  29(a) is respectfully denied.

24           Petitions, requests, or other motions by Mr. Shields.

25           MR. HUTT:  None, Your Honor.

1          *THE COURT:*  Thank you.  Let's commence a formal

2     charging, or jury instruction, conference.  During the last

3     recess, courtesy of my staff, the Court provided counsel for

4     the Government and the defendant with the Court's proposed jury

5     instructions and verdict form.

6          We will first consider the Court's instructions one by

7     one, after which the Court will entertain any properly filed

8     and presented instructions by the parties.

9          As to each instruction, beginning with instruction

10    No. 1, I will ask if there are objections.  You may remain

11    seated to indicate either yes or no.  Thereafter, to the extent

12    you are heard by way of objection, response, or reply, I ask

13    that you stand to address the Court, please.

14         Directing your attention to instruction No. 1, any

15    objection by the Government?

16         *MS. SPENCER:*  No, Your Honor.

17         *THE COURT:*  Or Mr. Shields?

18         *MR. HUTT:*  No, Your Honor.

19         *THE COURT:*  Instruction No. 1 approved.

20         Instruction No. 2, any objection by the Government?

21         *MS. SPENCER:*  No, Your Honor.

22         *THE COURT:*  Or by Mr. Shields?

23         *MR. HUTT:*  No, Your Honor.

24         *THE COURT:*  Instruction No. 2 approved.

25         Instruction No. 3, any objection by the Government?

 1            *MS. SPENCER:*  No, Your Honor.

 2            *THE COURT:*  Or by Mr. Shields?

 3            *MR. HUTT:*  I'm moving a little more slowly, Your

 4    Honor.  Could I have just a moment?

 5         (Pause in proceedings.)

 6            *MR. HUTT:*  No objection.

 7            *THE COURT:*  Instruction No. 3 approved.

 8            Instruction No. 4, any objection by the Government?

 9            *MS. SPENCER:*  No, Your Honor.

10            *THE COURT:*  Objection by Mr. Shields?

11            *MR. HUTT:*  No.

12            *THE COURT:*  Instruction No. 4 approved.

13            Instruction No. 5, any objection by the Government?

14            *MS. SPENCER:*  No, Your Honor.

15            *THE COURT:*  Or Mr. Shields?

16            *MR. HUTT:*  No, Your Honor.

17            *THE COURT:*  Instruction No. 5 approved.

18            Instruction No. 6, any objection by the Government?

19            *MS. SPENCER:*  Yes, Your Honor.

20            *THE COURT:*  Any objection by Mr. Shields?

21            *MR. HUTT:*  No, Your Honor.

22            *THE COURT:*  The objection by the Government.

23            *MS. SPENCER:*  Your Honor, the concern the Government

24    has is with the definition of the term "prohibited object."  We

25    have indicted Mr. Shields specifically under 1791(a)(2) and, as

1    listed, (b)(3) and (d)(1)(B).

2          Now, the things that are important about that is for

3    definition of prohibited object is the weapon other than a

4    firearm or destructive device or an object that is designed or

5    intended to be used as a weapon.  That can be found in the

6    definitions under (d)(1)(B) as noted in the indictment as

7    defined there.

8          What's been included in the definition or any other

9    object that threatens the order, discipline, or security of a

10   prison or life, health, or safety of an individual is to be

11   found under (d)(1)(G).

12         Now, when you refer to (d)(1)(G), and you look at the

13   penalties under 1791(b)(5), that is -- those are the

14   concomitant ones.  So by including the definition of any other

15   object that threatens the order, et cetera, found under (G),

16   we're including a misdemeanor offense.

17         We're not asking for any lesser at this point, and the

18   verdict form doesn't include that.  We do object that that

19   changes the calculus.  If the jury comes back guilty, then we

20   don't know which one they're finding on, whether it's the

21   felony or the misdemeanor.

22              *THE COURT:*  Thank you.

23         The position of Mr. Shields, please.

24              *MR. HUTT:*  The instruction No. 6 reads accurately and

25   instructs the jury as to the elements of the offense.

1          *THE COURT:*  Thank you.  The Government has the better

2     of this.  The Government, indeed, has charged this as a

3     prohibited object, meaning a weapon other than a firearm or

4     destructive device.

5          So that we could have this debate in open court, I

6     included the language also preferred by Mr. Shields.  I've now

7     considered it carefully and, again, I sustain the objection of

8     the Government.  Therefore, by redaction by excision in the

9     paragraph beginning, the term "prohibited object," I will

10    strike all of the language following "destructive device."

11    Once redacted, instruction No. 6 is approved.

12          *MS. SPENCER:*  Your Honor.

13          *THE COURT:*  Yes.

14          *MS. SPENCER:*  You said strike after "destructive

15    device."  It should include the rest of that clause, "or an

16    object that is designed or intended to be used as a weapon."

17    That's the specific language.  We'd ask for the whole thing to

18    be included.

19          *THE COURT:*  You are so right.  I have misspoken.  I

20    meant to say I will strike by redaction and excision all of the

21    language in the remaining two lines following the noun

22    "weapon."  Once redacted in that appropriate fashion,

23    instruction No. 6 is approved.

24          Instruction No. 7, any objection by the Government?

25          *MS. SPENCER:*  No, Your Honor.

1            *THE COURT:*  Or by Mr. Shields?

2            *MR. HUTT:*  No, Your Honor.

3            *THE COURT:*  Instruction No. 7 is approved.

4            Instruction No. 8, any objection by the Government?

5            *MS. SPENCER:*  No, Your Honor.

6            *THE COURT:*  Or by Mr. Shields?

7            *MR. HUTT:*  No, sir.

8            *THE COURT:*  Instruction No. 8 is approved.

9            Instruction No. 9, any objection by the Government?

10            *MS. SPENCER:*  No, Your Honor.

11            *THE COURT:*  Or by Mr. Shields?

12            *MR. HUTT:*  No, Your Honor.

13            *THE COURT:*  Instruction No. 9 is approved.

14            Instruction No. 10, any objection by the Government?

15            *MS. SPENCER:*  No, Your Honor.

16            *THE COURT:*  Or by Mr. Shields?

17            *MR. HUTT:*  No, Your Honor.

18            *THE COURT:*  Instruction No. 10 is approved.

19            Directing your attention to the Court's proposed

20   verdict form, any objection by the Government?

21            *MS. SPENCER:*  No, Your Honor.

22            *THE COURT:*  Any objection by Mr. Shields?

23            *MR. HUTT:*  Your Honor, with the understanding that we

24   have tendered to the Court a verdict form that would allow for

25   the jury to consider and rule on the lesser offense, which we

 1  have just discussed, just in terms of preserving that record,

 2  we would object to the verdict form.

 3          THE COURT:  Understood.  Response by the Government,

 4  if any?  Or the Government may stand on the record.

 5          MS. SPENCER:  We stand on the record at this point.

 6          THE COURT:  For now, the objection of the defendant is

 7  overruled.  The evidentiary record here is not sufficient for a

 8  reasonable juror to find the defendant guilty beyond a

 9  reasonable doubt of any lesser included offense.  Therefore,

10  the objection is overruled and, for now, the verdict form of

11  the Court is approved.

12          Does the Government have any additional instructions

13  or verdict form to tender?

14          MS. SPENCER:  We do not, Your Honor.

15          THE COURT:  Does Mr. Shields?

16          MR. HUTT:  Yes, Your Honor, as previously tendered.

17          THE COURT:  Well, let's review them discretely one by

18  one, if we may.  Let's do it this way.  I'm looking at the

19  defendant's competing and I'm looking at comp D01, evidence

20  direct and circumstantial inferences.  Does the defense persist

21  vis-a-vis this competing instruction?

22          MR. HUTT:  Yes, Your Honor, we do.

23          THE COURT:  Response by the Government?

24          MS. SPENCER:  We stipulated to the instructions by the

25  Court which incorporates direct and circumstantial in its

1   instructions.  We agree with the one the Court has given us to

2   review.  It is instruction 1.

3            *THE COURT:*  It is 1.  I overrule the objection of the

4   Government.  I approve comp D01, but I will incorporate that in

5   instruction No. 1 on page 3 of 4 following the second line

6   which ends "both direct and circumstantial."  Thereafter, I'll

7   include the two paragraphs that comprise comp D01 in

8   instruction No. 1.

9            Directing your attention to comp D02, "on or about," I

10  presume that the defendant does not persist vis-a-vis this

11  competing instruction because it is fairly included in an

12  instruction approved without objection by the Court, but I

13  inquire of Mr. Shields.

14           *MR. HUTT:*  You state it correctly, Your Honor.  We do

15  not.

16           *THE COURT:*  Thank you.  No further action with respect

17  to comp D02 is required.

18           Directing your attention to comp D03, "duty to

19  deliberate" and "verdict form."  I believe that is fairly

20  included in the Court's proposed instruction No. 10, which was

21  approved without objection.  Again, I inquire of Mr. Shields to

22  confirm.

23           *MR. HUTT:*  Again, you're correct, Your Honor.

24           *THE COURT:*  Thank you.  Thus, no further action

25  concerning comp D03 is required.

1              Directing your attention to comp D04 identified as

2    "knowingly," knowingly is defined in a stand-alone instruction

3    proposed by the Court which was approved without objection.

4    Thus, I presume that the defendant does not persist vis-a-vis

5    comp D04, but I inquire.  Does he or does he not, Mr. Hutt?

6              *MR. HUTT:*  Your Honor, this one we actually do persist

7    simply because it's more extensive and I believe more

8    informative to the jury than the piece that is in the Court's

9    proposed instruction.

10             *THE COURT:*  Response?

11             *MS. SPENCER:*  If I might have a moment.

12             *THE COURT:*  Comp D04 competes with instruction No. 7.

13             *MS. SPENCER:*  I see that, Your Honor.  We still stand

14   by our agreement with instruction No. 7.  The additional

15   language that defense is seeking to add, which is part of the

16   pattern, which is 1.37 of the pattern instructions, is the

17   "although knowledge on the part of the defendant."

18             There really aren't any facts to support that section.

19   I think it's really superfluous in this particular instance.

20             *THE COURT:*  Reply by Mr. Shields.

21             *MR. HUTT:*  None, sir.

22             *THE COURT:*  It is superfluous.  Thus, the Government's

23   objection to comp D04 is sustained.  The Court persists in

24   concluding that its instruction No. 7 approved without

25   objection is all that is required and necessary on this

1  evidentiary record.

2          Turning to nonstip D01 entitled "possessing contraband

3  in prison by a federal prisoner," I believe the position of

4  Mr. Shields is already of record in responding by objection to

5  the Government's suggestion that the elemental instruction of

6  the Court, No. 6, in which the Government convinced the Court

7  to redact by excision the language in the penultimate paragraph

8  on page 1 "or any other object that threatens the order,

9  discipline, or security of a prison or the life, health, or

10  safety of an individual."

11          Further argument on behalf of Mr. Shields?

12          *MR. HUTT:*  None, Your Honor.

13          *THE COURT:*  Further response on behalf of the

14  Government?

15          *MR. HUTT:*  No, Your Honor.

16          *THE COURT:*  Then the Court's findings, conclusions,

17  and rulings with respect to instruction No. 6 and the redaction

18  by excision of the language read into the record remains the

19  law of this case.  No further action with respect to nonstip

20  D01 is required.  Implicitly, of course, it is respectfully

21  rejected.

22          Directing your attention next to nonstip D02 entitled

23  "lesser included offense."  I presume the defendant persists

24  vis-a-vis this nonstipulated instruction; is that correct?

25          *MR. HUTT:*  It is.

1           THE COURT:  Additional argument in favor of this

2    instruction?

3           MR. HUTT:  No, sir.

4           THE COURT:  Additional response by the Government?

5           MS. SPENCER:  Your Honor, I have to confess I'm caught

6    out.  I don't have the nonstipulated instructions.  On our ECF

7    we didn't have any.  I don't know if they're e-mailed to the

8    Court.  I apologize.  We don't have it as an ECF as part of

9    document 99 as nonstipulated.  I may have totally missed the

10   attachments.

11          THE COURT:  Madam Clerk, very quickly can you print

12   them from your location?

13          COURTROOM DEPUTY CLERK:  Very quickly, sir.

14          THE COURT:  We'll be at ease for the printing of

15   nonstop D02, nonstip D03, and nonstip D04.

16      (Pause in proceedings.)

17          THE COURT:  Thank you, Madam Clerk.

18          MS. SPENCER:  Your Honor?

19          THE COURT:  Response by the Government.

20          MS. SPENCER:  Well, I had an opportunity to look at it

21   and look through the pattern instruction 1.33 which is

22   patterned on, to double my words.  I understand the law as it

23   talks about lesser included offenses.  I'm just trying to think

24   through whether or not this misdemeanor defense is subsumed

25   into the greater offense, that is.  I'm just trying to work

1  through that.  It's the difference in definitions of the

2  prohibited object being a weapon or being other than a weapon.

3          My inclination is to object to the instruction, and I

4  apologize.  I don't have any greater argument.  I am concerned

5  about these -- that it really is a lesser included or not.

6          *THE COURT:*  Reply by Mr. Shields.

7          *MR. HUTT:*  No, Your Honor.

8          *THE COURT:*  I have already concluded that the

9  evidentiary record is simply insufficient to support the giving

10  of a LIO, a lesser included instruction.  The reason is, is

11  from start to finish, both the Government and Mr. Shields has

12  characterized the putative and alleged prohibited object as a

13  weapon.  In fact, the entire putative affirmative defense of

14  necessity, justification, coercion, and duress by Mr. Shields

15  is predicated on him having a weapon to meet the imminent

16  threat of deadly forced administered by Mr. Heisler.

17          This jury has heard absolutely no evidence that would

18  lead it to believe that we are talking about anything other

19  than a weapon as a prohibited object.

20          Without that evidential support, giving of the

21  instruction would be error.  Again, the Court respectfully

22  rejects nonstip D02 titled "lesser included offense."

23          Directing your attention to nonstip D03, "unanimity of

24  theory."  Given the extant rulings of the Court, what is the

25  position of Mr. Shields vis-a-vis this nonstip D03 instruction?

1          MR. HUTT:  That, Your Honor, of course, it was

2   included with the others to be part of a package.  We're not

3   going to withdraw it.  We ask the Court to allow us to persist

4   for the record.

5          THE COURT:  Thank you.

6          Response for the record by the Government?

7          MS. SPENCER:  We agree.  It does not need it now.

8          THE COURT:  The Court concurs it is not necessary in

9   view of the Court's extant rulings of the Court.  Thus, the

10  Court respectfully rejects nonstip D03, the unanimity of theory

11  instruction.

12         Directing your attention finally to nonstip D04,

13  entitled "necessity," I presume the defendant persists

14  survigrously with respect to this proposed instruction.  I'll

15  receive any further argument by the defendant in support of

16  this necessity instruction.

17         MR. HUTT:  Thank you, Your Honor.

18         THE COURT:  You're welcome.

19         MR. HUTT:  I fear saying much would belabor the

20  obvious, and I expect that had the Court been persuaded as we

21  hoped the Court has been of the sufficiency of the evidence

22  provided to entitle Mr. Shields to the instruction, that the

23  Court would have included a necessity instruction in its

24  proposed instructions tendered to us.  As I am learning to try

25  and pick up on the Court's cues better, I'm going to assume

1    that the Court did not include it because the Court is not

2    persuaded by those facts.

3          Nonetheless, I feel obligated for Mr. Shields to point

4    several things out to the Court in my last best hope to

5    persuade Your Honor to allow Mr. Shields' case, in fact, to go

6    to the jury.

7          I know that the Court, prior to the start of trial,

8    did not have the benefit of having seen what I'm going to refer

9    to as the entire video recording which, of course, is only a

10   portion of the whole video recording that is available, but the

11   22, 23 minutes that we're talking about, which, among other

12   things, absolutely and completely corroborate the testimony

13   that Your Honor heard from Mr. Shields at the motions hearing

14   and that there was a long delay between when the event happened

15   and when the unit was locked down.

16         Mr. Shields' testimony, as I recall, is it was

17   something like 18 minutes.  Mr. Shields' memory to the Court on

18   that day in the hearing was remarkably correct.  The section

19   we've been given is 22 to 23 minutes long.  The chase by

20   Mr. Heisler, the armed chase we now know and which I, of

21   course, have been at pains to point out remains obvious from

22   very close review of the video, which the Court did not have

23   the benefit of, as well as Mr. Heisler's admission.  The armed

24   chase by Mr. Heisler of Mr. Shields very clearly present on

25   that video.

1          And then all the subsequent testimony about the

2    imminence of the threat and the fact the threat did not

3    dissipate, even up to and including the point of Mr. Heisler

4    going to Mr. Shields in his closed cell to make statements that

5    Mr. Heisler is clear Mr. Shields would have, could have, and

6    should have interpreted as a continuing threat.

7          I am afraid, Your Honor, that what we have learned in

8    this trial is the very disturbing truth from the quotation in

9    the case about we may as well withdraw in the perimeter and let

10   them fight it out because that is what we have heard and seen

11   over the course of the last few days.

12         Given the knowledge and understanding by these Bureau

13   of Prisons officials, that these inmates are armed, and,

14   nonetheless, persist in a policy that we're going to put them

15   together in a unit where we watch what they do and will not

16   invite, by policy, will not intervene when they threaten with

17   death, chase one another on the unit, knowing one another to be

18   armed.  That is the position Mr. Shields found himself in.

19         By operation of the law and the way that I read those

20   cases and the ways that are distinguishable and the ways they

21   are analogous, I make this last urge to the Court to give

22   Mr. Shields that necessity instruction and to allow us to argue

23   it to the jury in closing.

24         *THE COURT:*  Counsel, thank you.

25         Response by the Government.

1          *MS. SPENCER:*  Thank you, Your Honor.

2          *THE COURT:*  You're welcome.

3          *MS. SPENCER:*  The Government does object to nonstip

4   D04, the necessity instruction.  Anticipating that

5   instruction -- and apologies again for not having seen it -- we

6   filed in document 102 with the Court our arguments about the

7   necessity defense laying out carefully the law, including the

8   Tenth Circuit's test in going through the three traditional

9   common law requirements of the necessity defense.

10         We're helped by the Court's order, document 103, in

11  denying a writ for Mr. Vincent Basciano after a more fulsome

12  writ had been filed by the defense about why they needed him.

13         Specifically, the defense of necessity requires

14  imminent threat of death or serious bodily injury.  The Court

15  had previously found before that that had failed once

16  Mr. Shields was able to get away from Mr. Heisler.  There was

17  no longer an imminent threat.

18         If we look at the evidence now, Mr. Heisler contends

19  that he was intending to continue with the threats but

20  acknowledged, once he had been locked into his cell, there was

21  no ability to contact inmate Shields and, as he knew he was

22  moving to segregation, no ability to contact him physically

23  again.  So that imminent threat of death or serious bodily

24  injury has completely dissipated at the moment that inmate

25  Heisler is in the cell.

1          Imminence is narrowly conceived in the prison context.

2     Courts have declined to recognize the justification defense,

3     such as necessity, when an inmate says, well, I'm arming myself

4     in anticipation of a future attack.  We don't actually have an

5     inmate saying that.  We don't have evidence of that.  We have

6     argument about that.

7          Your Honor, I could go through the rest of the

8     elements, but I'll rely on the law we cited in document 102 and

9     rely on the Court's order once last summer when Mr. Dubois

10    tried to raise the necessity defense there and again the

11    Court's order here several times about the necessity defense.

12    Wringing of hands and decrying the situation at ADX does not

13    change the facts before this jury, and what this jury heard

14    about the incidents of March 18, 2015, when the defendant was

15    found in the segregated housing unit through a SecurPASS to be

16    in possession of a weapon in his rectum.

17               *THE COURT:*  Thank you.  Brief reply, if any, Mr. Hutt.

18               *MR. HUTT:*  No, Your Honor.

19               *THE COURT:*  Thank you.  Please indulge me momentarily

20    while I consummate my response.

21          Concerning tendered nonstip D04 titled "necessity," on

22    this record considered as a whole, I find and conclude as

23    follows:

24          The instruction is patterned after Tenth Circuit

25    pattern criminal jury instruction 1.36, coercion or duress,

1   which instruction I have considered carefully.

2         I also have considered the residual reasons stated,

3   arguments advanced, and authorities cited on this issue by both

4   parties and on the findings and conclusions on this issue by

5   the Court.

6         I continue to conclude ultimately that there simply is

7   not an adequate evidentiary basis for a reasonable juror to

8   conclude even by a preponderance of the evidence that

9   Mr. Shields possessed a weapon in ADX with justification and

10  necessity entitling him to a coercion or duress affirmative

11  defense instruction.

12        Defendant failed to prove when he armed himself; thus,

13  he has failed to prove that when any alleged well-rounded

14  apprehension of death or serious bodily injury to himself was

15  present, imminent and impending, that he was in possession of a

16  weapon.

17        Once Mr. Shields began his ascension of the stairs,

18  and Mr. Heisler was effectively restrained by another inmate,

19  Mr. Shields was no longer under an unlawful or present imminent

20  and impending threat of such a nature as to induce a

21  well-rounded apprehension of death or serious bodily injury to

22  himself.

23        Such an apprehension is belied by the videotape of the

24  relevant events, and the nature and extent of the peaceful

25  interaction between Mr. Heisler and Mr. Shields.  Mr. Shields

1  could certainly continue with a residual general apprehension
2  but not of imminent, not of an imminent threat of death or
3  serious bodily injury.

4        Thereafter, he was never again under an unlawful and
5  present imminent and impending threat of such a nature as to
6  induce a well-grounded apprehension of death or serious bodily
7  injury to himself.  Any threat thereafter was conditional
8  subject to the conduct and communication of Mr. Shields, which
9  condition never materialized.  At a minimum, any imminent
10  threat of death or injury ended when Mr. Heisler was locked
11  securely in his cell without any physical access to
12  Mr. Shields.

13        Additionally, Mr. Shields had reasonable legal
14  alternatives to violating the law.  Let's put aside for the
15  moment the danger that may have been associated with using the
16  distress signal.  There still remained the cop-out, the note,
17  and there still remained the opportunity for Mr. Shields in the
18  privacy of the SecurPASS area when no other prisoner was
19  present to have communicated his position clearly to Bureau of
20  Prisons officials.

21        Mr. Shields was not forced to possess the weapon that
22  he did.  But the coup de grâce for Mr. Shields is this.  Under
23  the law of necessity, in opinions announced by the United
24  States Supreme Court, the defendant must surrender the
25  prohibited object just as soon as the danger dissipates.  He

1   never did surrender that object voluntarily.  In fact, it

2   became sort of a game with him.  "Show me and I'll produce it."

3   Because he had an opportunity to surrender that object once the

4   threat was confined and dissipated but did not, then by

5   pronouncements of the United States Supreme Court he has no

6   claim to a necessity defense.

7          Therefore, I continue to sustain the objections of the

8   Government.  I continue to homologate the extant findings and

9   conclusions of the Court now as supplemented.  Therefore, I

10  respectfully reject defendant's nonstip DO4 entitled

11  "necessity."

12         Does the defendant have any additional instructions or

13  verdict form to tender or submit?

14         *MR. HUTT:*  No, Your Honor.

15         *THE COURT:*  Thank you.  During the charging conference

16  I approved certain instructions and the Court's verdict form to

17  which the parties stipulated or about which there was no

18  objection.  I also approved corrections and revisions brought

19  to the attention of the Court by way of objection and debate.

20  I considered and either sustained or overruled most of the

21  parties' objections to the Court's proposed instructions and

22  verdict form.  I have carefully considered the other

23  instructions tendered by the defense in this case and have

24  parsed them sequentially.  Having engaged in that ongoing and

25  comprehensive analysis, I find and conclude as follows:

1          That in their final form the proposed instructions and

2    verdict form of the Court as a whole accurately inform the jury

3    of the issues and governing law.

4          Additionally, those same instructions and verdict form

5    are supported by the evidence and they properly, plainly,

6    completely, and accurately instruct the jury on every issue

7    presented and preserved of record.

8          That in their final form, the proposed instructions

9    and verdict form of the Court accurately state the governing

10   law on this evidentiary record and provide the jury with an

11   accurate understanding of the relevant legal standards and

12   factual issues in this case.

13         Additionally, the proposed instructions as approved by

14   the Court and the verdict form as approved by the Court are not

15   repetitive, redundant, or superfluous and do not unduly

16   emphasize any single issue or evidentiary expert and do not

17   contain any improper or incomplete statements of the law.

18         The final instructions and verdict form of the Court

19   are not likely to confuse or distract the jury, nor are they

20   likely to unreasonably and unnecessarily extenuate or vitiate a

21   required statement of the law.

22         That the instructions and verdict form of the Court

23   are designed and organized to provide this jury with a complete

24   and coherent method by which to discharge their solemn duties

25   and oath in the trial of this case.

1          That concerning the proposed and tendered instructions

2     that I considered otherwise and rejected, I reiterate that I

3     approve, adopt, and incorporate the reasons stated, arguments

4     advanced, and authorities cited by the party opposing the

5     tendered instruction.

6          Therefore, it is ordered that the instructions of the

7     Court in their final form and the verdict form of the Court are

8     approved for inclusion in this Court's charge to the jury and

9     that all other proposed and tendered jury instructions are

10    respectfully rejected.

11         Done in open court effective forthwith.

12         Ordinarily, unless you request, I do not require the

13    reporter to make a verbatim record as I read the jury

14    instructions to the jury.  Does either party request or require

15    that the reporter make a verbatim record of those instructions

16    as they are read to the jury?  The Government?

17              *MS. SPENCER:*  No, Your Honor.

18              *THE COURT:*  Mr. Shields?

19              *MR. HUTT:*  We do make that request, Your Honor.

20              *THE COURT:*  Very well.

21         Then the court reporter shall make a verbatim record

22    as the Court reads the instructions to the jury.

23         I intend to provide copies of the final instructions

24    and the verdict form to each juror.  Any objection by the

25    Government?

1          *MS. SPENCER:*  No, Your Honor.

2          *THE COURT:*  Or by Mr. Shields?

3          *MR. HUTT:*  No, sir.

4          *THE COURT:*  I will continue that long-standing custom

5     and practice in this case.

6              Ordinarily, as I read the jury instructions or explain

7     the verdict form, I make those amendments and corrections which

8     may be necessary as a result of typographical, clerical,

9     syntactical, or other error.  Thereafter, I make the necessary

10    corrections and provide all parties in interest with a

11    corrected copy of any infected or affected instruction or the

12    verdict form.  May I continue that practice in the trial of

13    this case?

14         *MS. SPENCER:*  Yes, Your Honor.

15         *MR. HUTT:*  Yes, sir.

16         *THE COURT:*  So I shall.  Thank you.

17             Now, pursuant to the extant trial preparation

18    conference order, final argument for now has been limited to 45

19    minutes total per side.  Is that sufficient from the

20    perspective of the parties, hearing first from the Government?

21         *MS. SPENCER:*  It is, Your Honor.

22         *THE COURT:*  Hearing from the defense?

23         *MR. HUTT:*  Yes, Your Honor.

24         *THE COURT:*  We'll proceed on that basis.  Now, please

25    plan to keep your own time.  We'll provide you with a backup.

1    If I see that you're approaching the end of the allotted time

2    and you're not downshifting to get to park, I will, as quietly

3    and discreetly as possible, remind you of the limited time

4    remaining and respectfully request that you wrap it up in that

5    time.

6           Have you had an opportunity to confer with

7    Ms. Roberson concerning the availability of trial exhibits for

8    consideration by the jury?  The Government?

9           *MS. SPENCER:*  Yes, we have, Your Honor.

10          *THE COURT:*  The defense?

11          *MR. HUTT:*  No, Your Honor.

12          *COURTROOM DEPUTY CLERK:*  We will do that afterwards.

13          *THE COURT:*  Now, I have in mind this.  If the jury

14   requests to see the physical alleged weapons, I will allow them

15   to do that in the courtroom.  We will simply make those items

16   of evidence available to them on a clean bench, if you will.

17          They will not be permitted to touch those items for

18   obvious purposes.  And their review of those items of physical

19   evidence will not be superintended by any person.  Any

20   objection to the Court using that protocol in this case?  The

21   Government?

22          *MS. SPENCER:*  No, Your Honor.

23          *THE COURT:*  Mr. Hutt?

24          *MR. HUTT:*  No, Your Honor.

25          *THE COURT:*  Very well.  Is there further business to

1   come before the Court before we declare a recess until

2   8:30 a.m. tomorrow morning?  By the Government?

3          MS. SPENCER:  A point of clarification for closing

4   arguments.  Are the parties allowed to refer to the

5   instructions or have them on the Elmo, pull them up in some way

6   and go through them during argument?

7          THE COURT:  Yes.  Further business by Mr. Shields?

8          MR. HUTT:  May I inquire of the Court's practice?  You

9   told us what you were going to do with the physical evidence.

10  What about if the jury requests review of the video recording?

11         THE COURT:  We've already provided them with a clean

12  laptop and those items are in evidence.  They'll be made

13  available to the jury, and they can view them as they choose.

14         MR. HUTT:  Okay.  One of the reasons that I ask is

15  that the copies that -- the copy that has been provided to us

16  does not include -- or at least the way that we've been able to

17  figure out to play it does not include the realtime markings

18  that appear on the screen when the Government plays its copy of

19  those, and I'm curious whether or not those appear on the

20  computer that the jury will play them on.

21         Honestly, it's a point of curiosity.  The Court will

22  have noted that I, at the very beginning, made note to them

23  about I don't have realtime.  I only have a counter.  Quite

24  frankly, that's because I figured that's what they, the jurors,

25  were going to have.  It was only upon seeing the Government's

1    version of them in court that I ever learned that there was any

2    kind of realtime stamp on there.

3         Now, frankly, my guess is that that has something to

4    do with the software program that the recording is being played

5    back on when it's on my computer or my paralegal's computer as

6    opposed to the Government's computer.  Consequently, I'm

7    curious about the one that the jurors may be viewing.

8         THE COURT:  Well, I don't know.  Ultimately, I'm going

9    to make available to the jury those items in evidence that have

10   been admitted in evidence.

11        Madam Clerk, do you have an answer to the question?

12        COURTROOM DEPUTY CLERK:  Your Honor, I do not, not

13   having seen the disks that are included in the evidence book.

14        THE COURT:  Does the Government have an answer?

15        MS. SPENCER:  The exhibits that are in the exhibit

16   notebook going back to the jury are the disks that were shown

17   by my paralegal here.  Yes, it will be that version.  They will

18   see what we showed them.

19        THE COURT:  Well, the best I can do is matters have

20   been admitted in evidence.  Those items of evidence will be

21   made available to the jury.  Whether they are displayed as the

22   Government displayed them or the defense or in some other form

23   is not now relevant.

24        Further business by Mr. Shields?

25        MR. HUTT:  No, Your Honor.  Thank you very much.

 1          *THE COURT:*  Very well.  Please close the record in

 2   this case.  We are in recess until tomorrow at 8:30 a.m.

 3          Madam Clerk.

 4          (Court stood in recess at 5:03 p.m.)

 5                              **INDEX**

 6   **Item**                                                  **Page**

 7   WITNESSES

 8     JOSEPH HILL

 9          Cross-Examination By Mr. Beller                88

10          Redirect Examination By Ms. Spencer           108

11     AMY KELLEY

12          Direct Examination By Ms. Spencer             122

13          Cross-Examination By Mr. Hutt                 141

14          Redirect Examination By Ms. Spencer           154

15     TERRAL ANDERSON

16          Direct Examination By Mr. Cook                157

17          Cross-Examination By Mr. Beller               183

18          Redirect Examination By Mr. Cook              186

19     CHARLES ALVAREZ

20          Direct Examination By Mr. Cook                189

21          Cross-Examination By Mr. Hutt                 210

22     JAIME MUNOZ

23          Direct Examination By Mr. Cook                219

24          Cross-Examination By Mr. Hutt                 235

25

1    WITNESSES (Continued)

2        DONALD HEISLER

3            Direct Examination By Mr. Hutt                    253

4            Cross-Examination By Ms. Spencer                 270

5            Redirect Examination By Mr. Hutt                 295

6                         PLAINTIFF'S EXHIBITS

7    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

8    4-6              135                  139

9    7-10             164       164

10   11-12            171       172

11   13-15            176       176

12   16-23            225       225

13   24-25            233       233

14                        DEFENDANT'S EXHIBITS

15   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

16   7                243       243

17   8                237       238

18                         *  *  *  *  *

19                     **REPORTER'S CERTIFICATE**

20       I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above-entitled matter.   Dated

22   at Denver, Colorado, this 25th day of October, 2018.

23

24                                    _*S/Tracy Weir*_
                                        Tracy Weir

25