FILED
United States Court of Appeals
Tenth Circuit

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**May 20, 2019**

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

SHAWN SHIELDS,

      Defendant - Appellant.

No. 18-1364
(D.C. No. 1:15-CR-00200-REB-1)
(D. Colo.)

## ORDER AND JUDGMENT*

Before **BRISCOE**, **BALDOCK**, and **BACHARACH**, Circuit Judges.

A federal jury convicted Shawn Shields of possessing contraband in prison.
*See* 18 U.S.C. § 1791(a)(2). The district court sentenced him to thirty-seven months
in prison, and Shields appealed, claiming the district court erred by denying his
request to instruct the jury on the defense of necessity and refusing his request for
discovery related to that defense. Exercising jurisdiction under 28 U.S.C. § 1291, we
affirm Shields' conviction.

---

*After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

I

On March 18, 2015, Shields was involved in a verbal altercation with another inmate named Donald Heisler while confined at the United States Penitentiary – Administrative Maximum (ADX) in Florence, Colorado.  The incident was captured on video from several angles in the two-level unit.  *See, e.g.*, Supp. R., Ex. 3a (Lower Level East Camera); *id.*, Ex. 3d (Upper Level West Camera).  The videos depict both men on the lower level, with Shields standing beneath a staircase exchanging words with Heisler.  *Id.*, Ex. 3d at 00:38-00:51.  Shields walks swiftly under the staircase to the base of the stairs as Heisler either placed something on, or picked something up from, a nearby table.[1]  *Id.* at 00:52-00:53.  Another angle appears to show Heisler pick something up from the table and almost immediately place it back down.  *See id.*, Ex. 3a at 00:42-00:43.  Shields walked directly in front of Heisler and ran up the stairs as Heisler gave chase, making it some three or four steps before a third inmate, Vincent Basciano, grabbed Heisler and stopped him.  *Id.*, Ex. 3d at 00:53-00:59.  Heisler told Shields, "Come back down here[,] and I'll break your jaw."  R., Vol. 4 at 279-80, 302.  Basciano attempted to calm Heisler, telling him to think of his daughter.  Heisler then walked down the stairs, picked up a drink from the nearby table, and remained on the lower level of the unit.  Supp. R., Ex. 3d at 00:59-02:30.

---

[1] During the trial, Heisler testified on direct examination that he grabbed an ice pick—a 10 inch shank that he crafted from a dry dust mop—from the table.  *See* R., Vol. 4 at 261-62.  On cross-examination, however, Heisler testified that he did not threaten Shields with any kind of weapon and that "if [Shields] brought one to me, I was just going to take his."  *Id.* at 298.

Meanwhile, Shields, who by now was at the top level of the unit, went to the door of his cell, picked something up from the floor, and placed it in his waistband. *Id.* at 00:58-01:07. Shields and Heisler stayed on the different levels of the unit for more than a minute, until Heisler jogged up the stairs, approached Shields, and then turned and walked in the opposite direction, with Shields following him. *Id.* at 0:59-02:35. After several feet, the men stopped and exchanged more words until Heisler walked away again. *Id.* at 02:36-02:54. Once more, Shields followed, although this time, the two men walked next to one another to the far end of the unit, where they stopped and talked for several minutes. *Id.* at 02:55-07:11. At this point, while perhaps initially frustrated, they both soon appeared to be fairly calm and casual. *See id.*, Ex. 3c (Upper Level East Camera) at 03:09-07:15.

At trial, Officer Joseph Hill testified that he heard the initial commotion, went to see what was going on, and observed Basciano and Heisler on the stairs, with Basciano holding Heisler's leg.[2] The inmates told him, "Nothing's going on. Everything's okay," R., Vol. 4 at 63 (internal quotation marks omitted), but Hill ordered the prison's Special Investigative Services (SIS) to review the surveillance footage. Shields and Heisler insisted "they were both cool," *id.* at 80, but SIS locked down the unit. SIS then interviewed both men and transferred them to the Special Housing Unit (SHU), where there is no interaction between inmates and all inmates are subject to full-body x-ray scans via a SecurPass machine.

---

[2] Hill testified that he could not tell what Heisler had in his hands, but he was not concerned that Heisler had a weapon. R., Vol. 4 at 68-69.

Senior Officer Specialist Terral Anderson testified that he operated the SecurPass machine when Shields was admitted to SHU. He testified that only Shields and several other officers were present when Shields was processed. He indicated that he twice observed a metal object on Shields' body scans, and although Shields initially denied having any contraband, he eventually stated that if officers showed him the images, he would give it up.

Lieutenant Charles Alvarez, who was present after the first scan, escorted Shields to the SecurPass monitor and showed him the image. Upon seeing his scan, Shields responded, "Okay. You got me. Technology is a bitch nowadays. Just escort me to the holding tank there, and I'll give it to you[,] plus I don't want [Physician Assistant] Osagie's fat fingers in my ass." *Id.* at 206-07. Alvarez took Shields to a holding cell, where he observed Shields squat down and pull something out of his rectum. Shields placed the object in a bedpan and was escorted back to the SecurPass machine, where he was scanned for a fifth time. This time, the image was clear, reflecting no evidence of contraband.

SIS Officer Jaime Munoz testified that he took possession of the object recovered from Shields' rectum. Munoz stated that he unwrapped a plastic and cardboard sheath and discovered two pieces of metal, each sharpened to a point: one was four and one-half inches long; the other was one and one-half inches long. At no time during any of Shields' interactions with Munoz, Anderson, or Alvarez did Shields ever express that he had any safety concerns regarding Heisler. Alvarez testified that Shields offered no explanation at all for possessing the weapons.

4

After Shields was indicted, he sought discovery to prepare a necessity defense. The district court held a hearing and denied the request, ruling that the information Shields sought was immaterial because he was never under an imminent threat of harm as required in order to raise a necessity defense. Shields also sought a jury instruction on necessity, and although the court allowed him to put on evidence, it ultimately refused the instruction, ruling there was an insufficient evidentiary basis for a necessity instruction. Shields was convicted and now appeals.

II

Shields contends the district court erred in failing to instruct the jury on the defense of necessity and in denying his request for discovery related to that defense. We consider these contentions in turn.

*A.   Necessity Instruction*

"If supported by the evidence and the law, a criminal defendant is entitled to jury instructions concerning his theory of defense." *United States v. Butler*, 485 F.3d 569, 571 (10th Cir. 2007). But "[a] defendant is not entitled to an instruction which lacks a reasonable legal and factual basis." *United States v. Al-Rekabi*, 454 F.3d 1113, 1121 (10th Cir. 2006) (internal quotation marks omitted). "For the purposes of determining the sufficiency of the evidence to raise the jury issue, the testimony most favorable to the defendant should be accepted." *Id.* (internal quotation marks omitted). We review the denial of a necessity instruction for abuse of discretion. *See United States v. Dixon*, 901 F.3d 1170, 1176 & n.2 (10th Cir. 2018) (reviewing denial of duress instruction for abuse of discretion). "Under this standard, we will

5

reverse the district court only if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* (internal quotation marks omitted). "[W]hether there is sufficient evidence to constitute a triable issue of the defense is a question of law." *Id.* (brackets and internal quotation marks omitted).

When a defendant seeks to instruct the jury on the defense of necessity, he must show "(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm." *Al-Rekabi*, 454 F.3d at 1121 (internal quotation marks omitted). "The necessity exception should be strictly and parsimoniously applied." *Id.* at 1122. "To qualify for an instruction on an affirmative defense such as necessity a defendant must produce evidence of each element sufficient to warrant its consideration by the jury." *Id.*

Shields failed to satisfy any of the required elements. First, "the ability to contact law enforcement will generally constitute a reasonable alternative to illegal activity." *Dixon*, 901 F.3d at 1179 (brackets and internal quotation marks omitted). But Shields made no effort to contact or otherwise notify the prison guards of any threat. Instead, he told Officer Hill everything was "cool." Although Hill testified that there is no direct physical contact between guards and inmates at ADX unless the inmate is restrained, there was no physical impediment that prevented Shields from telling Hill about a threat. Moreover, Hill explained that he could have used his pepper spray if there was a security concern but there was no threat or danger posed to any inmate. Additionally, Hill testified that each cell has a duress button, which is

6

not a private means of communicating but it is available for medical emergencies and the like. Also, Hill testified that inmates can pass "cop-out" notes to guards at meal times, R., Vol. 4 at 57, or send a letter to the staff via the confidential mail. The availability of these options was corroborated by Alvarez and SIS Lieutenant Amy Kelley, who similarly testified that inmates can stop and speak to any staff member, write a cop-out note, hit the duress button, or directly express any safety concern to an SIS member. Shields failed to avail himself of any of these options.

Shields contends that these were not viable options because they would have left him labeled a snitch. He points out that the duress button is not private and that passing a note to the guards could be seen by other inmates. He also says he did not express any safety concerns during his SecurPass screening because he was never given the opportunity. And he contends that the lack of direct contact between inmates and guards at ADX required that he defend himself.

These allegations are unavailing. Initially, we reject Shield's sweeping assertion that lack of direct contact between guards and inmates at ADX justified his possession of weapons. *See United States v. Sahakian*, 453 F.3d 905, 909 (7th Cir. 2006) ("[P]risons are inherently dangerous places, [but] this perilous atmosphere, *per se*, does not justify the possession of a weapon."). Indeed, this argument would justify every inmate at ADX to possess a weapon. Although Shields cites Heisler's testimony that he walked with Shields to the far end of the unit so guards could not reach him with pepper spray *if* there was a physical altercation, he ignores Heisler's other testimony that he and Shields walked to the far end of the unit so guards could

see them talking and know there was no problem.  *See* R., Vol. 4 at 273-74.  And in

any event, "mere allegations that [law enforcement] would have been ineffective or

unwilling to protect [defendant] fall well short of satisfying a defendant's burden."

*Dixon*, 901 F.3d at 1179 (ellipsis and internal quotation marks omitted).

Additionally, if Shields truly faced an imminent threat, he should have said so,

either during his interview with SIS or during his processing into SHU, when only

prison guards were present.  On this score, we reject Shields' assertion that he could

not notify the prison guards for fear of being labeled a snitch.  *See United States v.*

*Bello*, 194 F.3d 18, 27 (1st Cir. 1999) (summarily rejecting snitch defense); *United*

*States v. Haynes*, 143 F.3d 1089, 1090-91 (7th Cir. 1998) (rejecting claim of

self-defense premised in part on fear of being labeled a snitch).  There was ample

testimony that inmates routinely use the food-tray slots of their cells to pass notes to

guards seeking medical care and other services.  Hill explained that other inmates

would not know whether an inmate was seeking such services or reporting a threat.

He also testified that prison mail is opened and read by SIS, reflecting another means

by which Shields could have contacted prison staff without alerting other inmates.

Given the options available to him, Shields was not entitled to a necessity instruction.

Although we need not consider the remaining elements for a necessity

instruction, *see Butler*, 485 F.3d at 572 n.2, Shields also fails to satisfy the second

element requiring an imminent threat of death or serious bodily injury.  In the prison

context, the element of imminence is construed narrowly.  *Sahakian*, 453 F.3d at 909.

The defendant must be "under an unlawful and present, imminent, and impending

threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury." *Butler*, 485 F.3d at 572 (brackets and internal quotation marks omitted).[3]  It is not enough that an inmate express some generalized fear of attack in the future; rather, he must show that "the threat was immediate and that there was no reasonable alternative to violating the law." *Sahakian*, 453 F.3d at 909 (internal quotation marks omitted); *see* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.1(d)(5) (3d ed. 2018) ("[T]he defense of necessity does not apply except in an emergency—when the threatened harm is immediate, the threatened disaster imminent.").  "[E]vidence of frequent violence in a prison—an inherently dangerous place inhabited by violent people—does not establish the kind of imminent threat required to support a necessity defense." *United States v. Feather*, 768 F.3d 735, 740 (7th Cir. 2014) (brackets, ellipsis, and internal quotation marks omitted).

Shields presented no evidence of an imminent danger.  The videos depict a verbal altercation in which Heisler attempted to chase Shields up the stairs until Basciano stopped him.  Although the evidence was inconclusive whether Heisler had a weapon at that time, any potential danger subsided once Heisler calmed down.  This is confirmed by Shields' own behavior:  when Heisler walked up the stairs to speak with him, Shields did not run away or defend himself; rather, he spoke to Heisler and repeatedly followed him around the unit.  He also told Hill everything was "cool,"

---

[3] Although Shields evaluates the imminence of a potential threat from his subjective perspective, we view the evidence objectively. *See, e.g., Butler*, 485 F.3d 574 ("Objectively considered, the duress or necessity, even if initially present, had lost its coercive force." (internal quotation marks omitted)).

and after SIS locked down the unit, he never told any prison official that Heisler might attempt to harm him.  "His acts are simply not consistent with an imminent threat." *Al-Rekabi*, 454 F.3d at 1125.

Additionally, the evidence does not establish when Shields came to possess the weapons, nor does he explain why he refused to surrender them.  "The justification of necessity lasts only as long as the circumstances giving rise to it." *Id.* at 1123. Although one video depicts Shields retrieve something from beneath his cell door after he ran up the stairs, it is not apparent whether he was retrieving the weapons, and it is entirely possible that he possessed them prior to the altercation.  Moreover, the evidence establishes that he surrendered the weapons only after he was confronted with his body scans revealing metal in his abdominal area.  Yet a necessity instruction requires "proof of abandonment of illegal conduct at the earliest possible opportunity." *Butler*, 485 F.3d at 573.

Nor can Shields establish the third element warranting a necessity instruction, which requires a direct, causal relationship between his possession of the weapons and the avoidance of harm.  He asserts arming himself enabled him to slow or stop an assailant, but this logic would justify virtually every inmate to possess a weapon. And in any event, we are not convinced that by concealing shanks in his rectum Shields was reasonably acting to thwart an imminent threat, if one had existed. Shields was not entitled to a necessity instruction.[4]

---

[4] Shields maintains that threats and apprehension can satisfy the element of imminence and that fear of being labeled a snitch can render unavailable the option

### B. Discovery

Shields also challenges the district court's denial of his discovery request for:

a. all Bureau of Prisons [BOP] policies, procedures, rules, memoranda, and regulations governing
   i. BOP personnel entering housing units, including SHU and Step-Down, in ADX Florence in response to disturbances in that unit;
   ii. assignment of prisoners to BOP facilities and to specific housing units within those facilities based on points assigned by BOP to prisoners;
   iii. the days and times prisoners may be out of their cells in all housing units at ADX Florence, including the SHU and Step-Down units; and
   iv. visits with prisoners by family and by legal counsel.

b. all BOP records pertaining to prisoner-on-prisoner threats and violence in the Step-Down unit at ADX Florence, said records to include information specifying whether there was criminal prosecution.

c. BOP records pertaining to Donald Heisler . . ., specifically records of threats and violence by Mr. Heisler, his methadone prescriptions, and his psychiatric and psychological records.

. . . .

g. those statistics showing the number of prisoners held in ADX Florence, and in the SHU and Step-Down unit, who have been (a) diagnosed with mental illness and/or (b) convicted of violent crimes.

R., Vol. 1 at 10-11.  Additionally, Shields sought to compel Basciano's testimony via

---

of contacting prison officials.  He relies on *United States v. Haney*, 287 F.3d 1266 (10th Cir. 2002), *vacated on reh'g*, 318 F.3d 1161 (10th Cir. 2003) (en banc), and *United States v. Francis*, 38 F. App'x 556 (10th Cir. 2002) (unpublished), but these cases are inapposite.  In neither case did we consider the evidentiary basis for a necessity instruction.  Rather, as indicated, *Haney* was vacated on rehearing, where we concluded the defendant waived a duress defense based on his status as a principal.  318 F.3d at 1163.  And in *Francis*, we simply recognized that the elements of duress are conjunctive and that failure to establish any one element precludes application of the defense.  38 F. App'x at 558-59.  We also determined there was no inconsistency between a jury's application of the duress defense to an attempted escape charge and the jury's refusal to apply the defense to a charge of possessing escape paraphernalia.  *Id.* at 559-60.  These cases do not advance Shields' cause.

writ of habeas corpus ad testificandum.

After a hearing, the district court denied the discovery request, reasoning that Shields failed to show he was operating under an imminent threat of danger and thus the information he sought was immaterial. The court also declined to compel Basciano's testimony, ruling in part that Shields failed to make a proffer to state how the testimony was relevant. After Shields made an additional proffer, the court affirmed its prior ruling, crediting his allegations but reasoning he still failed to show an imminent threat. We perceive no abuse of discretion. *See United States v. Apperson*, 441 F.3d 1162, 1191 (10th Cir. 2006) (standard of review for discovery ruling); *United States v. Reed*, 413 F.2d 338, 341 (10th Cir. 1969) (standard of review for denial of writ of habeas corpus ad testificandum). As we have explained, Shields was not in any imminent danger, rendering additional discovery or testimony related to a necessity defense immaterial. Further, much of the information Shields sought—information pertaining to BOP policies, inmate activity and housing assignments, and mental health or violent crime statistics of other inmates—was not relevant to a necessity defense. The district court therefore acted well within its discretion in denying Shields' requests.

III

The district court's judgment is affirmed.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

12

### UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT
### OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Elisabeth A. Shumaker<br>Clerk of Court | **May 20, 2019** | Chris Wolpert<br>Chief Deputy Clerk |

Mrs. Deborah Lynn Roden
Woodhouse Roden LLC
1912 Capitol Avenue, Suite 500
P.O. Box 1888
Cheyenne, WY 82001

**RE:     18-1364, United States v. Shields**
           Dist/Ag docket: 1:15-CR-00200-REB-1

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:      Marissa Rose Miller

EAS/lab